## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

**JOSHUA SOLE,**

    **Plaintiff,**

**v.**

**TYLER PERRY, TYLER PERRY STUDIOS, LLC, BRETT HENDRIX, and AND ACTION LLC**

    **Defendants.**

**CIVIL ACTION FILE NO.**

**1:15-CV-1700-LMM**

## DEFENDANT AND ACTION LLC'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant And Action LLC ("AA"), a local media production company, employed Plaintiff for a little over two months in a temporary, entry-level clerical position. Just before Plaintiff's work assignment was to end, he got high on his lunch break and returned to the campus of Tyler Perry Studios, LLC – the location where AA was filming. Still stoned, Plaintiff made his way into an executive office suite containing the personal offices of Tyler Perry, barricaded himself in a spare office, and refused to come out unless he was to allowed to speak with Mr. Perry.

Plaintiff refused multiple requests to vacate the office, and on-site security personnel became concerned that Plaintiff was a security threat. They called the

police.  The police arrived and instructed Plaintiff to leave the barricaded office, but he continued to refuse. Multiple officers were called to the scene, including a SWAT team, and they ultimately apprehended Plaintiff by forcing the door and having an officer access the office through the ceiling of an adjacent room.  The police arrested Plaintiff at gunpoint and took him to jail.  Not surprisingly, AA immediately terminated Plaintiff's employment after he engaged in this bizarre and frightening behavior.

Belatedly understanding the implications of his criminal conduct, Plaintiff opportunistically filed this lawsuit, attempting to justify his misdeeds and wrongly disparaging a co-worker he once treated as a close friend.  As described below, however, Plaintiff's claims have no merit. His claims were baseless the moment he filed them, and summary judgment should be entered on all counts.

## **FACTUAL BACKGROUND**

### I.    **The Parties.**[1]

#### A.    **And Action LLC, and its business.**

AA, Plaintiff's former employer, is a local company that produces films and television shows. Declaration of Ozzie Areu ("Areu Decl.") ¶2. AA hires,

---

[1] Plaintiff originally named Tyler Perry individually as a defendant, and asserted claims against him in his individual capacity.  Plaintiff never served Mr. Perry with process, however.  Because this case was filed over a year ago, any claims against Mr. Perry must be dismissed pursuant to Fed. R. Civ. P. 4(m).

supervises and compensates the personnel involved in creating the programs it produces. *Id.* at ¶10. AA contracts with defendant Tyler Perry Studios, LLC ("TPS") to use the TPS campus when AA wants to produce a show, and pays a fee to use the facilities. *Id.* at ¶9. While AA employees may have access to portions of the TPS campus while in production, they are not TPS employees, and TPS does not control their employment terms. *Id.* at ¶11.

### A.    Tyler Perry Studios, LLC, and its business.

TPS operates a media production facility in southwest Atlanta. *Id.* at ¶3. TPS's primary function is to oversee the operations of the TPS campus, which contains multiple buildings used to film movies and television shows. *Id.* at ¶4. Unlike AA, TPS does not produce media. *Id.* at ¶5. Its function is to manage the TPS property. *Id.* AA is a separate legal entity from TPS. *Id.* at ¶7. TPS does not own any of AA's membership units in whole or in part, or *vice versa*. *Id.* at ¶8.

### C.    Brett Hendrix.

AA formerly employed defendant Brett Hendrix. Hendrix worked as a Production Assistant ("PA") – the lowest entry-level position at the company. *Id.* at ¶14; Deposition of Brett Hendrix ("Hendrix Dep.") at 24:24-25:3. AA classified Hendrix as non-exempt for FLSA purposes and paid him $10.71 per hour (the same as it paid Plaintiff). Areu Decl., ¶15; Hendrix Dep. at 25:16-10; Pl. Dep. at

38:11-17. Hendrix assisted with AA's set decoration group. Declaration of Patrick Sheedy ("Sheedy Decl."), ¶6. Hendrix and other PAs working with that department (1) recorded AA's purchase of set decorations and props; (2) photographed set decorations and props; and (3) data-entered this information into spreadsheets so that AA would have a written and photographic record of its set decorations and could locate them for continuity purposes in the future. *Id.* at ¶3. These are all clerical and entry-level tasks requiring little or no prior experience and minimal training. *Id.* AA typically hires PAs for a particular show, so their employment usually lasts only 1-3 months. *Id.* at ¶4.

Hendrix was more experienced than most PAs, because he returned to work for AA on multiple shows. *Id.* at ¶7. Because Hendrix was a veteran PA, AA's Production Supervisor, Patrick Sheedy, began using him as a conduit for assigning tasks among the handful of PAs within the set decoration group. *Id.* at ¶8.[2] Sheedy would tell Hendrix what needed to be done and who should perform the required tasks, and Hendrix would relay those instructions to the group. Hendrix would also collect the group's work for Sheedy. Hendrix Dep. at 28:11-29:22, 46:13-22. Hendrix otherwise performed the same tasks as other PAs. Sheedy Decl. ¶8;

---

[2] When AA employed Plaintiff, four PAs were assigned to set decoration: Plaintiff, Hendrix, Michael Morris, and Shanika Peterson. Hendrix Dep. at 27:20-23.

Hendrix Dep. at 28:11-29:7, 46:13-22. To be clear, Hendrix was not responsible for making work assignments – Sheedy always dictated those.  Sheedy Decl. ¶8; Hendrix Dep. at 46:13-22.  Hendrix was not a manager and AA did not authorize him to hire, fire, or discipline employees.  Areu Decl.  ¶17; Hendrix Decl. ¶9; Hendrix Dep. at 26:18-27:1, 29:5-22.

Prior to this case, Hendrix had never been accused of sexual harassment, and AA had no notice of any such conduct.  Hendrix Decl. ¶15; Areu Decl. ¶17. Plaintiff admits no evidence exists suggesting Hendrix had previously been accused of sexual harassment at AA, or with another employer, or that anyone had reason to believe Hendrix sexually harassed him.  Pl. Dep. at 147:22-149:12, 153:22-154:3.

**D.    Plaintiff's background.**

AA employed Plaintiff Joshua Sole as a PA in its set decoration group between August 11, 2014 and October 30, 2014.  *Id.* at 38:6-10, Areu Decl. ¶37. From an early age, Plaintiff demonstrated a propensity for criminal behavior. When Plaintiff was a teenager the State of Colorado registered him as a sex offender and he spent two years in juvenile detention.  Plaintiff's Deposition taken March 11, 2015, in Fulton County Sup. Ct. Case No.  2014CV253411 ("March 11

Dep.") at 27:21-24, 38:8-18.[3] Plaintiff has since been convicted of multiple crimes. *See* transcript of November 21, 2014 TRO hearing, p. 20:22-24; March 11 Dep. at 36:17-38:18. He currently faces additional charges in Colorado for DUI and resisting arrest, and related to this case was arrested and charged with criminal trespass. Pl. Dep. at 12:14-13:10; Declaration of Lee Andrew Norman ("Norman Decl.") ¶16. Plaintiff has eight children by seven different women, and is delinquent in paying nearly $30,000 in child support. *See* Declaration of Matthew A. Boyd, Exhibit A (notices of child support liens), Pl. Dep. at 18:6-12; Pl. Mar. 11 Dep. at 23:1-26:7.

## II.   Plaintiff asks Hendrix if he can get a job at AA, and AA hires him.

Hendrix and Plaintiff met at a party in early July 2014. The two quickly became friends. Pl. Dep. at 166:7-17, 188:6-12. Shortly after they met, Plaintiff asked Hendrix if he could help him get a job with AA. Hendrix Decl. ¶10. Hendrix forwarded Plaintiff's resume to Sheedy. Hendrix Dep. at 62:21-63:8; Sheedy Decl. ¶12. Other than forwarding Plaintiff's resume and putting in a good word with Sheedy, Hendrix played no role in Sheedy's hiring decision. Sheedy Decl. ¶13; Hendrix Dep. at 63:6-8; Hendrix Decl. ¶11.

---

[3] After Plaintiff engaged in the conduct described below, TPS sought a restraining order against Plaintiff in Fulton County to bar him from the TPS campus (the "TRO case"). Plaintiff testified in court and was deposed in that case.

### III.    Plaintiff reviews and signs AA's discrimination and harassment policy.

AA hired Plaintiff on August 11, 2014. Pl. Dep. at 38:6-10.  When hired, Plaintiff reviewed and signed a number of documents, including AA's "Discrimination and Sexual Harassment Policy."  *Id.* at 137:8-138:20.  The documents state Plaintiff was employed by AA.  *Id.* at 34:24-35:20, 42:13-43:15, 46:4-9.  Exhs. 1-6, 10.[4]  AA's Discrimination and Harassment policy contains a detailed statement prohibiting harassment of any kind, including sexual harassment. *See* Pl. Dep., Ex. 10. It defines harassment in detail, provides examples of potentially harassing behavior and states it will not be tolerated.  *Id.* It requires employees to *immediately* report any harassment, and provides a complaint procedure. *Id.*  The policy allows employees to report sexual harassment through multiple channels, including "any member of management with whom the employee is comfortable." *Id.* Plaintiff admits AA gave him the full policy, he had the opportunity to review it, and he signed it.  Pl. Dep. at 137:8-139:4.[5] The policy

---

[4] Plaintiff personally wrote AA's name on some of the forms as his employer, and acknowledges he knew AA was his employer. *See* Pl. Dep. at 56:8-18, 70:4-18. Plaintiff's timecards similarly specified he was employed with AA. *See* Pl. Dep., Ex. 5.

[5] Plaintiff claims he was given only a copy of his signature page to keep, not the entire policy.  Pl. Dep. at 138:6-7.  That would be contrary to AA's normal practices and procedures, and contrary to the experience of Plaintiff's co-workers, Michael Morris, Shanika Peterson, and Brett Hendrix.  *See* Areu Decl. ¶24; Hendrix Decl. ¶6; Peterson Decl. ¶2; Morris Decl. ¶2.  It was also contrary to the

was always available to Plaintiff while he was employed with AA. Areu Decl. ¶25.

### B.   AA's policy is effective.

The record conclusively demonstrates AA's policy is effective.  Prior to this case, AA has not been subject to any sexual harassment lawsuit or EEOC charge. *Id.* at ¶26.[6]  AA's management is sensitive to situations that could result in sexual harassment and the company has an open-door policy and accommodating culture for handling employee issues. *Id.* at ¶27.  AA handles investigations into employee misconduct promptly and proactively with an eye towards ultimate fairness. *Id.* AA is committed to aggressively investigating sexual harassment complaints and taking appropriate action where necessary. *Id.* at ¶28.  Plaintiff has no evidence suggesting AA's policy is ineffective or not taken seriously.  Pl. Dep. at 140:6-16.

## IV.   Hendrix allegedly "harasses" Plaintiff, but Plaintiff reports nothing.

### A.   Plaintiff's relationship with Hendrix.

From July to November 2014, Plaintiff spent considerable amounts of time with Hendrix and continually sought his company. *See* generally *Id.* at 170-196. During this timeframe, Hendrix and Plaintiff exchanged over 1200 text messages,

---

experience of another former AA set decoration PA, Alberto Reyes, who similarly testified he received a full copy of the policy when AA hired him.  Deposition of Alberto Reyes ("Reyes Dep.") at 55:5-56:7.

[6] The same is true for TPS. *Id.*

virtually all of which were unrelated to work. *Id.* at Ex. 11.[7] Plaintiff regularly spent the night at Hendrix's apartment.  *Id.* at 174:6-9.  The two friends often would spend an entire day or evening together. *Id.* at 180:2-10, 184:2-8.  They went to movies, to restaurants, and partied together. *Id.* at 96:6-23, 175:3-6, 180:19-182:17, 195:19-22, 221:21-22. They gave each other rides. *Id.* at 222:17-223:18. Plaintiff told Hendrix "I like you around me" and confided that he "ha[dn't] felt a reason to be reserved or uncomfortable" around Hendrix. *Id.* at 187:12-188:5, Ex. 11, p. 7.  In short, Hendrix and Plaintiff had a close relationship. Hendrix Decl. ¶9; Hendrix Dep. at 110:11-111:19. As Plaintiff testified: "clearly we [were] establishing a pattern of hanging out."  Pl. Dep. at 187:3-4.

### B.    Harassment allegations.

Plaintiff claims Hendrix sexually harassed him, but identifies only a handful of events in support of his claim, none of which, individually or collectively, are sufficient to survive summary judgment:[8]

---

[7] The court reporter's copy of Exhibit 11 to Plaintiff's deposition is of poor quality. For the Court's convenience, AA has attached, as Exhibit A, a more legible copy, and has added page numbers to the Exhibit for reference.  Other than the added page numbers, the courtesy copy is identical to the actual exhibit.

[8] Hendrix denies that any incidents of purportedly unwelcome conduct occurred, but Plaintiff's specific, non-conclusory, and non-contradictory testimony is taken as true for purposes of summary judgment.

- Plaintiff claims that while he was at Hendrix's apartment, Hendrix once leaned back and rested his head on Plaintiff's lap. Plaintiff did not complain about this to Hendrix or indicate it was unacceptable. *Id.* at 92:17-25.

- Plaintiff claims that while he was at Hendrix's apartment, Hendrix hugged him while he was brushing his teeth. Plaintiff told Hendrix to "chill out," Hendrix immediately stopped, and the conduct did not re-occur. Plaintiff continued to see Hendrix and spend the night at his apartment after these alleged incidents. *Id.* at 353:13-354:15.

- Plaintiff claims that while he was Hendrix's apartment, Hendrix once tried to kiss him on the neck. Plaintiff told Hendrix to stop, and nothing like it ever happened again. *Id.* at 84:22-85:4, 199:12-200:22.

- Plaintiff claims that Hendrix "invaded his space" while at work on approximately three occasions. For each of these occasions, Plaintiff claims he asked Hendrix to look at his (Plaintiff's) computer screen, and in doing so Hendrix leaned into him and put his hand on Plaintiff's leg. As before, Plaintiff did not tell Hendrix to stop or that his behavior made him uncomfortable. *Id.* at 89:17-92:25.[9]

As a sign of friendship, Hendrix occasionally used nicknames with Plaintiff, including "Babyboy" and "Daddy O." Hendrix also referred to Plaintiff as "handsome" on a couple of occasions. *Id.* at 178:7-12, 184:18-20. Almost all of these comments occurred prior to AA employing Plaintiff or outside of work

---

[9] Contrary to Plaintiff's bald contention that this behavior was sexualized, however, both Michael Morris and Shanika Peterson were eyewitnesses to situations where Plaintiff requested Hendrix to lean over and look at his computer screen. Both Morris and Peterson testified that there was nothing sexual or inappropriate about Hendrix's actions at all – it was necessary for him to lean over and be in close proximity to Plaintiff for them both to see the computer screen at the same time. Morris Decl. ¶¶8-9; Peterson Decl. ¶¶8-9.

hours. *See generally* Pl. Dep. Ex. 11. Hendrix often uses such terms with close friends, and does not intend them to have any sexual connotation. Hendrix Dep. at 68:12-14, 70:8-13, 74:18-75:21.[10] Plaintiff now construes these statements as "flirtatious" (Pl. Dep. at 205:21-24), but Hendrix used these terms with Plaintiff *before* AA employed Plaintiff, and Plaintiff never objected to Hendrix using these terms with him at any point. *Id.* at 90:16-92:4, 92:17-93:10, 176:6-178:18, 187:1-188:17, 194:18-195:4. Plaintiff admits Hendrix never sexually propositioned him. *Id.*at 189:5-190:6.

Plaintiff's labeling Hendrix's purported conduct as "harassment" is an attempt to fabricate a claim. By Plaintiff's own testimony, none of Hendrix's alleged conduct affected Plaintiff's job performance. *Id.* at 208:21-209:14. Hendrix never criticized Plaintiff's work, or conditioned any tangible job action on Plaintiff consenting to any type of sexual advance. *Id.* at 211:18-25, 213:1-2, 216:2-21. Plaintiff stated he had no intention of quitting his job based upon Hendrix's alleged conduct. *Id.* at 210:3-7. Plaintiff never told anyone, including Hendrix, he believed Hendrix's conduct was unwelcome or inappropriate. *Id.* at 94:3-96:23, 188:2-193:5. Further, after the alleged conduct described above,

---

[10] There is also nothing inherently sexual about any of these terms. For example, "Daddy O" is a slang term from the 1950s which has the current equivalent of "dude" or "man" *See* http://www.urbandictionary.com/define.php?term=daddy-o.

Plaintiff continued to go over to Hendrix's apartment, invite him out socially, share rides, and spend considerable time with him outside of work. *Id.* at 94:12-96:23, 201:2-11, 221:5-223:18, 227:2-13, 229:14-235:16, and *generally* Ex. 11. Even after AA terminated Plaintiff's employment, Plaintiff continued to contact Hendrix, seek his company, and invited Hendrix to smoke marijuana with him. *Id.* at 265:10-266:13.

### C.    Plaintiff does not report any alleged harassment.

Plaintiff candidly admits he did not report Hendrix's alleged conduct to anyone, and no AA (or TPS) manager had any reason to suspect Hendrix was harassing him. *Id.* at 147:22-149:22, 265:5-9.  Plaintiff testified: "Q: You had not told anyone at either Tyler Perry Studios or And Action about your concerns about Mr. Hendrix, correct?  A:  Correct." *Id.* at 258:20-24.

## V.    Plaintiff engages in erratic and criminal behavior, and AA fires him.

The shows on which Hendrix and Plaintiff were working completed production in mid-October, 2014.  Sheedy Decl. ¶16.  Plaintiff believed his last day of work for AA would be October 31, 2014.  Pl. Dep. at 210:23-211:1.  On October 30, 2014, Plaintiff consumed illegal drugs while on his lunch break. *Id.* at 265:5-267:15.[11]   He returned to the TPS campus, still high. *Id.* at 242:8-10.

---

[11] Plaintiff claims he and Hendrix visited Hendrix's apartment while on lunch and

Plaintiff left his work area and erratically rode a bicycle around one of the studio's sets. *Id.* at 243:5-244:10, 246:3-23. After that, he accessed the building containing TPS's executive suites, using a seldom-used underground utility tunnel. *Id.* at 247:14-248:10. Plaintiff then went into the access-controlled executive suite. *Id.* at 267:13-268:23. Still stoned, Plaintiff confronted accountant Lorraine Morgan, and demanded to see Tyler Perry. Declaration of Lorraine Morgan ("Morgan Decl.") ¶4; *see also* Pl. Dep. at 269:2-271:8. Surprised that Plaintiff was in the access-controlled offices, and frightened by his demeanor, Morgan called security as soon as Plaintiff left her office area. Morgan Decl. ¶7.

Plaintiff left Morgan and entered a vacant office containing boxes of copier paper. Norman Decl. ¶¶10, 14; Pl. Dep. at 272:3-5, 275:5-8. Plaintiff barricaded himself in the office by stacking the heavy boxes paper against the door. Norman Decl. ¶14; Pl. Dep. at 282:3-6. Security personnel began looking for Plaintiff, and found him in the barricaded office. Norman Decl. ¶13; Pl. Dep. at 276:1-277:7. They could not enter the office because of Plaintiff's copier-paper barricade. Norman Decl. ¶¶14-15. Security personnel and Plaintiff's co-workers asked him to come out of the office multiple times. Norman Decl. ¶¶10-11, 13; Pl. Dep. at

---

that he smoked the remnants of a marijuana cigarette while there. He contends Hendrix put something other than marijuana in the joint, but admits his contention is rank speculation and he has no evidence to support it. *Id.* at 254:1-10.

278:15-284:12. Plaintiff insisted he would not come out until he spoke with Mr. Perry.  Norman Decl. ¶8; Pl. Dep. at 282:12-284:12.

After this continued for some time, and alarmed by Plaintiff's behavior, Andy Norman, in charge of TPS security, called the police.  Norman Decl. ¶13; Pl. Dep. at 282:23-284:12.  A police officer arrived, and instructed Plaintiff to leave the office. Norman Decl. ¶13; Pl. Dep. at 285:3-25.  Plaintiff ignored the officer's instructions, and she called for backup.  Norman Decl. ¶13.  A SWAT team was called in and the police ultimately had to force the door; Plaintiff continued to resist the officers' entry by shoving against the copier-paper barricade.  Norman Decl. ¶¶13, 15; Pl. Dep. at 284:3-5.  Simultaneously, another officer accessed the ceiling crawl space above an adjacent office and moved through the ceiling towards the office in which Plaintiff was barricaded.  Norman Decl. ¶16.  As the police pressed in from two directions, Plaintiff attempted to flee through the paneled ceiling.  Pl. Dep. at 285:5-286:17.  Weapons drawn, the officers demanded that Plaintiff surrender.  Norman Decl. ¶16.  Plaintiff finally relented, and the officers arrested him.  Norman Decl. ¶16; Pl. Dep. at 287:7-8.  He was ultimately charged with criminal trespass and taken to jail. Norman Decl. ¶16. Unsurprisingly, after Plaintiff's outrageous conduct, AA immediately terminated Plaintiff's employment. Areu Decl. ¶37.

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party shows summary judgment is warranted, the burden shifts to the non-moving party to present specific evidence showing that there is a genuine issue of material fact, or that the moving party is not entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 324-26 (1986). The response cannot consist of conclusory allegations. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

## ARGUMENT AND CITATION OF AUTHORITY

### I.    Plaintiff's Title VII claims against AA must be dismissed as  untimely.

A Title VII Plaintiff must prove he exhausted his administrative remedies before filing suit. *Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999); *Jordan v. City of Montgomery*, 283 Fed. Appx. 766, 767 (11th Cir. 2008). The first step is filing a timely charge of discrimination with the EEOC. 42 U.S.C. §2000e-5(b); *Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000). A charge must be filed within 180 days of the last discriminatory act. 42 U.S.C. §2000e-5(e)(1); *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). Failure to timely file a charge bars any claim. *Alexander*, 207 F.3d at 1332.

Plaintiff filed a charge of discrimination against TPS – but not AA – on February 4, 2015. Plaintiff was represented by counsel when he filed his charge. Pl. Dep. at 109:15-18. Plaintiff knew his employer was AA, both while employed and when he filed his original charge against TPS. *Id.* at 56:8-18, 70:4-19, 109:1-113:25. AA terminated Plaintiff's employment on October 30, 2014, so no subsequent act could form the basis of a claim. On July 2, 2015, after this lawsuit was filed and 245 days after AA terminated Plaintiff's employment, Plaintiff filed a charge against AA.[12] That charge is therefore indisputably untimely, and his Title VII claims against AA (sexual harassment and retaliation) must be dismissed.

## II.    Plaintiff's sexual harassment claim (Count I) should be dismissed.

Timeliness aside, summary judgment is warranted on Plaintiff's hostile work environment claim for at least three reasons: (1) no unlawful hostile work environment existed; (2) AA had no notice of allegedly harassing conduct; and (3) alternatively, Plaintiff's claims are barred by the *Faragher/Ellerth* defense.

### A.    The events Plaintiff relies upon, even if true, do not constitute actionable sexual harassment.

To prove sexual harassment under Title VII, a plaintiff must show: (1) he belongs to a protected group; (2) he has been subjected to unwelcome sexual harassment; (3) the harassment was based on his sex; (4) the harassment was

---

[12] *See* Pl. Dep., Ex 7 and 8. The EEOC dismissed both charges.

sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis exists for holding the employer liable. *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004). Assuming for purposes of this motion the first three elements exist, Plaintiff cannot establish the final two elements of his cause of action.

### 1.    The alleged conduct is not severe or pervasive.

#### a.    Alleged behavior occurring outside of the workplace cannot be considered.

"[T]he clear intent of Title VII is to combat discrimination in *the workplace*." *Succar v. Dade County School Board,* 60 F.Supp.2d 1309, 1314 n. 8 (S.D. Fla. 1999). This Court has joined the majority of courts addressing the issue and held that conduct that occurs outside of the workplace is not relevant or admissible to proving sexual harassment. *Meece v. Atlantic Southeast Airlines, Inc.*, No. 1:04-CV-3698-WSD-ECS, 2006 U.S. Dist. LEXIS 56435 at *6-7 (N.D. Ga., August 2, 2006); *see also Fuller v. State of Idaho*, No. CV-13-035-JLQ, 2014 U.S. Dist. LEXIS 168506 at *12-14 (D. Idaho, December 2, 2014) ("generally an employer is not liable for the harassment or other unlawful conduct perpetrated by a non-supervisory employee after work hours and away from a workplace setting."); *Gowetsky v. Singing River Hospital System*, 321 F.3d 503, 510-511 (5th Cir. 2003) (conduct outside of the workplace not considered); *Candelore v. Clark*

*County*, 975 F.2d 588, 590 (9th Cir. 1992) (same); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (same).  As noted above, the majority of the alleged conduct relied upon by Plaintiff occurred either (1) before Plaintiff began working with AA; or (2) when Plaintiff and Hendrix were socializing at Hendrix's apartment.  None of that alleged conduct can be considered here.

### b. The alleged conduct is not objectively severe or pervasive.

"The Eleventh Circuit has created a relatively high bar for plaintiffs asserting hostile work environment claims."  *Walker v. Golden Pantry Food Stores, Inc.*, 2005 U.S. Dist. LEXIS 40430 at *21 (M.D. Ga. Nov. 29, 2005). As the Eleventh Circuit has admonished, "[a]ll the sexual hostile work environment cases decided by the Supreme Court [have] involved patterns or allegations of extensive, long lasting, unredressed and uninhibited sexual threats or conduct that permeated the plaintiff's work environment."  *Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1028 (11th Cir. 2008), *citing Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).

A plaintiff must prove his work environment was both objectively and subjectively hostile.  *Adams v Austal U.S.A., LLC*, 754 F.3d 1240, 1249 (11th Cir. 2014). To evaluate whether a work environment is objectively hostile, courts consider the following factors: (1) the frequency of the conduct; (2) the severity of

the conduct; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods, Inc.* 121 F.3d 642, 647 (11th Cir. 1997).

Here, the only purported conduct upon which Plaintiff can base his harassment claim are (1) Hendrix's allegedly "flirtatious" messages (the vast majority of which occurred prior to AA employing Plaintiff or outside of work); and (2) approximately three occasions where Hendrix purportedly invaded Plaintiff's "personal space" and may have touched him on the leg. Those alleged incidents are insufficient to create a hostile work environment as a matter of law.

To begin, even if they are considered, Hendrix's referring to Plaintiff as "Daddy O" or "Babyboy" are non-sexual terms and not objectively offensive. Further, courts hold that merely commenting that an employee was "pretty," "beautiful" or "handsome" does not constitute sexual harassment. *See Wenner v. C.G. Bretting Mfg. Co.*, 917 F. Supp. 640, 647 (W.D. Wis. 1995) (telling plaintiff he was "handsome," among other objectionable conduct, was insufficient to avoid summary judgment); *Holmes v. Hous. Auth. of Joliet,* 2015 U.S. Dist. LEXIS 51346 at *12 (N.D. Ill. Apr. 20, 2015) (co-worker referring to the plaintiff as "pretty baby" or "beautiful" not sexual harassment); *Akonji v. Unity Healthcare,*

*Inc.,* 517 F. Supp. 2d 83, 98 (D.D.C. 2007) (telling a co-worker she "was a beautiful, attractive, intelligent and hard-working lady he would like to work with" insufficient).

With respect to Hendrix allegedly invading Plaintiff's personal space by leaning into him, two disinterested co-workers recalled seeing the conduct about which Plaintiff now complains and testified that there was nothing sexual about it – the reason Hendrix leaned into Plaintiff was to look at something on Plaintiff's computer screen. Morris Decl. ¶¶5, 7-9; Peterson Decl. ¶¶5, 7-9. Those witnesses' testimony demonstrates – objectively speaking – that there was nothing sexual about Hendrix's conduct in that respect.  Moreover, related to Plaintiff's "personal space" contention, the facts alleged by Plaintiff are similar to those which courts find insufficient to constitute actionable harassment. *See Wenner,* 917 F. Supp. at 647 (harasser's objectionable conduct included rubbing plaintiff's leg under the table, "looking adoringly" at plaintiff, telling plaintiff that he looked handsome, holding plaintiff's arm, rubbing plaintiff's shoulders while putting his cheek next to plaintiff's); *Weiss v. Coca-Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir.1993) (supervisor repeatedly asked plaintiff about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and

tried to kiss her once at a bar and twice at work; not sufficient to constitute actionable harassment); and *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 977-78, 980 (8th Cir. 2003) (concluding the co-worker's conduct was inappropriate, but not sufficiently severe or pervasive where it included calls to plaintiff's home, frequent visits to her office, discussions about relationships, touching plaintiff's arm, saying he "loved" her and she was "very special," placing romance novels in her mailbox, and invading her personal space).

Even if all of the conduct described above *and* the off-duty conduct that allegedly occurred at Hendrix's apartment is considered, summary judgment still is warranted. None of the alleged conduct is physically humiliating or threatening. Hendrix's alleged comments are not objectively offensive, severe, or pervasive. Courts in this Circuit routinely enter summary judgment in cases such as this one – indeed, courts regularly enter summary judgment despite far more egregious allegations than exist here. *See Lockett v. Choice Hotels Int'l, Inc.*, 315 Fed. Appx. 862, 863, 867 (11th Cir. 2009)(no finding of severe or pervasive where the plaintiff alleged that the harasser talked about sexual positions, that he said he would "lick her p-u-s-s-y", that he "would go down on [her] good," that her boyfriend "ain't F'ing [her] right," and that she needed "to get with a real guy."); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (plaintiff's supervisor said to

plaintiff   "I'm getting fired up", rubbed his hip against plaintiff's hip while touching her shoulder and smiling; twice made a sniffing sound while looking at plaintiff's groin area and once sniffed without looking at her groin; and constantly followed and stared at plaintiff in a "very obvious fashion."); and *Mitchell v. Pope*, 189 Fed. Appx. 911, 913 (11th Cir. 2006)(no finding of severe or pervasive despite plaintiff alleging that the harasser tried to kiss her, twice called her a "frigid bitch," made comments such as "you must be working out," "you sure do look fine," "your ass sure does look fine," and that she could "just walk into the room and [he gets] an erection," showed up on numerous occasions in her driveway, once drunk, telling her that he loved her, attempted to look down her shirt, rubbed up against her, chased her around the office, once picked her up, asked her in telephone conversations if she was dressed or naked, opened the women's bathroom door and turned the lights off when he knew plaintiff was inside, simulated "humping" another female employee with that employee's consent, made sexual comments and gestures about a female magistrate judge, referred to another employee in a derogatory manner, and asked plaintiff to go to a hotel hot tub with him when they were at a conference).

Further, none of Hendrix's conduct interfered with Plaintiff's job performance, and Plaintiff had no intention of quitting based upon the conduct.  Pl.

Dep. at 208-210. Those admissions compel the determination that Hendrix's alleged conduct was insufficiently severe or pervasive to state a claim. *See Fortson v. Carlson*, 618 Fed. Appx. 601, 608 (11th Cir. 2015).

> ### c. Plaintiff's conduct demonstrates Hendrix's alleged behavior was not subjectively hostile.

Further, the undisputed evidence demonstrates that Plaintiff did not subjectively perceive Hendrix's conduct as hostile. Courts regularly grant summary judgment in cases where, as here, the plaintiff's interactions with an alleged harasser are inconsistent with a subjective perception he was being harassed – even when the plaintiff claims he subjectively believed he was harassed. *See MackMuhammad v. Cagle's Inc.,* 379 Fed. Appx. 801, 805-806 (11th Cir. 2010) (summary judgment granted because evidence demonstrated plaintiff did not subjectively perceive a hostile work environment existed, noting that the Plaintiff's "post-employment assertions that he was able to perform his job well despite the comments and bad behavior, indicates that he did not subjectively find his co-workers' actions to be severe or pervasive."); *Lockett*, 315 Fed. Appx. At 865-866 (summary judgment granted because evidence demonstrated plaintiff subjectively did not believe her work environment was hostile, emphasizing lack of contemporaneous complaints or seeking medical treatment or counseling); *Hodge v. Fed. Express Corp.*, 2013 U.S. Dist. LEXIS 53369, at *15-17 (M.D. Ga. Mar. 7,

2013) (summary judgment granted where plaintiff did not complain about harasser, initiated contact with the harasser outside of work, and where alleged harassment did not affect job performance); *Geggatt v. Deese*, 2009 U.S. Dist. LEXIS 82641, at *26-27 (M.D. Fla. Sept. 10, 2009) (plaintiff did not subjectively perceive a hostile environment where she sought no treatment, continued to socialize with the alleged harasser, voluntarily went to his house, and continued to contact him after he battered her). These cases demonstrate that a plaintiff's bald claim that he perceived conduct as harassing is insufficient to avoid summary judgment.

Here, evidence that Plaintiff did not subjectively perceive Hendrix's conduce as harassing is legion. Plaintiff never told anyone – at AA or otherwise – that he believed Hendrix's behavior was unwelcome or inappropriate. *See* Plaintiff Dep. pp. 84-96; 188. Plaintiff took the AA job even though Hendrix referred to him as "Daddy O," "Babyboy," and "handsome" *before* he was employed. Pl. Dep. at 90:16-93:10, 176:6-178:18, 187:1-188:17, 194:18-195:4. If Plaintiff believed this conduct was so intolerable as to create a hostile environment, he would not have taken the job.[13]

---

[13] Moreover, Plaintiff works as a nude dancer at "Swinging Richards" and the "Coronet Club", adult clubs that cater to a homosexual clientele and where close contact between dancers and customers is the norm. Pl. Dep. at 304:6-25, Exhibit 25. This is not to say that individuals working in such environments can never be sexually harassed, but Plaintiff's history in this regard belies any argument that he

As noted above, Hendrix's conduct did not interfere with Plaintiff's job performance. *Id.* at 208:21-209:14. He did not seek treatment for the allegedly harassing conduct. *Id.* at 14:13-16:22, 338:17-19; Pl.'s Responses to Defs.' Interrogatories No. 14 (attached as Exhibit B). Plaintiff continued to go over to Hendrix's apartment, invite Hendrix out socially, share rides, and spent considerable time with him outside of work. *Id.* at 94:12-96:23, 201:2-11, 221:5-223:18, 227:2-13, 229:14-235:16, and generally Ex. 11. Even after AA terminated Plaintiff's employment, Plaintiff contacted Hendrix, sought his company, and invited Hendrix to smoke marijuana with him. *Id.* at 265:10-266:13. Plaintiff's conduct belies any notion that he subjectively believed Hendrix was harassing him. He cannot avoid summary judgment based upon these undisputed facts.

### B. AA did not know, and had no reason to know, of any conduct that could constitute harassment.

Where the perpetrator of alleged harassment is not a supervisor, the employer is liable only if it knew or should have known of the harassing conduct but failed to take prompt remedial action. *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000); *accord, Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2456, 2463 (U.S. 2013). Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently obvious as to

is unusually sensitive to men being in his personal space. *See* Pl. Dep. Exhibit 25.

constitute constructive knowledge to the employer. *Breda,* 222 F.3d at 889. The burden of proof is on the Plaintiff to show actual or constructive knowledge. *See Comments, Eleventh Circuit Pattern Jury Instructio*n 4.7 (no affirmative defense required in co-worker harassment scenario), *citing Beckford v. Dep't of Corr.*, 605 F.3d 951, 961 (11th Cir. 2010).

### 1.    Hendrix indisputably did not supervise Plaintiff under *Vance.*

The U.S. Supreme Court recently held "an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance*, 133 S. Ct. at 2443. The *Vance* Court expressly rejected employer vicarious liability for harassment caused by "individuals with the power to assign daily tasks [and who] are often regarded by other employees as supervisors[,]" limiting vicarious liability to individuals with the authority to make ultimate employment decisions regarding employees. *Id.* at 2452.

Here, it is undisputed that AA employed Hendrix as a PA – an entry-level position. Areu Decl. ¶14; Hendrix Decl. ¶2, Hendrix Dep. at 24:24-25:3. AA

classified Hendrix as non-exempt and paid him $10.71 per hour (the same as it paid Plaintiff). Areu Decl., ¶15; Hendrix Dep. at 25:16-10; Pl. Dep. at 38:11-17. The evidence is equally clear and undisputed that AA did not empower Hendrix to hire, fire, or discipline employees. Areu Decl. ¶16; Hendrix Decl. ¶8; Hendrix Dep. at 26:18-27:1, 29:5-22. All of the other PAs in Plaintiff's department confirmed that Hendrix had no supervisory responsibility. Reyes Dep. p. 66:16-67:15, 82:6-9 (Hendrix was a PA with no authority); Peterson Decl. ¶4; Morris Decl. ¶4 (same). Plaintiff has no personal knowledge regarding the authority (and there was none) AA granted to Hendrix. *See e.g.* Pl. Dep. at 369:1-5, 372:8-22. Plaintiff's purportedly subjective perception that Hendrix was his supervisor does not make it so, nor does it create a fact dispute for purposes of summary judgment.

### 2. AA had no knowledge of any allegedly harassing conduct.

The law "sets a higher standard" to impose liability on an employer for the harassing conduct of a non-supervisor, requiring actual or constructive knowledge by senior management of harassing conduct. *Nurse "Be" v. Columbia Palms West Hosp. L.P.*, 490 F.3d 1302, 1307 n.8 (11th Cir. 2007). No AA manager had knowledge about any harassing conduct involving Plaintiff or Hendrix. Areu Decl. ¶20; Sheedy Decl. ¶15. Plaintiff readily admits he has no reason to believe that any AA (or TPS) manager had any reason to suspect Hendrix was harassing him.

- 27 -

Pl. Dep. at Pl. Dep. at 147:22-149:12, 258:20-24.  As noted above, much of the alleged improper conduct occurred away from work at Hendrix's apartment. Further, Plaintiff testified that no evidence exists suggesting that any AA or TPS manager witnessed any alleged workplace conduct that could be construed as sexually harassing. *Id.* at 352:4-14.  No other AA employee ever complained about any sexual harassment by Hendrix.  Areu Decl. ¶21.

The Eleventh Circuit has also held that where, as here, an employer has adopted sexual harassment reporting policies, the employer is insulated from liability for hostile work environment claims premised on constructive knowledge. *Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997).  Plaintiff admittedly did not utilize AA's harassment reporting procedures.  Accordingly, AA had neither actual, nor constructive, notice of the alleged harassment. Even if Hendrix sexually harassed Plaintiff (which is denied), AA cannot be held liable.

### 3.    Alternatively, Even if Hendrix was a supervisor (which he was not), Plaintiff's claims are barred by *Faragher/Ellerth*.

Even if Hendrix was a supervisor under *Vance* (and he clearly is not), AA cannot be held liable for his purported conduct under *Faragher v. Boca Raton*, 524 U.S. 775, 808 (1998) and *Burlington Industries, Inc. v. Ellerth* 524 U.S. 742, 764 (1998). Under those cases, AA is not liable if it shows "(a) [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior,"

and (b) Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. 775 at 807.

"An employer may generally satisfy prong one of the *Ellerth/Faragher* defense by showing that is has promulgated an anti-harassment policy that contains a sufficient complaint procedure." *Daniel v. Spectrum Stores, Inc.*, 381 F.Supp.2d 1368, 1375 (M.D. Ga. 2005) *citing Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1286 (11th Cir. 2003).  AA meets this standard, as described above. Areu Decl. ¶22; Pl. Dep., Ex. 10.  Plaintiff admits he received the policy, reviewed it, and signed it.  Pl. Dep. at 137:8-138:20.  The undisputed evidence demonstrates AA's policy is effective.  Areu Decl. ¶26; Pl. Dep., Ex.10.  Accordingly, AA has satisfied prong one. *See Daniel*, 381 F.Supp.2d at 1375.

 "[O]nce an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then it is incumbent upon the employees to utilize the procedural mechanisms by the company specifically to address problems and grievances." *Madray Publix Supermarkets, Inc.*, 208 F.3d 1290, 1300 (11th Cir. 2000) (citations omitted). Plaintiff admits he never reported any harassment. Pl. Dep. at 94:3-96:23, 188:2-193:5.  Accordingly, *Faragher/Ellerth* applies, and summary judgment is proper.

## II.    Plaintiff's "retaliation" claim (Count II) has no merit.

Plaintiff's retaliation claim against AA must be dismissed because his EEOC charge was untimely, as described above.  Even if that were not so, Plaintiff must demonstrate (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and the protected activity.  If Plaintiff makes this showing, then AA must articulate a legitimate non-retaliatory reason for its action. Once AA makes that showing, the burden shifts back to Plaintiff to show that reason is a pretext for illegal retaliation.  *Peters v. HealthSouth of Dothan, Inc.*, 542 Fed. Appx. 782, 786 (11th Cir. 2013). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient." *Wilson v. B/E Aero., Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004).  Summary judgment is proper because Plaintiff cannot establish the first and third elements of a retaliation claim or that AA's reason for terminating his employment was pretextual.

### A.    Plaintiff did not engage in protected activity.

To assert a retaliation claim, Plaintiff must have reported conduct he reasonably believed violated Title VII.  *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311-12 (11th Cir. 2002).  Plaintiff did not inform anyone at AA (or TPS) he

allegedly was subjected to a hostile work environment. Pl. Dep. at 147:22-149:12, 258:20-24.  Because no protected activity exists, AA should be granted summary judgment.  *See Brown v. City of Opelika*, 211 Fed. App'x 862, 863-4 (11th Cir. 2006) (*per curiam*) (summary judgment proper where plaintiff never complained that defendant engaged in any unlawful employment practice).

## B.    No causation exists.

Without protected activity, there can be no causation.  Even if Plaintiff had engaged in protected activity (and he clearly did not) he must establish that his protected activity was the "but-for" cause of an alleged adverse employment action – here, his employment termination.  *Univ. of Texas SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).  The decisionmaker, Ozzie Areu, was indisputably unaware of any problems Plaintiff might have had with Hendrix (or otherwise). Areu Decl. ¶20; Plaintiff Dep. at 148:7-14.  As a result, Areu could not have been aware of any protected activity, and no causation exists.  *See Shannon v. Bellsouth Telecomms., Inc.,* 292 F.3d 712, 716 (11th Cir. 2002) (decision-maker must be aware of protected conduct to establish causation).

## C.    Plaintiff cannot establish pretext.

AA's legitimate and non-retaliatory reason for terminating Plaintiff's employment was his outrageous behavior on October 30, 2014.  Areu Decl. ¶37.

Plaintiff admits his conduct would be "concerning" to AA.  Pl. Dep. at 281:11.  No evidence exists suggesting this reason is a pretext for unlawful retaliation.  Areu had virtually no interaction with Plaintiff and had no knowledge of any protected activity. Areu Decl. ¶¶19-20. His decision to terminate Plaintiff's employment, therefore, could not possibly be a pretext for retaliation.

**III.    Plaintiff's claim for "failure to provide a safe work environment" (Count 3) fails to state a claim on which relief can be granted.**

Count 3 of the Amended Complaint purports to assert a claim for "failure to provide a safe work environment" against AA.    Such a claim does not exist in Georgia.   As noted by this Court on number of occasions, in employment cases, no common law cause of action exists outside of a negligent hiring/retention theory (addressed below), and O.C.G.A. §34-2-10 does not apply to sexual harassment claims, but only to physical conditions in the workplace. *See Smith v. Pefanis*, 652 F. Supp. 2d 1308, 1336 (N.D. Ga. 2009), *R&R adopted,* Aug. 31, 2009; *Forsberg v. Pefanis*, 2009 U.S. Dist. LEXIS 26598 at *5-6 (N.D. Ga., March 27, 2009); *Orquiola v. National City Mortgage Company,* 510 F. Supp. 2d 1134, 1139, 1162 (N.D. Ga. 2006).   Further, Plaintiff does not allege Hendrix caused him any physical harm, and therefore cannot identify any "unsafe" work environment.

**IV.    Plaintiff's negligence claims (Count 4) must be dismissed.**

Count 4 of Plaintiff's Amended Complaint alleges AA negligently hired or

retained Hendrix.  To move forward, Plaintiff must prove that AA "reasonably knew or should have known of [Hendrix's] 'tendencies' to engage in certain behavior relevant to the injuries allegedly incurred by the Plaintiff." *Hays v. Page Perry, LLC*, 627 Fed. Appx. 892, 897 (11th Cir. Ga. 2015), *citing Novare Grp., Inc. v. Sarif,* 290 Ga. 186, 718 S.E.2d 304, 309 (Ga. 2011).  Thus, to avoid summary judgment, Plaintiff has the burden of demonstrating AA knew or should have known of a propensity by Hendrix to engage in sexually harassing conduct and did nothing.  *See Stewart v. Alpharetta First United Methodist Church*, 221 Ga. App. 748, 753 (1996).  Plaintiff admitted no evidence exists to support any claim Hendrix had previously been accused of sexual harassment with another employer, or that AA or TPS had any reason to believe Hendrix was sexually harassing him.  Pl. Dep. at 147:22-149:12, 258:20-24, 153:17-154:3; *See also* Hendrix Decl. ¶14; Areu Decl. ¶21.  Plaintiff has (and clearly never had) any evidence to support these claims, and summary judgment is proper.[14]

## V.    Plaintiff's intentional infliction of emotional distress claim fails.

Plaintiff testified that the only individual he believes intended to harm him

---

[14] Insofar as Plaintiff seeks to allege a negligent hiring/supervision/retention claim based on his termination, Georgia law does not permit such a claim. *See Farrell v. Time Serv., Inc.*, 178 F. Supp. 2d 1295, 1300 (N.D. Ga. 2001) ("an at-will employee cannot allege a claim for negligent hiring, retention or supervision based on an allegedly improper discharge.").

in any way is Hendrix.  Pl. Dep. at 295:20-22.  An employer is not liable for an employee's intentional torts, including sexual harassment.  *See Trimble v. Circuit City Stores, Inc.*, 469 S.E.2d 776, 779 (1996).  Allegedly harassing conduct (if any) is outside the course and scope of employment and cannot be imputed to AA.

Further, the underlying facts do not support a claim.  "The required standard for intentional infliction of emotional distress is stringent and difficult to establish. [I]ntentional infliction of emotional distress is hard to establish because of the court's justifiable concern that causes of action grounded upon emotional distress may give rise to fictitious, inflated, or trivial claims unless properly circumscribed. This tort is reserved for only the most egregious behavior, which plaintiffs bear a heavy burden in establishing." *Bradley v. Dekalb County*, 2010 U.S. Dist. LEXIS 118467, at *12-13 (N.D. Ga. May 17, 2010).  Whether a claim rises to the requisite level of outrageousness and egregiousness as to state an IIED claim is a question of law.  *Northside Hosp., Inc. v. Ruotanen*, 246 Ga. App. 433, 435 (2000). Because Plaintiff cannot establish actionable sexual harassment, Plaintiff also cannot meet the standard for IIED.  *See Robinson v. Intercorp*, 512 F. Supp. 2d 1307, 1311-1313, 1315 (N.D. Ga. 2007) (no IIED where the plaintiff experienced multiple sexual propositions and innuendoes from her immediate supervisor in an office setting and over the course of 2 years); *Spivey v. Akstein*, 2005 U.S. Dist. LEXIS

38845 at *78 (N.D. Ga. December 2, 2005) (kissing and fondling and sexually charged remarks from the alleged harasser insufficient).[15]

## VI. Plaintiff's claim for alleged "Bad Faith/Expenses of Litigation (Count 9) is derivative of his other claims and should be dismissed.

Plaintiff relies upon "the foregoing acts of Defendants" in asserting that they have litigated in bad faith. *See* Amended Complaint [Dkt. No. 16], ¶ 76. Far from it – as explained above, Plaintiff's claims have no merit. Plaintiff's "bad faith" claim is entirely derivative of his other claims, and must similarly be dismissed.

## <u>CONCLUSION</u>

Plaintiff lacks evidence to support each and every one of his claims. AA should be granted summary judgment for the reasons set forth above.

Respectfully submitted this 25th day of May, 2016.

303 Peachtree Street, N.E.
Suite 4000
Atlanta, Georgia 30308
Telephone:  (404) 614-7400
Facsimile:   (404) 614-7500

*Counsel for Defendant And Action LLC*

**HAWKINS PARNELL**
      **THACKSTON &YOUNG LLP**

*/s/ Matthew A. Boyd*
Matthew A. Boyd
Georgia Bar No. 027645
mboyd@hptylaw.com
H. Eric Hilton
Georgia Bar No. 355417
ehilton@hptylaw.com

---

[15]  Plaintiff also cannot base an IIED claim on his termination. "Georgia courts have held that an employer's termination of an employee, however stressful to the employee, generally is not extreme and outrageous conduct." *Clarke v. Coates & Clarke, Inc.*, 990 F.2d 1217 (11th Cir. 1993).

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **JOSHUA SOLE,** | |
| **Plaintiff,** | **CIVIL ACTION FILE NO.** |
| **v.** | **1:15-CV-1700-LMM** |
| **TYLER PERRY, TYLER PERRY STUDIOS, LLC, BRETT HENDRIX, and AND ACTION LLC,** | |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

This is to hereby certify that I have this day electronically filed **DEFENDANT AND ACTION LLC'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

Kwame Thompson, Esq.
Kwame T. Thompson, P.C.
235 Peachtree Street, NE
Suite 400
Atlanta, Georgia 30303-1400

This 25th day of May, 2016.

/s/ Matthew A. Boyd
Matthew A. Boyd
Georgia Bar No. 027645

iManage 11317561v.9