**In the Matter Of:**

SOLE vs. TYLER PERRY

1:15-CV-1700-LMM

---

**ALBERTO M. REYES**

*April 25, 2016*

---



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 2 of 144

ALBERTO M. REYES                                April 25, 2016
SOLE vs. TYLER PERRY                                         1

1   IN THE UNITED STATES DISTRICT COURT FOR THE

2          NORTHERN DISTRICT OF GEORGIA

3

4   CIVIL ACTION NO.  1:15-CV-1700-LMM

5

6   JOSHUA SOLE,

7          Plaintiff,

8       vs.

9   TYLER PERRY, TYLER PERRY STUDIOS, LLC, BRETT

10  HENDRIX, and AND ACTION, LLC

11          Defendants.

12

13

14

15

16       DEPOSITION OF:  ALBERTO M. REYES

17                APRIL 25, 2016

18                 11:06 A.M.

19

20

21

22

23

24

25



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 3 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                              2

```
 1              A P P E A R A N C E S

 2  APPEARING ON BEHALF OF THE PLAINTIFF:
         TROY KING LAW FIRM
 3        Mr. Troy King
          3330 Cumberland Boulevard
 4        Suite 500
         Atlanta, Georgia 30339
 5        770-621-2575

 6        MR. TROY KING
         Attorney at Law
 7        235 Peachtree Street, Northeast
         Suite 400
 8        Atlanta, Georgia 30303

 9  APPEARING ON BEHALF OF THE DEFENDANT:
         HAWKINS & PARNELL
10        Mr. Matthew Boyd
          303 Peachtree Street, Northeast
11        Atlanta, Georgia 30308
          404-614-7400
12        mboyd@hptylaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
1                         INDEX

2                                          PAGE

3   WITNESS

4   Alberto M. Reyes                         5

5

6

7              INDEX OF EXHIBITS

8   NUMBER        DESCRIPTION        PAGE

9     1           Subpoena          13

10    2           Statement         27

11    3           Text Message      43

12    4           Ease Document     48

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                     PROCEEDINGS

2   APRIL 25, 2016                      11:06 A.M.

3               MR. BOYD:  This is the deposition

4   of Alberto Reyes being taken in the case of

5   Sole versus Tyler Perry Studios, LLC, et al.,

6   Civil Action No. 1:15-CV-1700, pending in the

7   United States District Court for the Northern

8   District of Georgia.

9               Could you please swear in the

10  witness?

11               ALBERTO REYES,

12  having been first duly sworn, was examined and

13  testified as follows:

14  EXAMINATION BY MR. BOYD:

15      Q.    All right.  Can you please state

16  your full name for the record.

17      A.    Alberto Miguel Reyes.

18      Q.    Okay.  Mr. Reyes, you understand

19  you're here for your deposition to be taken

20  today; right?

21      A.    Yes.

22      Q.    Okay.  Have you ever had your

23  deposition taken before?

24      A.    No.  I don't know if being a

25  witness or a deposition is the same thing.



1          Q.      Okay.  Were you a witness in a

2    lawsuit before?

3          A.      Yes.

4          Q.      What kind of lawsuit was that?

5          A.      Property -- apartment complex

6    had a fire and I was a resident there, and

7    the resident who was injured sued the

8    property company, so, you know, I was a

9    witness for that.

10         Q.      Okay.  Were you a witness in

11   court, or was it in a conference room like

12   this today?

13         A.      It was court.

14         Q.      Court, okay.

15         A.      Uh-huh.

16         Q.      All right.  Well, let me give you

17   some ground rules since you've never been in

18   this scenario before.  I'll ask you a series

19   of questions.  You'll need to answer out loud.

20   The court reporter here is taking down

21   everything that everybody in this room says,

22   okay?

23         A.      Yes.

24         Q.      If you don't understand my

25   question, that's fine, just ask me to repeat



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 7 of 144

ALBERTO M. REYES                                April 25, 2016
SOLE vs. TYLER PERRY                                        6

 1  it or rephrase it and I'll do my best to do

 2  that.  If you answer my question, I'm going to

 3  assume you understood it.  Is that fair?

 4       A.    Yes.

 5       Q.    Okay.  Like I said before, you

 6  need to answer verbally.  No gestures, no --

 7  yes or no, shaking your head, or that sort of

 8  thing, so the court reporter can get

 9  everything down, okay?

10       A.    Yes.

11       Q.    All right.  You need to tell me

12  your answer to a question you do know the

13  answer to, but if you don't know, just tell me

14  you don't know.  That's fine too.

15       A.    Yes.

16       Q.    All right?  If you know part of

17  the answer, tell me the part you do know and

18  then tell me you don't know the rest.

19       A.    Okay.

20       Q.    All right?  Any reason why you

21  can't give truthful and accurate testimony

22  today?

23       A.    No.

24       Q.    Okay.  Any medications that you're

25  taking that may affect your memory or your



1    ability to testify?

2          A.    No.

3          Q.    Are there any medications you

4    normally take that you didn't take today that

5    would similarly affect you?

6          A.    No.

7          Q.    Okay.  Are you under the influence

8    of any alcohol or any kind of drug?

9          A.    No.

10         Q.    Okay.  The court reporter just

11   swore you in.  You do understand that you are

12   under oath and under penalties of perjury

13   today?

14         A.    Yes.

15         Q.    All right.  Are you represented by

16   counsel today?

17         A.    Yes.

18         Q.    Who is that?

19         A.    Troy King.

20         Q.    All right.  And when did you

21   retain Mr. King to represent you?

22         A.    Last week.

23         Q.    What day?

24         A.    Thursday or Friday.  I don't

25   recall.  It was Thursday or Friday.



1          Q.      Was it before or after you were

2    served with the subpoena in this case?

3          A.      It was after.

4          Q.      Okay.  And how did you find out

5    about Mr. King?

6          A.      I was referred to by a friend.

7          Q.      Who referred you?

8          A.      Tye Farley.

9          Q.      Tye Farley?

10         A.      Uh-huh.

11         Q.      Who is Mr. Farley?

12         A.      He's a councilman that's

13   helping -- that guided me on the case.

14         Q.      Okay.  Where is he a councilman?

15         A.      I'm sorry?

16         Q.      You said --

17         A.      Or he's like a counsel, like

18   a -- I guess he's a counselor for this case.

19         Q.      Okay.  Counselor for whom?

20         A.      For Josh.

21         Q.      Josh Sole?

22         A.      Yes.

23         Q.      Okay.  Where is Mr. Farley

24   located, do you know?

25         A.      New York.



1          Q.    Okay.  Did Mr. Farley reach out to

2    you?

3          A.    Yes.  I -- well, after I reached

4    out to Josh about the case in the beginning,

5    he referred me to -- Josh referred me to Tye.

6          Q.    Okay.  And when did you first

7    speak to Tye?

8          A.    Last -- was it -- last year.  It

9    was early last year, probably around this

10   time.  I don't exactly remember.  I know it

11   was early last year.

12         Q.    All right.  Early 2015?

13         A.    Yes.

14         Q.    Okay.  All right.  Tell me about

15   that first conversation you had with Tye.

16         A.    I mean it was very brief.  He

17   just asked me -- like I said, I reached out

18   to Josh after I heard about this situation.

19   I don't know him, never heard of him.

20   Reached out to him to kind of -- because the

21   story sounded similar.

22               And so I spoke with him, and he

23   passed me on to Tye, and he just asked me

24   what my story was and I kind of just gave him

25   my engagement with the Tyler Perry Studios,



 1   and he just said, Okay, we'll be in touch.

 2   This might be helpful to this case.

 3            And that was that.  And so he

 4   asked me to basically just write a statement

 5   saying, you know, everything that I had told

 6   him.  And I didn't hear from him again for

 7   like -- probably till like a month ago,

 8   maybe, after this time last year.  So that

 9   was it after that.

10        Q.    Okay.  The first time you spoke to

11   Mr. Farley, was that on the telephone or in

12   person?

13        A.    Telephone.

14        Q.    Telephone?

15        A.    I've never met him.

16        Q.    All right.  Did you actually talk

17   to Joshua Sole before you spoke to Mr. Farley

18   that first time?

19        A.    The only time I -- I think he

20   only responded to my message when he said, "I

21   will put you in touch with my counsel."  That

22   was the only time.  But I've never spoken to

23   him over the phone.  This was via Facebook,

24   by the way.

25        Q.    Okay.



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 12 of 144

ALBERTO M. REYES                                      April 25, 2016
SOLE vs. TYLER PERRY                                            11

 1        A.      I've never spoken to him.  And I
 2  had reached out to him after that, like after
 3  we spoke, just to see, you know, what was
 4  going on.  And he never even responded, so I
 5  just assumed he wasn't allowed to speak with
 6  me.  So that was the only conversation we've
 7  ever had.
 8        Q.      Okay.  And you said you wrote out
 9  a statement.  Was that for Mr. Farley?
10        A.      Yeah.  I initially wrote it out
11  for him, yes.
12        Q.      Okay.  And you understood
13  Mr. Farley to be a representative of Mr. Sole?
14        A.      I'm sorry?
15        Q.      Did you understand Mr. Farley to
16  be a representative of Mr. Sole?
17        A.      I -- well, I know he's like a
18  grief counselor, or something he told me he
19  was, or something --
20        Q.      Crisis counselor?
21        A.      Crisis counselor, yes.
22        Q.      Okay.  Yeah.  But did he tell you
23  he was affiliated with Mr. Sole?
24        A.      As far as that, yes, the crisis
25  counselor.



1         Q.     All right.  All right.

2                So let me make sure I've got the

3     time frame.  You reached out to Mr. Sole via

4     Facebook?

5         A.     Yes.

6         Q.     Is that right?  Okay.  And had he

7     tried to contact you before then?

8         A.     No.

9         Q.     All right.

10               And you didn't know him before you

11    reached out?

12        A.     No.  He was hired after I --

13    after me at Tyler Perry Studios.

14        Q.     Okay.  I think I asked that

15    question, so let me just make sure the record

16    is clear on that.  You did not know him before

17    you reached out to him; is that correct?

18        A.     Yes.

19        Q.     All right.

20               And maybe refresh your memory a

21    little bit.  Was that about in June of 2015

22    when you did that?

23        A.     The statement?

24        Q.     The original message.  And you can

25    refer to documents.



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                        13

 1          A.     I don't -- I don't know because
 2   I actually didn't print that one.  I couldn't
 3   find his name because it's not under his
 4   name.  It's something else.  But I think it
 5   was around this time.  I can't recall like
 6   the actual date, to be honest.
 7          Q.     Okay.  Let me -- let's back up
 8   real quick.  I'm going to hand you what's been
 9   marked as Exhibit 1.
10              MR. BOYD:  I only have one copy.
11   I'm sorry.
12          Q.     (By Mr. Boyd) Take your time to
13   review that.  My question is, do you recognize
14   it as the subpoena that you were served with
15   last week?
16          A.     Yes, I have that with me.
17              (Whereupon, Defendant's
18              Exhibit 1 was marked for
19              identification.)
20          Q.     (By Mr. Boyd) Okay.  Attached to
21   the subpoena was an exhibit requesting certain
22   documents from you.
23          A.     Yes, and I brought everything
24   that I had and that I could find, so.
25          Q.     Okay.  Tell me what you did to



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 15 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                            14

 1   kind of look for documents that were

 2   responsive to the subpoena?

 3         A.    I went back to deleted Facebook

 4   messages, I went back to my e-mail, because

 5   most of the conversations I've had that I can

 6   show for proof where via e-mail and Facebook.

 7   So that's -- I printed anything I had.  For

 8   some reason, I can't find the e-mail that

 9   initially shows when Brett asked me to do a

10   phone interview.  I just have the e-mail

11   where he said to send him my resume and I

12   responded saying that I sent it to him.

13         Q.    Okay.  Can I see the documents

14   that you brought today, please?

15         A.    You want everything?

16         Q.    Uh-huh, yeah.

17         A.    And the statement as well?

18         Q.    Anything you have, yeah.  Okay.

19   Is that a copy of the subpoena?

20         A.    This is just the subpoena, yeah.

21         Q.    Okay, got it.

22               MR. BOYD:  Let's go off the record

23   for a second.

24               (A short discussion was held.)

25         Q.    (By Mr. Boyd) All right,



ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                                 15

1   Mr. Reyes, I just went through the documents
2   that you have provided today.  Thanks for
3   bringing those.  We're going to have copies
4   made, and we'll make them exhibits to your
5   deposition in just a moment.
6          A.     Okay.
7          Q.     Do you have any other documents
8   other than the ones you provided here today
9   that relate to your employment on the premises
10  of Tyler Perry Studios?
11         A.     No.  Like I said, everything
12  that I could find is there.  There were some
13  that I was looking for.  Like I said, I don't
14  know why I couldn't find the original e-mail
15  with the interview because he e-mailed me --
16  Brett e-mailed me to tell me let's do a phone
17  interview.  And for some reason, the initial
18  e-mail is there.  But that one is not coming
19  up.  I don't know if it was under another
20  e-mail or not.  Like I said, I couldn't find
21  my conversation with Josh via Facebook
22  because I couldn't remember his name and I
23  couldn't type it in.
24            Because like I said, I haven't
25  spoken to Josh past that time frame, which



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 17 of 144

ALBERTO M. REYES                                                        April 25, 2016
SOLE vs. TYLER PERRY                                                              16

1    was last year, around this time.  So trying

2    to -- like I said, his name is not -- because

3    I remember when I found him, it wasn't under

4    Josh.  It was -- I know it was an S.  That's

5    all I could tell you.  Solis, something like

6    that, I couldn't find it.

7          Q.    Old Soul or something like that?

8          A.    Something like that.  But every

9    time I typed it in, it wouldn't come up,

10   so -- because I was trying to bring that to

11   show my -- you know, the conversation between

12   him and I couldn't find that.

13         Q.    Okay.  What about employment

14   records that you had from working at Tyler

15   Perry Studios?

16         A.    These are my employment records

17   like those -- that's pretty much what they

18   give you.  Like at the end of the pay period,

19   you get that.

20         Q.    The time cards?

21         A.    Yeah.

22         Q.    Okay.  Are there other documents

23   that you previously had in your possession

24   that you just don't have anymore or couldn't

25   find related to your work there?



1        A.      There could be because I

2   actually thought I threw these out but I

3   didn't.  But I wouldn't recall what they are.

4   I don't remember if I kept -- I know we had

5   to sign basically -- you know, what was in

6   here, there was some things that we signed.

7   I don't recall if I kept them or not, like

8   past that.  I don't know if they gave -- I

9   don't remember if they gave me a copy or not.

10       Q.      Okay.

11       A.      So, I don't know.  But most of

12  those documents -- which are just basically

13  saying that I received the handbooks and

14  stuff like that, signing that I received

15  those things.  W-9's, I know I don't keep

16  that, like -- not W-9's.  I-9's.

17       Q.      Sure.

18       A.      Basically regular HR paperwork

19  that they normally keep.

20       Q.      So when you first went through, I

21  guess, orientation there, you signed a bunch

22  of documents.

23       A.      Uh-huh.

24       Q.      Is that right?  And did you keep

25  copies and just don't have them now?  Is that



1    what you're saying?

2         A.    Like I said, I can't remember if

3    I was given copies to keep.  If I did, then,

4    yes, I wouldn't have them now.  I don't know.

5         Q.    Okay.  You just don't remember?

6         A.    I don't remember, right.

7         Q.    All right.  That's fine.  Fair

8    enough.

9              Okay.  Give me your current

10   address.

11        A.    ███████████████████████

████████████████████████████████████

███████████

███████████████████████████████████████

██████████████

16        Q.    Do you have any other residences?

17   Do you live anywhere else?

18        A.    Between -- oh, no.

19        Q.    Okay.  Are you currently employed?

20        A.    Yes.

21        Q.    Who do you work for?

22        A.    The General Insurance.

23        Q.    And what do you do there?

24        A.    I'm an administrative assistant.

25        Q.    How long have you been in that



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                            19

 1   job?

 2        A.     I've been at this job for two

 3   months now.

 4        Q.     Where are they located?

 5        A.     In Alpharetta, Windward Parkway.

 6        Q.     And who do you report to there?

 7        A.     Kyle Cincere.

 8        Q.     How do you spell his name?

 9        A.     K-y-l-e, and Cincere is

10   C-i-n-c-e-r-e, something like that.

11        Q.     Okay.  All right.

12               You gave us your full name before.

13   Do you go by Al Be?

14        A.     Yes.

15        Q.     Okay.  Have you ever gone by any

16   other names other than your full name and

17   Al Be?

18        A.     No.

19        Q.     Have you ever been arrested?

20        A.     Yes.

21        Q.     Tell me every time you've been

22   arrested.

23        A.     I've been mostly -- you want

24   every time like separately or just for the

25   reasons?



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          20

```
 1          Q.      Separately, yeah.
 2          A.      As earliest I was arrested was
 3   as a teenager, fight with my brother.  My mom
 4   got involved, and so I got arrested for that.
 5          Q.      How old were you then?
 6          A.      I think I was 13.
 7          Q.      Okay.  How old are you now?
 8          A.      31.
 9          Q.      31.  Okay.  All right.
10          A.      After that, I was arrested again
11   in school, anger -- that was juvenile.  I
12   think -- that was really a rough time, so I'm
13   trying to remember because there were times I
14   just went like for five minutes, like
15   literally, and came out.  I went so frequent
16   that they pretty much just sent me and called
17   my mom to pick me up.
18               So I can't really give you a
19   time -- I can't recall as a juvenile, but if
20   I had to guess, maybe about five times, but
21   they weren't really convictions, they were
22   just -- I acted up at school, police came and
23   took me and I went to, like, the little
24   police department, and my mom came and got
25   me.
```



1        Q.      Okay.  And what were the age range

2    when that was occurring?

3        A.      Between 13 and 16, give or take.

4        Q.      Okay.

5        A.      Then after that, the first time

6    as an adult was I had a domestic dispute with

7    my ex, he was abusive, so we both went to

8    jail.  In the state of Florida, that's pretty

9    much how it goes.  If you -- police come to

10   your house, everybody's going to jail.

11            So that was two times in, I

12   guess, a three- or four-month period.  And

13   then --

14       Q.      Where in Florida was that?

15       A.      Orlando, Orange County.

16       Q.      Okay.  And how old were you then?

17       A.      19-ish.

18       Q.      Okay.  Go ahead.

19       A.      And then the last time was

20   actually after the incident at Tyler Perry

21   Studios.  I went back to work.  I was very

22   disgrunt (sic) from everything that happened,

23   and I wasn't getting hours, so I had a

24   dispute with my supervisor and I knocked --

25   and I worked in an assistive living facility



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 23 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          22

1    at that time, so of course, knocking over

2    property with elderly people there is very

3    much shunned upon.  So they called the

4    police, and I got arrested, but it was

5    dropped.  It was just basically minimized to

6    a disorderly conduct.

7          Q.    So that was in 2015.  Is that

8    right?

9          A.    2014.

10         Q.    2014.  And your answer was a

11   little unclear.  So this -- you were working

12   at another employer; correct?

13         A.    Yes.  Actually, that was in

14   between Tyler Perry Studios.  Because I was

15   working there before Tyler Perry Studios,

16   they kind of -- they didn't let me go because

17   I knew that my time would be temporary.  I

18   knew that the assignment was a temporary

19   assignment.  So they kind of just gave me the

20   freedom to go.  But when I came back, they

21   didn't have any hours, so.

22         Q.    I see.

23         A.    Yeah.

24         Q.    And you knocked over some stuff.

25   What did you do?



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 24 of 144

ALBERTO M. REYES                                      April 25, 2016
SOLE vs. TYLER PERRY                                            23

1        A.    Plant in the middle of the

2    table.  It was a ceramic plant.

3        Q.    Okay.  All right.

4              Were those -- have you told me all

5    the times you've been arrested?

6        A.    Yes.

7        Q.    Okay.  Have you ever been

8    convicted of anything?

9        A.    No, actually.  They were all

10   dropped.

11       Q.    Was the disorderly conduct dropped

12   or were you convicted of that or plead to

13   that?

14       A.    I was told -- and I don't

15   remember exactly because I haven't looked at

16   my record.  But I was told it wouldn't show

17   up on my record.  It was just a minimal

18   disorderly conduct.  I paid the fine and that

19   was it.  It was basically treated as a

20   regular ticket.

21       Q.    I see.  Okay.

22             So you did plead to that one?

23       A.    Yes.

24       Q.    Okay.  And what county was that

25   in?



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 25 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                         24

 1          A.     I guess Fulton.

 2          Q.     Do you know what month of 2014

 3    that was?

 4          A.     It's August or September --

 5    September.  September.

 6          Q.     All right.  Have you ever been in

 7    the military?

 8          A.     No.

 9          Q.     Do you have any relatives in the

10    northern part of the state of Georgia, blood

11    or marriage?

12          A.     No.  I'm adopted, so that might

13    help you.

14          Q.     Okay.  Well, what about adoptive

15    parents as well?

16          A.     In Georgia, no.  I'm the only

17    one here.

18          Q.     Okay.  The reason why we ask that

19    is we're here and if we ever impanel a jury in

20    this case, I want to know if your brother or

21    sister or -- just something that's on there.

22    We ask this of everybody.

23                 Are you involved in a church?

24          A.     I go to church.  I wouldn't say

25    I'm involved in a church.



ALBERTO M. REYES                                        April 25, 2016
SOLE vs. TYLER PERRY                                              25

1        Q.     Okay.  Which one do you attend?

2        A.     I've been to Victory Church on

3   Jimmy Carter.  Tabernacle, it's off of -- I

4   don't know, Moreland.  That's really the last

5   two I've been to in a while.

6        Q.     What about either civic or social

7   groups, any clubs that you're a member of?

8        A.     I mean I work in the industry,

9   like local independent films, so I do set

10  deck for that.

11       Q.     Is there any professional

12  organizations that's associated with that?

13       A.     Not really.

14       Q.     Okay.  What about, are you a union

15  member of any sort?

16       A.     No.

17       Q.     All right.  Other than locating

18  the documents that you brought today, did you

19  do anything to prepare for your deposition?

20       A.     Yeah.  I read my statement.  I

21  talked with my lawyer.  To be honest with

22  you, I only found out about the deposition

23  last week, literally Wednesday.  So I didn't

24  know that I was going to actually be on

25  trial.



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          26

1            So I was told that I was going
2    to be getting served, and so I went to -- I
3    wasn't home for two days.  I was staying at a
4    friend's house.  So when I came back home, I
5    found a card on my door, which was actually
6    Thursday night.  So I called the attorney
7    and -- I called him, and he told me he had
8    a -- he had to serve me.  So he came that
9    night.
10        Q.    So you talked to the person who
11   actually handed you the paper?
12        A.    Yes, yeah.
13        Q.    Okay.  He wasn't an attorney, he
14   was just a process server.
15        A.    Oh, okay.  I have his card but,
16   yeah.
17        Q.    Okay.  All right.  Let's back up.
18   You were telling me that you talked to Tye
19   Farley sometime last year; correct?
20        A.    Yes.
21        Q.    Okay.  And we were -- kind of got
22   sidetracked.  You were telling me about the
23   first time you talked to him and you said you
24   spoke with him on the phone and he told you
25   that what you had to say might be useful.  Is



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                              27

1  that a fair assessment?

2         A.      Yes.

3         Q.      Okay.   When was the next time you

4  spoke to him?

5         A.      From the first time?

6         Q.      From the first time.

7         A.      After he asked me to write my

8  statement.

9         Q.      All right.   We'll look at that in

10  a minute.   But if I'm remembering correctly,

11  that's dated June 5th of last year.   We can

12  just --

13               MR. BOYD:   Let's mark this.

14         Q.      (By Mr. Boyd) Mr. Reyes, I'm going

15  to hand you what's been marked as Exhibit 2 to

16  your deposition.   And these exhibits -- we

17  refer them to as exhibits just so we can know

18  what they are.   But I believe that's a copy of

19  what you brought today.   You can go ahead and

20  look at it.

21               (Whereupon, Defendant's

22               Exhibit 2 was marked for

23               identification.)

24         Q.      (By Mr. Boyd) Is Exhibit 2 the

25  statement that you were just referring to?



```
 1          A.      Yes.
 2          Q.      All right.  And if you look to the
 3   last page of Exhibit 2, is that your signature
 4   there?
 5          A.      Yes.
 6          Q.      All right.  It's dated 6/05/2015.
 7   Do you see that?
 8          A.      Yes.
 9          Q.      All right.  Is that when you
10   prepared this statement?
11          A.      That's when I completed it.  It
12   took me a couple of days to get it right.  I
13   think I worked on it for a couple of days,
14   but that's when I completed it, yes.
15          Q.      Okay.  Fair enough.  And did you
16   mark in that date there?
17          A.      Yes.
18          Q.      Okay.  All right.
19                  And so does that refresh your
20   memory as to when you spoke to Mr. Farley the
21   first time?
22          A.      Well, no, that wasn't the first
23   time.  That would have been the second time.
24          Q.      Okay.  How long before you
25   completed this statement on June 5th of last
```



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          29

1  year or 2015 did you speak to Mr. Farley?

2        A.      It probably was a couple of

3  days.  I would say maybe a week or two prior,

4  if that.  Probably not even.  Maybe a week at

5  most.

6        Q.      Okay.  All right.  And that was

7  the first time you had spoken with him?

8        A.      Yes, when I had initial contact

9  with him.

10       Q.      Did -- that first time, did he

11 call you or did you call him?

12       A.      He called me.

13       Q.      Do you know how he got your

14 number?

15       A.      I may have given it to Josh to

16 give to him.  I don't know.  I don't even

17 remember, because now that I'm thinking about

18 it, I don't remember how he got my number.

19 And the -- I don't remember -- well, yeah, it

20 had to have been him calling me because I

21 have no record of like -- we didn't speak via

22 e-mail, so I may have just given it to Josh.

23 Actually, I think that is -- yeah.  He asked

24 me for my number that he would refer me to

25 his counselor, so, yeah, that's how he got



1   it.

2          Q.      All right.

3                  All right.  So you spoke to him,

4   then you prepared this statement and finished

5   it on June 5th?

6          A.      Yes.

7          Q.      Did you speak to Mr. Farley again?

8          A.      I sent it to him, texted him and

9   let him know I had it.  And then he said

10  we'll be in touch after -- you know, once, I

11  guess, they reviewed or when they were ready

12  to move forward with whatever they needed to

13  move forward with.

14         Q.      Okay.  Did you talk to him on the

15  phone again or was it a message or how did you

16  communicate with him?

17         A.      I think it was e-mail when I

18  send it to him.  And I actually didn't print

19  any of those either.  So yeah -- I'm sorry?

20         Q.      So you do have other e-mails from

21  Mr. Farley?  Is that right?

22         A.      Yeah.  I didn't know if I

23  actually -- I didn't know if that -- I didn't

24  even think to print them, to be honest.  I

25  don't know why I didn't print them.  I didn't



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 32 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          31

 1   print them, and I don't know why I didn't
 2   print them, to be honest.
 3        Q.     What -- to the best of your
 4   recollection, what other items do you have
 5   that you could obtain today?
 6        A.     That would be it.  I just didn't
 7   know if that -- I only thought I needed to
 8   print stuff that had to do with my
 9   interactions with Tyler Perry.  I didn't know
10   that -- I guess if I had to say why I didn't
11   print those, why it didn't dawn on me to
12   print the e-mails between me and Mr. Farley,
13   was because I didn't think that that had
14   anything to do with what I'm doing here
15   today.  I thought that I needed to print
16   everything from my proof working at Tyler
17   Perry Studios.  So if that has -- if that is
18   something you needed, then that's something I
19   dropped the ball on and I apologize, but
20   that's really the only other thing that I
21   don't have.
22        Q.     Okay.  Let's look at Exhibit 1,
23   which is the subpoena.  The very last page is
24   the attachment to the subpoena.  It says
25   documents to be produced at deposition.  So



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 33 of 144

ALBERTO M. REYES                                        April 25, 2016
SOLE vs. TYLER PERRY                                              32

 1  let's just go through this so we know what

 2  we're talking about.  So No. 1, all documents

 3  evidencing or relating to conversations or

 4  communications you had with plaintiff, who was

 5  Josh Sole, his attorneys or his

 6  representatives.  Do you see that?

 7         A.     Yep.

 8         Q.     Okay.  So are those communications

 9  with Mr. Farley the only communications with

10  his representatives that you haven't brought

11  with you here today?

12         A.     Yes.

13         Q.     Is there anything else within that

14  category that you have in your possession that

15  you haven't brought today?

16         A.     No, that would be it.

17         Q.     All right.  Let's look at No. 2.

18  And it's all documents evidencing and relating

19  to conversations, communications you had with

20  Brett Hendrix.  Have you brought everything

21  you have in that category here today?

22         A.     Yeah, everything I have.  Like I

23  said, the only one I cannot find is the one

24  that says call me so we can do the interview.

25  Because we had an interview like two days --



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 34 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          33

1    not actually -- I sent him the -- you guys

2    have my papers.  I sent him the initial

3    Facebook message and then he said send in my

4    resume, and the next day is when he said call

5    me and we had the interview on the phone on a

6    Sunday.  So that's the only one I can't find.

7         Q.    Okay.  But you -- so you know it

8    exists, you just can't find it; right?

9         A.    Yes.

10        Q.    Okay.  Let's look at category

11   No. 3 on the subpoena, that final page.  And

12   I'm summarizing.  It's basically all documents

13   you have relating to your employment at And

14   Action, LLC, or at Tyler Perry Studios?

15        A.    Or everything that I could find

16   is here, yes.

17        Q.    Okay.  And No. 4 was all documents

18   referral -- or related to Brett Hendrix or

19   Joshua Sole.  You brought everything?

20        A.    Everything I could find, yes.

21        Q.    Okay.  We need you to print and

22   produce, then, the communications you had with

23   Mr. Farley.

24        A.    Okay.

25        Q.    We can go off the record and I can



ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                                  34

1  tell you how to do that after we're done.

2          A.      All right.

3          Q.      Okay?  All right.

4                  All right.  Okay.  So you've told

5  me about two occasions where you spoke to

6  Mr. Farley, one before you prepared your

7  statement and one, I guess, at about the same

8  time you finished preparing your statement.

9  Is that right?

10         A.      Right.

11         Q.      When was the next time you spoke

12 to him?

13         A.      He messaged me -- am I allowed

14 to pull out my phone to give you an exact

15 date?

16         Q.      Sure.

17         A.      I turned it off.  Excuse me.

18                 Basically he messaged me to tell

19 me about the upcoming trial or case, which

20 like I said was -- I'll tell you exactly but

21 it had to be a few weeks to a month ago.  No

22 more than a month ago.

23                 And like I said, I didn't even

24 recognize who he was because I -- it's been

25 so long, I didn't think nothing of it.  I



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 36 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                           35

1    kind of thought that this wasn't going

2    anywhere.  You know, I thought about it every

3    once in a blue moon, but I didn't think

4    nothing of it.  I said, oh, well, it is what

5    it is, and left it alone.

6              He messaged me on, actually,

7    April 15th so it wasn't even a month ago,

8    right.

9         Q.    Okay.  So April 15th of this year;

10   correct?

11        A.    Really, sooner than I thought,

12   April 15th, yes.

13        Q.    Can I see that message?

14        A.    (Witness complies.)

15        Q.    Is this all messages from

16   Mr. Farley?

17        A.    Yes.

18        Q.    Okay.  All right.  Mr. Reyes, I'm

19   going to ask you just to read these text

20   messages into the record for us.  I don't know

21   that there's a good way to copy these short of

22   putting your phone on a copy machine.

23        A.    Right.

24        Q.    All right?  So if you would, for

25   each one of these messages, state the date,



ALBERTO M. REYES
SOLE vs. TYLER PERRY

April 25, 2016
36

1  say who the message is from, and then if you

2  would, just read the message into the record

3  and the time as well.

4        A.      Okay.  From the beginning?

5        Q.      Yeah, from the beginning.

6        A.      Okay.  Friday, April 15th, 2016,

7  Hello, Al Be, this -- Tye Farley -- this

8  message is from Tye Farley, on Friday,

9  April 15th.

10               "Hello, Al Be, Tye Farley, the

11  one contacted you to Josh's case.  How are

12  you?"

13               Saturday, April 16th.  "Good

14  morning.  Sorry for the delay.  I'm fine and

15  you?"

16               Sunday, April 17th.

17        Q.      Slow down just a little bit so she

18  can take it down.  Go ahead.

19        A.      Let me go back to Saturday.

20  Saturday, my response was, "Good morning.

21  Sorry for the delay.  I'm fine and you?"

22               Sunday, April 17th, Tye says,

23  "I'm great.  A story will be going out soon.

24  You are mentioned along with some of your

25  quotes."



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 38 of 144

ALBERTO M. REYES                                        April 25, 2016
SOLE vs. TYLER PERRY                                              37

1              I replied okay.

2              Wednesday, April 20th, "Call

3    me," from Tye.

4              Thursday, April 21st, 2016.  "I

5    got served this evening."  That was my

6    response.  Sorry.  "I got" -- oh, I said,

7    "Okay, we will talk tomorrow."

8         Q.    Tye said that?

9         A.    Tye said that.  Excuse me.

10        Q.    Okay.  That's fine.  Just take

11   your time and just go through it piece by

12   piece.

13        A.    Tye says again, "When do you

14   have to appear in court?"

15             I said -- this is all

16   April 21st, Thursday.  I replied, "Monday at

17   12 p.m."

18             Same day, Tye replies, "Okay,

19   tomorrow for sure, we will go over your story

20   and testimony."  I replied okay.

21             Now, Friday, April 22nd, 2016,

22   I'm at work.  "How long will this prep take

23   so I can call you back?"  That was me.

24             He replies -- Tye replies,

25   "Actually, I have found a lawyer for you."



1            I replied, "Yeah, I was going to

2     ask you why do I need a lawyer if I'm just a

3     witness."

4            "Because you are being

5     questioned" -- Tye replies, "Because you are

6     being questioned by another lawyer."

7            I replied, "Okay.  So do I need

8     to call you or him, and is this lawyer going

9     to cost me?"

10           He replies, "Do you need one

11    that will do this for free?"  And he -- and

12    Tye replies, "There are two ways you can

13    handle this.  You can get this lawyer.  Just

14    got his price.  He said he can rep you and

15    drop his price to 5 flat" -- is that right --

16    "5 flat or call or can walk in and just

17    tell -- or you can just walk in and tell your

18    story and tell the truth.  You just want to

19    have a lawyer there to advise you.  I would

20    walk in with a lawyer."

21           Tye replies, "He will get back

22    to me this evening between 5 p.m. and

23    7:00 p.m."  And then he says again, "Okay, I

24    got you a lawyer."  I replied okay.  He says,

25    "So we are good."



 1              I said okay, and that's the end

 2     of our conversation.

 3          Q.     Okay, thank you.

 4              The -- did you actually have a

 5     conversation with Mr. Farley over the course

 6     of these text messages?

 7          A.     No.  Just all the text messages.

 8          Q.     All in the text messages.

 9          A.     Yes.

10          Q.     You didn't -- so other than the

11     two times -- well, let me ask it this way.

12     Other than the two times you spoke to him back

13     in 2015 that we've already discussed, have you

14     had a conversation with him, you know, either

15     on the telephone or face-to-face?

16          A.     No, everything's been through

17     text.  He apparently gave him my number, so I

18     haven't spoken to him after that until he

19     contacted me.  So since this, I've always

20     spoken to him, (indicating).

21          Q.     So the counsel that's here

22     representing you today, Mr. King, was obtained

23     through Mr. Farley.  Is that right?

24          A.     Well, he was referred to me,

25     Mr. Farley, I don't know how --  yeah, I



ALBERTO M. REYES                                     April 25, 2016
SOLE vs. TYLER PERRY                                              40

1   guess.

2        Q.    And Mr. Farley said on the text

3   message he got you a lawyer; right?

4        A.    Yes.

5        Q.    Okay.  And had you met Mr. King

6   before you walked in here today?

7        A.    No.

8        Q.    Okay.  Had you spoken with

9   Mr. King before you walked in here today?

10       A.    Yes.  I have spoken to him.

11       Q.    Okay.  When did you first speak to

12  Mr. King?

13       A.    Friday -- Friday or Saturday.

14  Saturday.  Saturday.  He text me Saturday and

15  asked me to --

16       Q.    Don't talk to me about what you

17  talked about.  That's fine.

18            Now, have you retained Mr. King to

19  be your lawyer here today?

20       A.    Yes.

21       Q.    Okay.  And are you paying him to

22  be here today?

23       A.    Yes.

24       Q.    You are.  Okay.  All right.

25            Did you know Mr. King is assisting



1  Mr. Sole's attorney in Mr. Sole's lawsuit?

2        A.    Before today, no.

3        Q.    Okay.  You were present in the

4  waiting room here before we started the

5  deposition when I asked Mr. King that;

6  correct?

7        A.    Yes.

8        Q.    Okay.  Is that the first time you

9  knew that there was any affiliation between

10  Mr. King and Mr. Sole's attorneys in this

11  case?

12        A.    Yes.

13        Q.    Do you know if Mr. Sole is paying

14  your attorney anything to be here today to

15  represent you?

16        A.    No.

17        Q.    All right.  Other than Mr. Farley,

18  have you communicated with anyone else and

19  Mr. King here about Mr. Sole's case?

20        A.    Yes.  I've spoken with another

21  PA who I worked with there.  That's actually

22  how I even found out about this from the

23  beginning.  I mean, we all heard what we

24  heard on the radio.  But I found out more in

25  depth about it through her.



ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                                   42

1          Q.    And who is that?

2          A.    Ceret.

3          Q.    Is that the person you referred to

4     in your statement?

5          A.    Yes.

6          Q.    Okay.  C-e-r-e-t?  Is that right?

7          A.    Yeah.  That's the best way I

8     could spell it.

9          Q.    Okay.  What's her last name?

10         A.    I don't know that.

11         Q.    You don't know?  Okay.  All right.

12         A.    I don't recall it.

13         Q.    Okay.  Okay, other than Cerey

14    (sic) --

15         A.    Ceret.

16         Q.    Ceret?  I'm sorry -- Ceret,

17    Mr. Farley, and Mr. King, have you spoken with

18    anyone else about this matter?

19         A.    I mean, people who know me

20    personally know why I was let go from Tyler

21    Perry Studios, so I mean just like word of

22    mouth through people when it happened, but I

23    wouldn't say I talked about this case.  I

24    talked about my reasoning for being let go.

25         Q.    Okay.  Right.  I'm talking about



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 44 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                         43

 1   Mr. Sole's case in particular.

 2          A.     Oh, no, no, no.

 3          Q.     Okay.  All right.  Have you been

 4   interviewed by anybody from press about

 5   Mr. Sole's matter?

 6          A.     No.

 7          Q.     All right.  Mr. Reyes, I'm going

 8   to hand you what's been marked as Exhibit 3.

 9   Have you seen Exhibit 3 before?

10                 (Whereupon, Defendant's

11                 Exhibit 3 was marked for

12                 identification.)

13                 THE WITNESS:  Oh, that's -- that

14   looks like the message that I think I sent to

15   Josh, I believe.

16          Q.     (By Mr. Boyd) Okay.  Mr. Sole

17   produced this to us in this litigation.

18          A.     Okay.  Well, there it is.

19          Q.     Okay.  And so you recognize

20   Exhibit 3 as the original message you sent to

21   Mr. Sole?

22          A.     Yes.

23          Q.     All right.  This is not dated.  I

24   will tell you that through some recent

25   forensic review, we believe this may have been



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 45 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                        44

 1   sent on June 2nd of 2015.

 2        A.    Okay.

 3        Q.    Does that coincide with your

 4   recollection of when this might have been

 5   sent?

 6        A.    I don't -- I don't recall when I

 7   sent it.

 8        Q.    From the time you first sent this

 9   message until the time that you finished your

10   statement that we just looked at, Exhibit 2, I

11   believe, how many days would have passed?

12        A.    You know, to be honest with you,

13   I don't know because it was kind of like a

14   whirlwind when that happened.  So I can't

15   really tell you the time frame that I recall.

16   So...

17        Q.    I think you said before, from

18   the -- you thought it was probably a week or

19   less between the time you reached out to

20   Josh --

21        A.    Right.

22        Q.    -- and from the time you prepared

23   your statement.  Is that fair?

24        A.    Right.  So I mean, yeah, that

25   could be fair, yeah.



ALBERTO M. REYES                                      April 25, 2016
SOLE vs. TYLER PERRY                                              45

1        Q.    Okay.  All right.  So within a

2   matter --

3        A.    But to give exact dates, I

4   couldn't tell you.

5        Q.    That's fine and I understand.  I

6   mean it's been a while.  But within a week --

7   this would have been sent within a week of

8   your finishing your statement; correct?

9        A.    Right.

10       Q.    All right.  All right.

11             And when you -- take a look at

12  Exhibit 2.  When did you -- how -- you've said

13  you finished it and signed it on June 5th.

14  When did you send that to Mr. Farley?

15       A.    Probably the same day because I

16  did it on Word and copied it to my e-mail and

17  then just sent it to him -- or actually, no,

18  I just sent it to him as an attachment.  I'm

19  sorry.

20       Q.    All right.  So you finished it,

21  signed it, dated it.  Did you scan it?

22       A.    No.

23       Q.    How did you get your signature on

24  there and send it?

25       A.    This is printed -- well, this is



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 47 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                            46

 1  printed.  Oh, for this, yeah, I probably did

 2  scan it, actually.  Yes, I did.  For the

 3  signature, yeah, I did scan it.  I'm sorry.

 4       Q.    Okay.  And is one of the e-mails

 5  you didn't bring here today, you sent to

 6  Mr. Farley?

 7       A.    The e-mails, yeah.

 8       Q.    All right.

 9       A.    I was working at a -- I was

10  working at that time where I could scan it,

11  and I scanned it in when I -- when I -- I

12  wanted my signature to be on the letter, so

13  yes, I did scan it.

14       Q.    All right.  Did you send it to

15  anybody other than Mr. Farley?

16       A.    No, only him.  Well, now, my

17  attorney.

18       Q.    Right.  At the time.

19       A.    Oh, at the time, no.  Probably

20  to myself.  I think I forwarded a copy to

21  myself so that I could have it in case I ever

22  needed it.  So me and Mr. Farley.  Just in

23  case it was ever needed again, I have a copy

24  of it, of myself.

25       Q.    Okay.  Since then, have you sent



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 48 of 144

ALBERTO M. REYES                                      April 25, 2016
SOLE vs. TYLER PERRY                                            47

1   it to anybody other than to Mr. King?

2       A.     No.

3       Q.     Okay.  Have you ever spoken to

4   Kwame Thompson, Mr. Sole's attorney?

5       A.     No.  Again, I -- no.  I thought

6   I might have because I didn't know who the

7   people -- there was such time but I -- no,

8   I've never spoken to him, never met him.

9       Q.     What about anybody from his

10  office?

11      A.     No.

12      Q.     So has all of your contact about

13  this matter been with Mr. Farley until

14  Mr. King recently?

15      A.     Yes.

16      Q.     All right.  Before -- so

17  Mr. Farley found you Mr. King before you even

18  asked to be represented; correct?

19      A.     You mean for today?

20      Q.     Yeah.

21      A.     Yeah.

22      Q.     Okay.

23      A.     Well, like I said, I didn't even

24  know there was a trial.  I'm really unaware

25  of everything.  So I just -- honestly, I



ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                                48

1    thought I was writing a statement.  So.

2         Q.    Sure.  No, I understand.  I

3    understand.

4              But -- okay.

5         A.    He asked me if I knew any free

6    lawyers.  I said no.

7         Q.    All right.  And so he found you

8    Mr. King.  And then did you call Mr. King or

9    did Mr. King call you?

10        A.    He called me.

11        Q.    All right.  Okay.

12             (Whereupon, Defendant's

13             Exhibit 4 was marked for

14             identification.)

15        Q.    (By Mr. Boyd) Mr. Reyes, I'm going

16   to hand you a group of documents that we've

17   marked as collective Exhibit 4.  Take a look

18   at those.  These are documents we pulled just

19   today actually from your files over at And

20   Action.  I'm going to go through several of

21   these with you.  But let's look at the first

22   page of Exhibit 4, okay?

23        A.    All right.

24        Q.    It's right there.  Top of the

25   page, it says "ease" and it says "start/close

 1  form."  And underneath that, there's some

 2  handwriting.  Do you see that?

 3          A.    Uh-huh.

 4          Q.    Is that your handwriting?

 5          A.    Yes.

 6          Q.    Okay.  Is this part of the

 7  paperwork you signed when you first started

 8  working on the premises of Tyler Perry

 9  Studios?

10          A.    Yes.

11          Q.    Okay.  All right.  Sounds good.

12                Let's look at the next -- not the

13  next page but the page after that.  At the top

14  it says, "section 2, employer authorized

15  representative review and verification."

16          A.    Uh-huh.

17          Q.    Do you see that?

18          A.    Uh-huh.

19          Q.    Down below, there's a -- it says

20  signature of employer or authorized

21  representative, and it has a signature there.

22  It says Michelle and I can't read the last

23  name.  I'm sorry.  Or Cappin, it looks like.

24          A.    Uh-huh.

25          Q.    Do you know who that is?



 1         A.      The last name doesn't ring a

 2    bell.  I mean, I knew a Michelle there, but I

 3    can't say that's the same Michelle.  There

 4    were a couple of people with the same names

 5    but to say off the top of my head, no, I

 6    don't know who that is.  I can't put a face

 7    with the name.

 8         Q.      When you first came onboard, did

 9    you sit down with someone and go through this

10    paperwork?

11         A.      No, it was kind of like an open

12    tent and everybody just went to the back and

13    they gave you a folder, fill out your

14    paperwork.  When you were done, you gave it

15    back.  They checked it to see if you missed

16    anything, and then they sent you on your way.

17         Q.      Okay.  All right.  Sounds good.

18              All right.  Look at the next page,

19    authorization agreement for payroll direct

20    deposit.  Do you see that?

21         A.      Yes.

22         Q.      All right.  And down at the very

23    bottom, there's a six section box there.  Do

24    you see that?

25         A.      Yes.



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                         51

 1          Q.    Okay.  Is that -- on the very
 2    left-hand side, the top and bottom of that
 3    box, is that your printed name and your
 4    signature?
 5          A.    Yes.
 6          Q.    Let me finish my question before
 7    you answer.  I know sometimes you know where
 8    I'm going, but for the court reporter to get
 9    it all down, we need to have a question and
10    answer, okay?
11          A.    (Nodding.)
12          Q.    So is that your handwriting in
13    both the printed name and the signature?
14          A.    Yes.
15          Q.    Okay.  Did you notice the company
16    name was And Action, LLC?
17          A.    Yes.
18          Q.    Okay.  And what's your
19    understanding of And Action, LLC?
20          A.    I believe we were contracted
21    through them.
22          Q.    Right.  That's the production
23    company that you're actually hired by?
24          A.    Yes.
25          Q.    Okay.  And you understood that



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 53 of 144

ALBERTO M. REYES                                     April 25, 2016
SOLE vs. TYLER PERRY                                            52

 1   that was your employer, was And Action;

 2   correct?

 3        A.     Yeah.

 4        Q.     Okay.  Good.

 5               All right.  Turn to the page --

 6   the top of it says, "Independent contractor

 7   nonunion crew agreement."  Do you see that?

 8        A.     Uh-huh.

 9        Q.     All right.  Is that your

10   handwriting in the very top piece there?

11        A.     Yes.

12        Q.     All right.  It says you're

13   employed as an office assistant?  Is that

14   right?

15        A.     No.  I was a set decorator, PA.

16        Q.     Okay.  Was that your hourly rate,

17   the $10.71 an hour?

18        A.     I guess.  I didn't really pay

19   attention to it because we really morely

20   (sic) focused on the daily rate.  We were

21   told our -- mainly our daily rate.  We didn't

22   break it down by hourly rate.

23        Q.     The daily rate was going to be the

24   minimum amount you were paid.  Is that right?

25        A.     I believe it was what you got



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          53

```
 1   paid, yeah, up to ten hours.  Anything after
 2   that was overtime, if I recall, yeah.
 3        Q.     All right.  Sounds good.
 4               Look at the page -- turn several
 5   pages to the accounting policies and
 6   procedures.  Do you see that?
 7        A.     Yes.
 8        Q.     All right.  Is that your
 9   handwriting on the left-hand side of the page?
10        A.     Yes.
11        Q.     And do you see the approved by --
12        A.     Yeah.
13        Q.     -- line?  Do you recognize that
14   signature?
15        A.     No.
16        Q.     Was the producer on -- which show
17   were you working on?
18        A.     Well, I was contracted for If
19   Loving You is Wrong and Love Thy Neighbor.
20        Q.     Okay.  And did you understand the
21   producer was Will Areu on that one?
22        A.     Yes.
23        Q.     All right.  Does that refresh your
24   memory as to whose signature that might be?
25        A.     I mean if I'm looking at it, I
```



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 55 of 144

ALBERTO M. REYES                                       April 25, 2016
SOLE vs. TYLER PERRY                                              54

 1  mean, I guess.  I don't -- I can't really

 2  make out what it is, but I guess it could be

 3  a WA, yeah.

 4        Q.     Okay.  Any reason to think that's

 5  not Will Areu?

 6        A.     Right.  You said what?

 7        Q.     Is there any reason for you to

 8  think that that's not Will Areu's signature?

 9        A.     Oh, no.  I mean I wasn't there

10  when he signed it.  These weren't signed when

11  I had them, right.

12        Q.     Got you.  Look underneath there,

13  do you recognize that signature, the

14  production supervisor?

15        A.     The only production -- there

16  were several people there.  So I don't know

17  in particular who that is.  Like I said, this

18  looks like chicken scratch to me.

19        Q.     Was your production supervisor

20  Patrick Sheedy?

21        A.     Yes.

22        Q.     All right.

23               Okay.  Look -- again, turn several

24  pages.  And there's a page says discrimination

25  and sexual harassment policy?



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          55

1          A.      Okay.

2          Q.      Do you see that?  Turn to the

3   third page of that particular policy.

4          A.      (Complies.)

5          Q.      Is that your signature on that

6   policy?

7          A.      Yes.

8          Q.      Okay.  And you dated it May 27,

9   2014?

10         A.      Uh-huh.

11         Q.      Is that right?

12         A.      Yes.

13         Q.      Okay.  Do you recall receiving

14  this policy?

15         A.      Yes.

16         Q.      Okay.  Were you able to look

17  through it, review it?

18         A.      Yes.

19         Q.      All right.  Do you have any

20  questions about it?

21         A.      For you?

22         Q.      No, when you -- at the time you

23  signed this.

24         A.      Oh, no.

25         Q.      Okay.  And was this part of the



ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                               56

1    packet that you received when you first came

2    onboard?

3         A.    I think that's one of the

4    packets that it's -- yeah.

5         Q.    Okay.  This sexual harassment

6    policy was in that packet, is my question.

7         A.    Yes.

8         Q.    Okay.  Good.  All right.

9         Okay.  And you see the dates on

10   there.  It looks like you started working on

11   location there on May 27, 2014.  Is that

12   right?

13        A.    Yes.

14        Q.    And from your statement,

15   Exhibit 2, I believe you said your last day

16   was July 11th, 2014.  Is that right?

17        A.    Yes.

18        Q.    Did you have any interactions with

19   Patrick Sheedy while you were employed with

20   And Action?

21        A.    Yes.

22        Q.    Did you see him as your ultimate

23   supervisor?

24        A.    I knew he was the -- no, I saw

25   Brett as my ultimate supervisor.



1        Q.     Okay.  You know Brett reported to

2     Patrick, though; correct?

3        A.     Yes.

4        Q.     And that's what I meant by that

5     question.  I mean was Patrick the supervisor

6     over --

7        A.     Yes.  He was the production

8     supervisor, yes.  He was over.

9        Q.     Over everybody; right?

10       A.     Yes.

11       Q.     All right.  And what group were

12    you in when you were working for And Action?

13       A.     Set decorating department,

14    right.

15       Q.     And what were you doing?  What was

16    your job?

17       A.     I was a PA.  I was basically

18    recording the counting of the buyers, taking

19    pictures of it.  Going on set, taking

20    pictures of things that needed to go into the

21    picture book.  We had a picture book.  I had

22    to put all the pictures of all the items in

23    the picture book for continuity.  That was my

24    main job.

25       Q.     All right.  And who did you work



1    with?

2          A.     Brett as the lead supervisor.

3    As the lead PA, there was another.

4          Q.     That's Brett Hendrix?

5          A.     Yes.

6          Q.     Okay.  Lead PA, you said?

7          A.     Yes.

8          Q.     All right.  And that's lead

9    production assistant?

10         A.     Yes.

11         Q.     Okay.  Go ahead.

12         A.     Mike Morris, he was another PA

13   just like me but actually he was basically

14   assigned to the set decorator but he was

15   still the PA.

16         Q.     Okay.  Who was the set decorator?

17         A.     Dennis -- I wrote it in my

18   statement.  Dennis Donegan.

19         Q.     Okay.  All right.  So --

20         A.     And then Ceret.  I don't

21   remember her last name.

22         Q.     All right.  Who else did you work

23   with?

24         A.     The buyers.  Tony Hall, who is

25   listed in my statement.  There were two



ALBERTO M. REYES                                      April 25, 2016
SOLE vs. TYLER PERRY                                              59

 1   other -- there were -- do you want it from

 2   the whole time I was there?

 3         Q.    Well, yeah.  I mean people who you

 4   interacted with on a regular basis.

 5         A.    Oh.  There were two other buyers

 6   there, but I can't remember their names,

 7   because I interacted with them, but they were

 8   just buyers.  I didn't really -- you want the

 9   place period or just my department?

10         Q.    Yeah, the people who you -- and I

11   don't -- obviously, you might have run into a

12   lot of people while you were there --

13         A.    Okay.

14         Q.    -- but I'm talking about people

15   that you worked with on a day-to-day basis.

16         A.    They're the people I worked with

17   on a day-to-day basis.  I did assist with --

18   and I don't remember his name for the life of

19   me.  He was the art director.  He had me

20   assisting with a photo shoot.  I can't

21   remember -- Calvin.  Calvin.  I don't

22   remember his last name, but I know his name

23   was Calvin.

24         Q.    Okay.

25         A.    I assisted once with filming and



ALBERTO M. REYES                                        April 25, 2016
SOLE vs. TYLER PERRY                                               60

1   with the -- what are they called?  The DPs, I

2   don't remember his name either.  I know the

3   last name was White.

4          Q.     What does DP stand for?

5          A.     Director -- director of

6   photography.  Director of photography.

7          Q.     Okay.  So sort of your normal

8   setting, what work you generally were doing,

9   did you have a desk, an office, a table?

10         A.     I had like a table.

11         Q.     Okay.  Where was that located?

12         A.     In the set decorating

13  department.

14         Q.     How many people were in that

15  department?

16         A.     The first few that I named, me,

17  Brett, Mike, Ceret, and the set decorator and

18  three buyers, so about five or six of us.

19         Q.     Okay.  All in the same room?

20         A.     Yes.

21         Q.     It's a big open room; right?

22         A.     Yes.  We had set dressers who

23  came -- actually, I'm sorry.  There were two

24  set dresser supervisors as well in there.

25  But they were always in and out.  They



ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                             61

```
 1   weren't in there all the time.
 2        Q.     Okay.  And that was the place you
 3   spent most of your time --
 4        A.     Yes.
 5        Q.     -- in the six weeks or so you were
 6   there?
 7        A.     Yes.
 8        Q.     All right.
 9               Okay.  Just -- I think I know the
10   answer to this.  But you don't have any
11   personal knowledge as to the relationship
12   between And Action, LLC, and Tyler Perry
13   Studios, LLC, do you?
14        A.     No.
15        Q.     Are you aware of anyone other than
16   Mr. Sole presently who worked on site at Tyler
17   Perry Studios for whatever production company
18   who made a claim of sexual harassment?
19        A.     No.
20        Q.     You didn't make a claim of sexual
21   harassment, did you?
22        A.     No.
23        Q.     All right.  You -- have you had
24   any discussions with anyone affiliated with
25   either And Action or Tyler Perry Studios about
```



ALBERTO M. REYES                                           April 25, 2016
SOLE vs. TYLER PERRY                                                    62

 1   how they would handle a sexual harassment

 2   complaint?

 3          A.     No.

 4          Q.     So I take it you don't have any

 5   knowledge about how that might be handled?

 6          A.     No.

 7          Q.     Is that correct?

 8          A.     Oh, yes, no.

 9          Q.     Got it.  Did you know Brett

10   Hendrix before you started working with And

11   Action?

12          A.     No.

13          Q.     How did you figure out to contact

14   him through Facebook?

15          A.     My friend, his name is Ryan --

16   but he's passed away so I don't know if

17   that's going to help.  But he referred me.

18   He saw -- he knew Brett.  Actually they went

19   to college together and Brett posted on

20   Facebook and he knew that I -- he works in

21   the film industry as well, or worked in the

22   film industry, and he knew that I wanted to

23   get in, so he saw that and told me, hey,

24   check it out, and that's what I did.

25          Q.     Okay.  Is this the Ryan Baker --



ALBERTO M. REYES                                        April 25, 2016
SOLE vs. TYLER PERRY                                              63

```
 1          A.      Yes.

 2          Q.      -- you refer to in your statement?

 3          A.      Yes, Baker.

 4          Q.      All right.

 5                  And was it a posting?  How did --

 6   what was it that you were responding to?

 7          A.      I never actually saw the

 8   posting.  Ryan told me about it and said go

 9   ahead and get it.  So I didn't even look for

10   it because I didn't -- I wasn't friends with

11   Brett.  But he told me the name.  I looked up

12   Brett's name and sent the message, but I

13   can't -- I never even actually saw the

14   posting.

15          Q.      I see.  Okay.  So you just sent

16   Brett a message with your resume?

17          A.      I sent him a message on Facebook

18   initially.

19          Q.      Yeah, I know.  We've got to get

20   the copies so -- okay.  We'll go back and look

21   at those.  But --

22          A.      And he replied and said send in

23   my resume and that's what I did.

24          Q.      Okay.  And then you said there was

25   a phone interview.  Is that right?
```



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 65 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                            64

1        A.      Yes, we did a phone interview on

2   that Sunday.

3        Q.      Who was on the phone?

4        A.      Me and Brett.

5        Q.      All right.  What kind of questions

6   did he ask you?

7        A.      He just asked me about my

8   organizing.  He basically told me about the

9   position.  He just asked me can I work well

10  under pressure, just basic interview

11  questions.  I don't remember exactly every

12  one.  It was just a basic standard interview.

13  And pretty much I answered every question.

14  And he said, "Great, we'll see you Tuesday,"

15  because that Monday was Memorial Day.  So I

16  started the day after.

17       Q.      All right.  Were there several

18  people going through the on-boarding process

19  when you came on?

20       A.      Yeah.  When I was doing

21  paperwork, yeah, there were people.

22       Q.      Okay.  Did Brett tell you who you

23  would be reporting to in that phone interview?

24       A.      I don't know if he told me or I

25  just assumed that I would be reporting to him



 1 | because I did the interview with him.  He
 2 | did -- well, he said, "When you're done with
 3 | your paperwork, come see me."
 4 |        Q.     Okay.
 5 |        A.     So I kind of just -- like I
 6 | said, I don't know if he directly -- I can't
 7 | recall if he directly said I would be
 8 | reporting to him, but I just assumed that.
 9 | And then pretty much the time that I worked
10 | there, I reported to him, like that's who I
11 | reported to.
12 |        Q.     Okay.  And there were certain
13 | tasks that your group had to complete;
14 | correct?
15 |        A.     Yes.
16 |        Q.     And Brett was responsible for
17 | basically doling out that work?
18 |        A.     Yes.
19 |        Q.     Is that how it worked?  Okay.  And
20 | who did Brett report to?
21 |        A.     Patrick.
22 |        Q.     Patrick.  Okay.
23 |               All right.  Do you know how -- the
24 | manner in which Brett was paid?
25 |        A.     No.



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 67 of 144

ALBERTO M. REYES                                        April 25, 2016
SOLE vs. TYLER PERRY                                              66

1          Q.     Do you know how much he was paid?

2          A.     No.

3          Q.     Did you have any conversations

4    with anyone at And Action or at Tyler Perry

5    Studios regarding the extent of Brett's

6    authority?

7          A.     I would talk with Ceret.

8          Q.     And she's another production

9    assistant?

10         A.     Yeah.

11         Q.     Okay.  Go ahead.

12         A.     I just kind of wanted to know

13   what his authority was because I started to

14   feel uncomfortable with a lot of the things

15   that -- as written in my statement, and I

16   started to question.  And, you know, she

17   reassured me that he's just a PA.  I mean,

18   yes, he's a lead, but he's just a PA.  He

19   really doesn't have any authority.  So it was

20   kind of like small chatter like that, yeah.

21         Q.     Okay.  And that was your

22   understanding, he was really just a PA?

23         A.     Right.

24         Q.     Okay.  And he really didn't have

25   any authority to hire or fire; right?



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 68 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                        67

```
 1           A.    Right.
 2           Q.    Okay.  And anybody tell you
 3   anything different, that he did have that
 4   ability?
 5           A.    No.
 6           Q.    Okay.  As I understand it, he had
 7   been there longer than the other PAs in the
 8   group; right?
 9           A.    Right.
10           Q.    And he kind of knew what to do;
11   right?
12           A.    Right.
13           Q.    Is that why he was the lead as far
14   as organizing the work?
15           A.    If I had to assume, yes.
16           Q.    Okay.  All right.  Other than
17   Ceret, did you have any conversations with
18   anybody about the extent of his authority
19   there?
20           A.    No.
21           Q.    Okay.  Pull out your statement,
22   Exhibit 2, please.
23           A.    (Witness complies.)
24           Q.    Kind of want to go through this
25   kind of paragraph by paragraph.
```



ALBERTO M. REYES                                      April 25, 2016
SOLE vs. TYLER PERRY                                            68

```
 1              As far as your on-boarding and
 2   hire with And Action, do you know who Brett
 3   talked to as far as getting approval to hire
 4   you?
 5        A.    No.
 6        Q.    Okay.  Now, I understand that
 7   there was some dissension between you and
 8   Mr. Hendrix while you were there; correct?
 9        A.    Yes.
10        Q.    And is all of that dissension
11   described in your statement here?
12        A.    Yes.
13        Q.    Is there anything else that you
14   did not include in your statement that you had
15   problems with from Mr. Hendrix?
16        A.    No.
17        Q.    All right.  Did Mr. Hendrix ever
18   try to make romantic overtures toward you?
19        A.    No.
20        Q.    Did you report any of your
21   dissatisfaction with Mr. Hendrix to anyone
22   other than -- anyone in management of And
23   Action or Tyler Perry Studios?
24        A.    No.
25        Q.    Okay.  Are you aware that Mr. --
```



1   are you aware of any other -- well, do you

2   have any knowledge about any other employment

3   Mr. Hendrix may have had other than with And

4   Action, LLC?

5         A.    I'm sorry.  Say that again.

6         Q.    Yeah, poor question.  Do you know

7   anything about Mr. Hendrix's past?

8         A.    No.

9         Q.    All right.  So you don't know what

10  other jobs he may have had?

11        A.    No.  I know he had some pictures

12  where he done some plays, but, extent of

13  that, I think I asked him about a particular

14  picture he had and he said he did a play, so

15  I don't know if that was employment or just

16  something he did.

17        Q.    Sure, sure.  Are you aware -- or

18  do you have any knowledge that Mr. Hendrix was

19  ever accused of sexual harassment previously?

20        A.    No.

21        Q.    Are you aware of anybody who

22  claims they were sexually -- other than

23  Mr. Sole, who claims they were sexually

24  harassed at either And Action or Tyler Perry

25  Studios?



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 71 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          70

```
 1           A.     No.
 2           Q.     All right.  You're not contending
 3    that you were sexually harassed there, are
 4    you?
 5           A.     No, I'm not.
 6           Q.     Do you know why Mr. Sole would
 7    have said that you would have knowledge of
 8    Mr. Hendrix's former sexual harassment
 9    conduct?
10           A.     No.  That's what -- are you
11    asking me that that's what he said that I
12    know?
13           Q.     Yeah.
14           A.     Unless he's -- might have
15    mistaken what I said in my e-mail as that,
16    Exhibit A.  Where is that?  Or this.  I'm
17    sorry.  3.
18           Q.     3.  Yeah.
19           A.     I don't know if he confused me
20    saying that that's what I meant, but no, I
21    don't know why he would say it because I
22    never -- my situation with Brett was not
23    sexual.  It was more -- it was petty but not
24    sexual.
25           Q.     Sure.
```



ALBERTO M. REYES                                      April 25, 2016
SOLE vs. TYLER PERRY                                            71

```
 1        A.    So I mean, I don't know if he
 2   took this as me saying that I'm -- have the
 3   same situation.  I think I said -- slightly
 4   the same, so he might have took that as -- if
 5   I had to guess.
 6        Q.    Okay.  You're referring to
 7   Exhibit 3?  That's your original note to
 8   Mr. Hendrix -- I mean, I'm sorry, to Mr. Sole?
 9        A.    Right, yes.
10        Q.    Right.  So you're guessing,
11   though, right now, aren't you?
12        A.    Yeah, because I -- we never
13   talked about that.  So I wouldn't know why.
14        Q.    Okay.  They also said you would
15   have knowledge of history of sexual
16   harassment, Tyler Perry Studios, LLC, and And
17   Action, LLC.  Do you have any knowledge about
18   that?
19        A.    Knowledge, no.  I -- he --
20   unless -- I don't know how he would know
21   this, because like I said, I haven't spoken
22   to him, but me and Ceret witnessed him very
23   intimate with the other PA.  Like it was
24   obvious there was something going on.  I
25   don't know if that's what he's referring to,
```



ALBERTO M. REYES                                              April 25, 2016
SOLE vs. TYLER PERRY                                                      72

1  but I --

2        Q.    Okay.  Tell me -- give me -- you

3  need to tell me who you're talking about.

4  Who --

5        A.     Mike Morris.

6        Q.    Okay.  So you think that

7  Mr. Hendrix was intimate with Mr. Morris?

8        A.    I do.  There was -- it was clear

9  as day there was something going on to both

10 me and her.  It was favoritism.  I mean they

11 ate and drank from the same cup.  They left

12 together.  It was -- I mean I wouldn't say

13 that they were like flat on the table being

14 intimate.  But I mean, it wasn't -- anybody

15 could tell that there was some intimacy going

16 on between them.

17             So if he's referring to that,

18 yes, I do believe that because that's

19 actually in my statement about favoritism

20 and -- I didn't want to make accusations

21 because I mean I can't sit there and say for

22 sure, but if I -- I really think that there

23 was some romanticness (sic) going on between

24 them two.

25       Q.     Between Mr. Hendrix and



ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                              73

1  Mr. Morris?

2          A.      Yes.

3          Q.      Okay.   But they didn't say that

4  that was happening; correct?

5          A.      Right.

6          Q.      This was an assumption you were

7  making; correct?

8          A.      Yes.

9          Q.      Okay.   And did you ever see

10  Mr. Morris tell Mr. Hendrix that his behavior

11  was inappropriate in any way?

12          A.      No.   Not that I saw, no.

13          Q.      Did you raise their interactions

14  between the two of them with anybody else at

15  And Action or Tyler Perry Studios?

16          A.      I wouldn't say raised.  Me and

17  Ceret would kind of just give each other that

18  eye.  Like when we see things, we kind of

19  like -- we look like we knew what was going

20  on because we sat -- like I said, we sat

21  across from each other, and we would just

22  kind of just give each other like, uh-huh, we

23  know what's going on.  But I wouldn't say --

24  I didn't -- we didn't go around like making

25  it a thing to anybody.  We just kind of just



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 75 of 144

ALBERTO M. REYES                                      April 25, 2016
SOLE vs. TYLER PERRY                                            74

1   snickered about it kind of thing.

2       Q.    Okay.  Did it seem unwelcome to

3   Mr. Morris at all?

4       A.    No.  I know there was a couple

5   times Mr. Morris -- there were a couple times

6   Mr. Morris came in and they didn't leave

7   together and it was odd because pretty much

8   every day they left together.  So I don't

9   know.

10      Q.    Okay.  Again, you're just

11  speculating at this point?

12      A.    Yeah.

13      Q.    All right.  Did Mr. Morris ever

14  tell you that he thought Mr. Hendrix's

15  behavior was inappropriate in any way?

16      A.    No.

17      Q.    Do you know if Mr. Morris ever

18  reported anything about Mr. Hendrix's behavior

19  to anyone?

20      A.    No.

21      Q.    Do you know if Ceret reported

22  anything about Mr. Hendrix's behavior to

23  anyone?

24      A.    No, not that I know of.

25      Q.    Okay.  Okay.



ALBERTO M. REYES                                         April 25, 2016
SOLE vs. TYLER PERRY                                              75

```
 1              The sort of dissension between and
 2   you Mr. Hendrix, I guess, related to your --
 3   I'm summarizing here, but tell me if this is a
 4   fair summary -- your being in other locations
 5   or talking to other people within the company?
 6   Is that --
 7        A.      That is what he led me to
 8   believe, yes.
 9        Q.      Okay.  All right.  And you knew, I
10   think you even say so in your statement, that
11   you were not supposed to be taking photographs
12   on set; correct?
13        A.      Right.  Well, in my statement, I
14   was informed no photography policy, and
15   again, this is -- and I was telling my lawyer
16   before I got here.  I did put that -- because
17   I know that -- I don't want to make lies.
18   But about the -- that it was only referred to
19   on set.  I -- that was a mistake on my end.
20              It does say no photography,
21   but -- I mean there's plenty of people there
22   that take pictures on set, they have pictures
23   posted at their desk.  The only two pictures
24   I ever took was the two that you have
25   present, my -- well, he's not my nephew,
```



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 77 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          76

1    my -- his mother is like my sister and I call

2    him my nephew.

3              They asked if we know any

4    extras, let them know, and she was selected,

5    so he came on set.  I took a picture with

6    him, nothing of the set.

7              And then the second one was of

8    my hand.  I really thought those were, like,

9    very innocent like photos.  I didn't even

10   see -- and the funny thing is the only one

11   who made a big deal about it was Brett.

12        Q.    Okay.

13        A.    As a matter of fact, he didn't

14   even say anything about the first photo

15   because I don't know if the dates -- are my

16   papers back?  I don't know if the dates are

17   on my Instagram post but they were two

18   different time stamps.  The first one was

19   never even mentioned.  The last one with my

20   hand with the paper wrapper is the one that

21   got the attention from him.

22              And the only reason why he's

23   Facebook friends with me was because when I

24   reached out to him, we became Facebook

25   friends.



ALBERTO M. REYES                                        April 25, 2016
SOLE vs. TYLER PERRY                                              77

1              But, again, I did not know

2     that -- I assumed that, you know, hey, don't

3     take pictures of the set, don't take pictures

4     of what's going on in Tyler Perry Studios.  I

5     didn't know I couldn't take a picture with my

6     little buddy, or my hand, you know.  I mean I

7     could see if I had Tyler Perry Studios or

8     something in the background or different

9     things like that.  But -- you know.

10             Q.    The -- let's talk about sort of

11    your last day there.  You had already been

12    told that you were -- your assignment was

13    going to be ending; correct?

14             A.    That week, yes.

15             Q.    Okay.  And what day was it?  Do

16    you recall?

17             A.    The day that I left?

18             Q.    Yeah.

19             A.    June 11th -- or July 11th.  It

20    was -- it was -- I think it was the day

21    before or two days prior to my actual end

22    date.  It wasn't the end date.  It was --

23             Q.    Within a day or two?

24             A.    Yes.

25             Q.    Okay.  That's fine.



1          And Mr. Hendrix told you that

2    someone other than him had made the decision

3    for you to be let go; correct?

4          A.     Yes.

5          Q.     Do you know who that was?

6          A.     No, he never told me.

7          Q.     All right.

8          A.     Well, actually, at first he

9    didn't tell me, and then he said that it was

10   somebody in the hair department because my

11   friend -- a friend of mine worked on set as

12   well.  And when I had downtime, I would go

13   over there and speak to him.  And so he said

14   that that -- the manager of that department

15   said that I had to go.

16         Q.     Okay.  So that was confirmed by

17   somebody else that it was in the hair --

18         A.     No, that's what he said.  That

19   was never confirmed.  That's what he said.

20         Q.     Let me make sure I'm

21   understanding.  So Mr. Hendrix told you it was

22   someone in the hair department?

23         A.     Yeah.  He told me two different

24   reasons.  We were standing outside at the

25   gate talking for a while.  At first he said



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                           79

```
 1   it was higher than him, it was out of his
 2   control.  And I said -- I asked him who it
 3   was.  He didn't tell me at first, and then he
 4   came back and said -- in the second, you
 5   know, sentence, he said, oh, well, it was the
 6   wardrobe, the hair department manager wanted
 7   you gone.
 8        Q.    Okay.  And then you spoke to
 9   someone else who said the same thing?  Is that
10   what I heard you say?
11        A.    No, no.
12        Q.    Okay.  I misunderstood you.  Who
13   was the friend that you said was also in the
14   department?
15        A.    My friend, his name is Jerome
16   Allen.
17        Q.    Okay.
18        A.    He worked there as a hair
19   dresser.
20        Q.    Okay.  And what did Jerome tell
21   you?
22        A.    He told me he didn't know
23   anything about that when I asked him
24   afterwards.
25        Q.    Okay.  So he just didn't know
```



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 81 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          80

1  whether it had happened or not?

2       A.    Yeah, he didn't know anything

3  about that.

4       Q.    All right.  So you don't know for

5  sure whether someone in the hair department

6  did ask for you to be let go; correct?

7       A.    I don't know for sure but I do

8  know that I reached out to Patrick Sheedy,

9  the production assistant.  I don't know if it

10 was a day or two later.  It was a couple of

11 days -- it was within the first couple of

12 days.  He wasn't even aware that I was let

13 go.  He thought that I -- it was my last day.

14 He told me that, "Relax, don't worry about

15 it.  When the show picks back up in August,

16 you'll be fine.  Don't pay attention to

17 Brett."

18            So I'm thinking if I was let go

19 by a manager, I think that he would know

20 being that he's over it.  He was unaware of

21 that.  He didn't even know I was let go.

22            Along with Ceret who --

23 actually, I spoke with Patrick after Ceret

24 because Ceret was the one who told me that --

25 that Brett was going around the hallway



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          81

1  saying that he was going to let me go.  He

2  was going to let me go, because I'm on some

3  stalker shit.  Excuse me.  I don't know if

4  I'm allowed to say that or not, but he said

5  that.  Like that's what he was going around

6  saying to everybody in the building.

7        Q.    So Ceret told you that that was

8  what Brett was saying?

9        A.    Yes.

10       Q.    All right.  You didn't hear Brett

11 say that specifically yourself, did you?

12       A.    No.

13       Q.    Okay.  And you don't know whether

14 someone in the hair department did make that

15 request; correct?

16       A.    I know that Patrick Sneedy (sic)

17 confirmed that I wasn't -- that that wasn't

18 the case.  I mean --

19       Q.    Let's back up.  Did you ask

20 Patrick whether -- specifically whether

21 someone in the hair department had asked for

22 you to be let go?

23       A.    I didn't ask him specifically if

24 someone in the hair department asked me to be

25 let go.  I asked him if I was fired.  He said



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          82

1    I wasn't fired, so.

2         Q.     All right.  Okay.  Do you know one

3    way or the other whether someone asked Brett

4    to escort you out?

5         A.     No.

6         Q.     All right.  And your understanding

7    was Brett didn't have the authority to fire

8    you; correct?

9         A.     Right.

10        Q.     All right.  Now, the -- so you

11   don't know if Brett actually did make the

12   decision to walk you out; right?

13        A.     What I do know is that Brett had

14   me believe that I was fired because he --

15   because he knew -- he knew that I believed

16   that I was under him, that he brought me in.

17   I -- I did.  I believed that he -- I'm new

18   here.  You don't want to do anything to mess

19   up your chances.  So I believed that he had

20   the ability to take and take -- to give me

21   the chance to work there and take it away.

22             I didn't know anything about

23   that.  I don't know who, who makes decisions.

24   I was just trying to do a good job, make

25   connections.  I didn't know at the -- when it



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 84 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          83

 1  was time for a final decision, reprimandment

 2  (sic), and I didn't want to question that

 3  because I wanted to do whatever I could to

 4  stay in there.  So I -- if Brett said it, I

 5  listened.

 6         Q.    Okay.

 7         A.    And he knew that.  So when he

 8  would come to me, he -- and he used that to

 9  his advantage.

10               So when he walked me through the

11  building and told me he was escorting me out

12  and, you know, basically said, you know, "You

13  have to go, I didn't make the decision," I

14  believed him.  Even though I later tried to

15  inquire further.  But, you know, that's just

16  how it was.

17         Q.    All right.  That's fine.

18               Have you spoken with Mr. Hendrix

19  after July 11th of 2014?

20         A.    No.

21         Q.    Have you spoken with anyone about

22  Mr. Hendrix since that day?

23         A.    I -- like I said, yes, I did.  I

24  spoke with Ceret.  I remember she had me on

25  speakerphone with a couple of people from the



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 85 of 144

ALBERTO M. REYES                                     April 25, 2016
SOLE vs. TYLER PERRY                                            84

1    office.  And I spoke with Patrick Sneedy
2    (sic).  And I reached out to Michelle.
3    That's what I say -- Michelle, who was -- it
4    was -- I don't really know her position, but
5    I know she was one of the production -- I
6    don't know if she was, like, right there with
7    Patrick Sneedy, but she worked from New York.
8    I don't know if her name's Melissa, Michelle.
9    I know it was something like that.  She
10   worked in New York.
11              But I had spoken to her once
12   when I worked there when she was there, and
13   we had a conversation about it, and she gave
14   me advice.  So when I was let go, I reached
15   out to her, which the e-mail is in here as
16   well.
17        Q.    Okay.
18        A.    And -- but I only spoke to Ceret
19   and Patrick Sneedy.
20        Q.    It's Sheedy, isn't it?
21        A.    I don't know.  I thought it was
22   Sneedy but -- okay.
23        Q.    I think it is Sheedy, by the way.
24        A.    Okay.
25        Q.    All right.  Okay.  Okay.  And that



ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                               85

```
1   would have been done at around the same time
2   you left.  Is that right?
3         A.    Yeah.  It was within the first
4   couple of days.
5         Q.    Okay.  Tell me about your
6   conversation you had with Michelle.
7         A.    Well, I didn't have a
8   conversation.  It was just an e-mail.
9         Q.    Oh, I see.  Okay.  Other -- did
10  you actually have a conversation, you know,
11  verbally with anyone other than Ceret?
12        A.    Patrick.
13        Q.    Okay.
14        A.    After -- you mean after I was
15  let go?
16        Q.    After you were let go, yes.
17        A.    Yes, Patrick.
18        Q.    Okay.  What did Patrick say to
19  you?
20        A.    Like I said earlier, he said
21  that he didn't know anything about me being
22  fired.  I'm sorry.  I also spoke with Dennis
23  too.  Dennis Donegan, the set decorator.  I
24  spoke with him as well.  But both of them
25  actually were both unaware.  They both said
```



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 87 of 144

ALBERTO M. REYES                                        April 25, 2016
SOLE vs. TYLER PERRY                                              86

1   the same thing.  They were unaware that I was

2   let go.  Patrick told me, Relax.  You know,

3   you can come back in August.  I mean, when

4   the show picks up, you know, we'll call you

5   back.

6             Dennis said that he didn't know.

7   He said he can't believe that Brett did that

8   to me, when he does this, and X, Y, Z.  But

9   he apologized.  He said if I ever need a

10  reference, he would reference -- because I

11  asked him to speak on my behalf, just kind of

12  see if he could defend me or whatever.

13       Q.    Okay.  But they all said that

14  Brett didn't have the authority to terminate;

15  correct?

16       A.    They didn't really say that he

17  didn't have the authority.  He just said I

18  wasn't fired.

19       Q.    Oh, okay.

20       A.    But I never worked there again.

21  And I remember in August, I called -- oh,

22  that's the other thing, after I was let go --

23  because I reached out to -- while I was

24  working there, I spoke with Mark Swinton, who

25  was a -- another executive producer there,



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 88 of 144

ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                              87

1    but I think he's more so over the plays.  He

2    asked me to send in my resume, which I have

3    an e-mail of that too, which I sent him my

4    resume.

5              I don't recall when because it

6    was a phone call, but I got called in for an

7    interview for a set assistant stage manager

8    for the play.

9         Q.    Uh-huh.

10        A.    Because I've done stage manager

11   before.  I got called in for the interview.

12   I went to the interview.  I met with -- I

13   don't remember the woman's name and I don't

14   remember the guy's name.  They -- both of

15   them I remember seeing them when I worked

16   there.  They interviewed me.  They asked me

17   kind of what happened with Brett.  They said

18   they were going to, you know, interview other

19   candidates and get back with me.  Never heard

20   back from them.  They said they went with

21   another candidate.

22        Q.    Do you know whether they spoke to

23   Brett after they interviewed you?

24        A.    I'm pretty sure they did.

25        Q.    Do you know that they did?



ALBERTO M. REYES                                         April 25, 2016
SOLE vs. TYLER PERRY                                                  88

1        A.      I can't say for sure.

2        Q.      Okay.  You don't have any personal

3    knowledge of that; correct?

4        A.      No.

5        Q.      All right.

6                You said, a minute ago, that when

7    you spoke on the phone with Ceret, she had a

8    speakerphone on and there may have been other

9    people there?

10       A.      Yes.

11       Q.      What were you referring to there?

12   Was that after you were walked out?

13       A.      Yeah.  This was like a couple of

14   days after.

15       Q.      Who else was on the phone with

16   you?

17       A.      I think it was a PA.  Or no,

18   they weren't PAs.  Secretary, his name -- I

19   forgot his name.  It was a guy and a girl.  I

20   think the girl's name was Britney.  And I

21   can't remember the guy's name.  I know he's

22   the office secretary or something like that.

23   I know he did like the payroll or something

24   for the -- he works in the office with

25   Britney, the girl.



1       Q.      All right.  Do they have anything

2   to say during that conversation?

3       A.       They were kind of like silent.

4   They didn't really chime in.  They were kind

5   of just like listening while me and Brett

6   talked.

7       Q.      You mean you and Ceret?

8       A.      Yeah, me and Ceret talked.

9       Q.      Okay.

10      A.       I actually tried -- Leno, that's

11  his name.  Leno, L-e-n-o, something like

12  that.  He -- I tried to reach out to him, but

13  he said he didn't want to be involved like

14  person -- like on the side, because I

15  actually -- he was somebody that I actually

16  became acquainted with there.  So when I

17  tried to find out what was going on, he

18  didn't want to get involved.  That was in

19  between the conversation that I had when she

20  had me on the speakerphone.

21      Q.      Okay.  All right.  Let's take a

22  break for a second.

23              (A short break was taken.)

24      Q.      (By Mr. Boyd) Mr. Reyes, we're

25  back on the record, and you understand you're



ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          90

 1   still under oath; correct?

 2          A.    Yes.

 3          Q.    Okay.  We just took a break.  Did

 4   you have a discussion with your attorney while

 5   we were on break?

 6          A.    Yeah, we talked.

 7          Q.    Okay.  Was Mr. Thompson there when

 8   you talked?

 9          A.    Him?

10          Q.    Yes.

11          A.    Oh, well, he went to the

12   restroom and came out.

13          Q.    Was he present for any portion of

14   the conversation?

15          A.    Yes.

16          Q.    Okay.  Tell me what you talked

17   about when you went outside.

18          A.    Me and Mr. Thompson talked about

19   his office, where he works at, and that's

20   really it.  And Mr. Kwame -- I'm sorry,

21   Mr. Kwame.  That is Mr. Kwame.

22          Q.    Did you talk about your testimony

23   at all?

24          A.    They just said I'm doing good,

25   just keep it up.



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 92 of 144

ALBERTO M. REYES                                April 25, 2016
SOLE vs. TYLER PERRY                                        91

 1        Q.    Okay.  All right.  Did they ask
 2   you to change anything or tell you questions
 3   they were going to ask you?
 4        A.    No.
 5        Q.    Okay.  Real quick.  Exhibit 2,
 6   your statement, did anybody give you comments
 7   on that before you finalized it or help you
 8   prepare it?
 9        A.    I did -- I'm not the best
10   grammatical person.  I'm just going to be
11   honest.  So I was dating somebody at the
12   time, and I had them just make sure that
13   there were proper grammar, like as far as
14   periods, where they needed to be.  So he just
15   kind of helped me edit the periods and commas
16   and make it something more like -- not like a
17   third-grader wrote it, so.
18        Q.    Who was that?
19        A.    His name is Jay Ggease.
20        Q.    How do you spell his last name?
21        A.    G-g-e-a-s-e.
22        Q.    Okay.  Did Mr. Farley give you any
23   comments on the statement?
24        A.    No.
25        Q.    Did he help you prepare it?



1          A.      No.

2          Q.      Did he suggest to you what -- what

3    it might should say?

4          A.      No.

5          Q.      Did anybody, other than just

6    checking your grammar, contribute in any way

7    to that statement?

8          A.      No.

9          Q.      This is all you?

10         A.      That is all me.

11         Q.      All right.  Just to clear

12   something up real quick.  I'm not even going

13   to mark this as an exhibit.  This appears to

14   be an e-mail conversation between yourself

15   and -- and you've been calling him Patrick

16   Sneedy (sic)?

17         A.      Right.

18         Q.      If you look at the bottom of that

19   page, you see his e-mail address is Patrick

20   Sheedy?  Do you see that?  Right here,

21   (indicating).

22         A.      Oh, right.  Okay.

23         Q.      Okay.  Does that refresh your

24   memory as to his name?

25         A.      Yeah, I don't know why I was



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 94 of 144

ALBERTO M. REYES                                    April 25, 2016
SOLE vs. TYLER PERRY                                          93

1   calling him Sneedy.

2        Q.    That's fine.  You see that his

3   e-mail address is at -- from And Action, LLC;

4   correct?

5        A.    Yes.

6        Q.    Okay.  And that's who you

7   understood him to be employed with?

8        A.    Yes.

9        Q.    Okay.

10            MR. BOYD:  Subject to recross, I

11  don't have any further questions.

12            MR. KING::  Anything?

13            MR. THOMPSON:  I don't think we've

14  got any questions.

15            MR. BOYD:  All right.  We're

16  finished.

17            Thank you.  Appreciate your time

18  today.

19     (The deposition concluded at 1:44 p.m.)

20

21

22

23

24

25            C E R T I F I C A T E



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 95 of 144

ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                                  94

1

2    STATE OF GEORGIA)

3    COUNTY OF FULTON)

4

5        I hereby certify that the foregoing

6    transcript was taken down, as stated in the

7    caption, and the questions and answers thereto

8    were reduced to typewriting under my

9    direction, that the foregoing pages represent

10   a true, complete, and correct transcript of

11   the evidence given upon said hearing.

12       I further certify that I am not of kin or

13   counsel to the parties in the case; am not in

14   the regular employ of counsel for any of said

15   parties, nor am I in any way financially

16   interested in the result of said case.

17                    _Cindy C. Jenkins_

18

19                    Cindy C. Jenkins

20                    Certified Court Reporter, 470

21

22

23

24

25



1                    D I S C L O S U R E

2        I, Cindy C. Jenkins, do herby disclose

3   pursuant to Article 10.B. of the Rules and

4   Regulations of the Board of Court Reporting of the

5   Judicial Council of Georgia that Esquire was

6   contacted by the party taking the deposition to

7   provide court reporting services for this deposition

8   and there is no contract that is prohibited by

9   O.C.G.A. 15-14-37(a) and (b) of Article 7.C. of the

10  Rules and regulations of the Board for the taking of

11  this deposition.

12       There is no contract to provide reporting

13  services between Esquire or any person with whom

14  Esquire has a principal and agency relationship nor

15  any attorney at law in this action, party to this

16  action, party having a financial interest in this

17  action, or agent for an attorney at law in this

18  action, party to this action, or party having a

19  financial interest in this action.  Any and all

20  financial arrangements beyond our usual and customary

21  rates have been disclosed and offered to all

22  parties.

23              _____

24              Cindy C. Jenkins

25              Certified Court Reporter, 470



ALBERTO M. REYES
SOLE vs. TYLER PERRY

April 25, 2016
Index: $10.71..ahead

**$**

**$10.71**
  52:17

**1**

**1**
  13:9,18
  31:22
  32:2

**11:06**
  4:2

**11th**
  56:16
  77:19
  83:19

**12**
  37:17

**13**
  20:6 21:3

**15th**
  35:7,9,12
  36:6,9

**16**
  21:3

**16th**
  36:13

**17th**
  36:16,22

**19-ish**
  21:17

**1:15-CV-1700**
  4:6

**1:44**
  93:19

**2**

**2**
  18:12
  27:15,22,
  24 28:3
  32:17
  44:10
  45:12
  49:14
  56:15
  67:22
  91:5

**2014**
  22:9,10
  24:2 55:9
  56:11,16
  83:19

**2015**
  9:12
  12:21
  22:7 29:1
  39:13
  44:1

**2016**
  4:2 36:6
  37:4,21

**20th**
  37:2

**21st**
  37:4,16

**22nd**
  37:21

**25**
  4:2

**2628**
  18:11

**27**
  55:8
  56:11

**2nd**
  44:1

**3**

**3**
  33:11
  43:8,9,
  11,20
  70:17,18
  71:7

**30345**
  18:13,15

**31**
  20:8,9

**4**

**4**
  33:17
  48:13,17,
  22

**5**

**5**
  38:15,16,
  22

**5th**
  27:11
  28:25
  30:5
  45:13

**6**

**6/05/2015**
  28:6

**7**

**7:00**
  38:23

**A**

**A.M.**
  4:2

**ability**
  7:1 67:4
  82:20

**abusive**
  21:7

**accounting**
  53:5

**accurate**
  6:21

**accusations**
  72:20

**accused**
  69:19

**acquainted**
  89:16

**acted**
  20:22

**Action**
  4:6 33:14
  48:20
  51:16,19
  52:1
  56:20
  57:12
  61:12,25
  62:11
  66:4
  68:2,23
  69:4,24
  71:17
  73:15

  93:3

**actual**
  13:6
  77:21

**address**
  18:10
  92:19
  93:3

**administrative**
  18:24

**adopted**
  24:12

**adoptive**
  24:14

**adult**
  21:6

**advantage**
  83:9

**advice**
  84:14

**advise**
  38:19

**affect**
  6:25 7:5

**affiliated**
  11:23
  61:24

**affiliation**
  41:9

**age**
  21:1

**agreement**
  50:19
  52:7

**ahead**
  21:18
  27:19
  36:18
  58:11



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 98 of 144

ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                              Index: Alberto..Boyd

63:9          16,21         73:6          68:25         65:17
66:11                       ate           69:1,17,      83:12
              Areu                         21 80:12
Alberto       53:21         72:11                       basis
4:4,11,17     54:5          Atlanta       ─────────      59:4,15,
                            18:12                        17
alcohol       Areu's                          B
7:8           54:8          Attached      ─────────     beginning
                            13:20                       9:4 36:4,
Allen         arrested                    back          5 41:23
79:16         19:19,22      attachment    13:7
              20:2,4,10     31:24         14:3,4        behalf
allowed       22:4 23:5     45:18         21:21         86:11
11:5                                      22:20
34:13         art           attend        26:4,17       behavior
81:4          59:19         25:1          36:19         73:10
                                          37:23         74:15,18,
Alpharetta    assessment    attention     38:21         22
19:5          27:1          52:19         39:12
                            76:21         50:12,15      believed
amount        assigned      80:16         63:20         82:15,17,
52:24         58:14                       76:16         19 83:14
                            attorney      79:4
anger         assignment    26:6,13       80:15         bell
20:11         22:18,19      41:1,14       81:19         50:2
              77:12         46:17         86:3,5
anymore                     47:4 90:4     87:19,20      big
16:24         assist                      89:25         60:21
              59:17         attorneys                   76:11
apartment                   32:5          background
5:5 18:12     assistant     41:10         77:8          bit
              18:24                                     12:21
apologize     52:13         August        Baker         36:17
31:19         58:9 66:9     24:4          62:25
              80:9 87:7     80:15         63:3          blood
apologized                  86:3,21                     24:10
86:9          assisted                    ball
              59:25         authority     31:19         blue
apparently                  66:6,13,                    35:3
39:17         assisting     19,25         basic
              40:25         67:18         64:10,12      book
appears       59:20         82:7                        57:21,23
92:13                       86:14,17      basically
              assistive                   10:4          bottom
approval      21:25         authorizati   17:5,12,      50:23
68:3                        on            18 22:5       51:2
              assume        50:19         23:19         92:18
approved      6:3 67:15                   33:12
53:11                       authorized    34:18         box
              assumed       49:14,20      57:17         50:23
April         11:5                        58:13         51:3
4:2 35:7,     64:25         aware         64:8
9,12          65:8 77:2     61:15                       Boyd
36:6,9,                                                 4:3,14
13,16,22      assumption
37:2,4,



ALBERTO M. REYES                                        April 25, 2016
SOLE vs. TYLER PERRY                            Index: break..company

13:10,12,
20 14:22,
25 27:13,
14,24
43:16
48:15
89:24
93:10,15

break
52:22
89:22,23
90:3,5

Brett
14:9
15:16
32:20
33:18
56:25
57:1
58:2,4
60:17
62:9,18,
19 63:11,
16 64:4,
22 65:16,
20,24
68:2
70:22
76:11
80:17,25
81:8,10
82:3,7,
11,13
83:4
86:7,14
87:17,23
89:5

Brett's
63:12
66:5

bring
16:10
46:5

bringing

15:3

Britney
88:20,25

brother
20:3
24:20

brought
13:23
14:14
25:18
27:19
32:10,15,
20 33:19
82:16

buddy
77:6

building
81:6
83:11

bunch
17:21

buyers
57:18
58:24
59:5,8
60:18

─────────

C

C-e-r-e-t
42:6

C-i-n-c-e-
r-e
19:10

call
29:11
32:24
33:4
37:2,23
38:8,16
48:8,9
76:1 86:4

87:6

called
20:16
22:3
26:6,7
29:12
48:10
60:1
86:21
87:6,11

calling
29:20
92:15
93:1

Calvin
59:21,23

candidate
87:21

candidates
87:19

Cappin
49:23

card
26:5,15

cards
16:20

Carter
25:3

case
4:4 8:2,
13,18 9:4
10:2
24:20
34:19
36:11
41:11,19
42:23
43:1
46:21,23
81:18

category
32:14,21

33:10

ceramic
23:2

Ceret
42:2,15,
16 58:20
60:17
66:7
67:17
71:22
73:17
74:21
80:22,23,
24 81:7
83:24
84:18
85:11
88:7
89:7,8

Cerey
42:13

chance
82:21

chances
82:19

change
91:2

chatter
66:20

check
62:24

checked
50:15

checking
92:6

chicken
54:18

chime
89:4

church
24:23,24,

25 25:2

Cincere
19:7,9

civic
25:6

Civil
4:6

claim
61:18,20

claims
69:22,23

clear
12:16
72:8
92:11

clubs
25:7

coincide
44:3

collective
48:17

college
62:19

commas
91:15

comments
91:6,23

communicate
30:16

communicate
d
41:18

communicati
ons
32:4,8,9,
19 33:22

company
5:8
51:15,23
61:17



ALBERTO M. REYES
SOLE vs. TYLER PERRY

April 25, 2016
Index: complaint..decorating

75:5

**complaint**
62:2

**complete**
65:13

**completed**
28:11,14,
25

**complex**
5:5

**complies**
35:14
55:4
67:23

**concluded**
93:19

**conduct**
22:6
23:11,18
70:9

**conference**
5:11

**confirmed**
78:16,19
81:17

**confused**
70:19

**connections**
82:25

**contact**
12:7 29:8
47:12
62:13

**contacted**
36:11
39:19

**contending**
70:2

**continuity**
57:23

**contracted**
51:20
53:18

**contractor**
52:6

**contribute**
92:6

**control**
79:2

**conversatio
n**
9:15 11:6
15:21
16:11
39:2,5,14
84:13
85:6,8,10
89:2,19
90:14
92:14

**conversatio
ns**
14:5
32:3,19
66:3
67:17

**convicted**
23:8,12

**convictions**
20:21

**copied**
45:16

**copies**
15:3
17:25
18:3
63:20

**copy**
13:10
14:19
17:9
27:18

35:21,22
46:20,23

**correct**
12:17
22:12
26:19
35:10
41:6 45:8
47:18
52:2 57:2
62:7
65:14
68:8
73:4,7
75:12
77:13
78:3 80:6
81:15
82:8
86:15
88:3 90:1
93:4

**correctly**
27:10

**cost**
38:9

**councilman**
8:12,14

**counsel**
7:16 8:17
10:21
39:21

**counselor**
8:18,19
11:18,20,
21,25
29:25

**counting**
57:18

**county**
21:15
23:24

**couple**
28:12,13
29:2 50:4
74:4,5
80:10,11
83:25
85:4
88:13

**court**
4:7 5:11,
13,14,20
6:8 7:10
37:14
51:8

**crew**
52:7

**crisis**
11:20,21,
24

**cup**
72:11

**current**
18:9

_____

**D**

**daily**
52:20,21,
23

**date**
13:6
28:16
34:15
35:25
77:22

**dated**
27:11
28:6
43:23
45:21
55:8

**dates**

45:3 56:9
76:15,16

**dating**
91:11

**dawn**
31:11

**day**
7:23 33:4
37:18
45:15
56:15
64:15,16
72:9 74:8
77:11,15,
17,20,23
80:10,13
83:22

**day-to-day**
59:15,17

**days**
26:3
28:12,13
29:3
32:25
44:11
77:21
80:11,12
85:4
88:14

**deal**
76:11

**decision**
78:2
82:12
83:1,13

**decisions**
82:23

**deck**
25:10

**decorating**
57:13
60:12



ALBERTO M. REYES
SOLE vs. TYLER PERRY

April 25, 2016
Index: decorator..Excuse

decorator
  52:15
  58:14,16
  60:17
  85:23

defend
  86:12

Defendant's
  13:17
  27:21
  43:10
  48:12

delay
  36:14,21

deleted
  14:3

Dennis
  58:17,18
  85:22,23
  86:6

department
  20:24
  57:13
  59:9
  60:13,15
  78:10,14,
  22  79:6,
  14  80:5
  81:14,21,
  24

deposit
  50:20

deposition
  4:3,19,
  23,25
  15:5
  25:19,22
  27:16
  31:25
  41:5
  93:19

depth
  41:25

desk
  60:9
  75:23

direct
  50:19

directly
  65:6,7

director
  59:19
  60:5,6

discriminat
ion
  54:24

discussed
  39:13

discussion
  14:24
  90:4

discussions
  61:24

disgrunt
  21:22

disorderly
  22:6
  23:11,18

dispute
  21:6,24

dissatisfac
tion
  68:21

dissension
  68:7,10
  75:1

District
  4:7,8

documents
  12:25
  13:22
  14:1,13
  15:1,7

16:22
17:12,22
25:18
31:25
32:2,18
33:12,17
48:16,18

doling
  65:17

domestic
  21:6

Donegan
  58:18
  85:23

door
  26:5

downtime
  78:12

DP
  60:4

DPS
  60:1

drank
  72:11

dresser
  60:24
  79:19

dressers
  60:22

drop
  38:15

dropped
  22:5
  23:10,11
  31:19

drug
  7:8

duly
  4:12

—————————
      E
—————————

e-mail
  14:4,6,8,
  10  15:14,
  18,20
  29:22
  30:17
  45:16
  70:15
  84:15
  85:8  87:3
  92:14,19
  93:3

e-mailed
  15:15,16

e-mails
  30:20
  31:12
  46:4,7

earlier
  85:20

earliest
  20:2

early
  9:9,11,12

ease
  48:25

edit
  91:15

elderly
  22:2

employed
  18:19
  52:13
  56:19
  93:7

employer
  22:12
  49:14,20
  52:1

employment
  15:9
  16:13,16
  33:13
  69:2,15

end
  16:18
  39:1
  75:19
  77:21,22

ending
  77:13

engagement
  9:25

escort
  82:4

escorting
  83:11

et al
  4:5

evening
  37:5
  38:22

everybody's
  21:10

everything'
s
  39:16

evidencing
  32:3,18

exact
  34:14
  45:3

EXAMINATION
  4:14

examined
  4:12

Excuse
  34:17
  37:9  81:3



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 102 of 144

ALBERTO M. REYES                                      April 25, 2016
SOLE vs. TYLER PERRY                          Index: executive..funny

executive
  86:25

exhibit
  13:9,18,
  21 27:15,
  22,24
  28:3
  31:22
  43:8,9,
  11,20
  44:10
  45:12
  48:13,17,
  22 56:15
  67:22
  70:16
  71:7 91:5
  92:13

exhibits
  15:4
  27:16,17

exists
  33:8

Expressway
  18:11

extent
  66:5
  67:12
  69:12

extras
  76:4

eye
  73:18

———————

      F

———————

face
  50:6

face-to-
face
  39:15

Facebook
  10:23
  12:4
  14:3,6
  15:21
  33:3
  62:14,20
  63:17
  76:23,24

facility
  21:25

fact
  76:13

fair
  6:3 18:7
  27:1
  28:15
  44:23,25
  75:4

Farley
  8:8,9,11,
  23 9:1
  10:11,17
  11:9,13,
  15 26:19
  28:20
  29:1
  30:7,21
  31:12
  32:9
  33:23
  34:6
  35:16
  36:7,8,10
  39:5,23,
  25 40:2
  41:17
  42:17
  45:14
  46:6,15,
  22 47:13,
  17 91:22

favoritism
  72:10,19

feel
  66:14

fight
  20:3

figure
  62:13

files
  48:19

fill
  50:13

film
  62:21,22

filming
  59:25

films
  25:9

final
  33:11
  83:1

finalized
  91:7

find
  8:4 13:3,
  24 14:8
  15:12,14,
  20 16:6,
  12,25
  32:23
  33:6,8,
  15,20
  89:17

fine
  5:25 6:14
  18:7
  23:18
  36:14,21
  37:10
  40:17
  45:5
  77:25
  80:16
  83:17

93:2

finish
  51:6

finished
  30:4 34:8
  44:9
  45:13,20
  93:16

finishing
  45:8

fire
  5:6 66:25
  82:7

fired
  81:25
  82:1,14
  85:22
  86:18

flat
  38:15,16
  72:13

Florida
  21:8,14

focused
  52:20

folder
  50:13

forensic
  43:25

forgot
  88:19

form
  49:1

forward
  30:12,13

forwarded
  46:20

found
  16:3
  25:22

26:5
  37:25
  41:22,24
  47:17
  48:7

four-month
  21:12

frame
  12:3
  15:25
  44:15

free
  38:11
  48:5

freedom
  22:20

frequent
  20:15

Friday
  7:24,25
  36:6,8
  37:21
  40:13

friend
  8:6 62:15
  78:11
  79:13,15

friend's
  26:4

friends
  63:10
  76:23,25

full
  4:16
  19:12,16

Fulton
  24:1

funny
  76:10



Case 1:15-cv-01700-LMM   Document 68   Filed 05/26/16   Page 103 of 144

ALBERTO M. REYES                                April 25, 2016
SOLE vs. TYLER PERRY                Index: G-g-e-a-s-e..honestly

**G**

**G-g-e-a-s-e**
 91:21

**gate**
 78:25

**gave**
 9:24
 17:8,9
 19:12
 22:19
 39:17
 50:13,14
 84:13

**General**
 18:22

**generally**
 60:8

**Georgia**
 4:8 18:12
 24:10,16

**gestures**
 6:6

**Ggease**
 91:19

**girl**
 88:19,25

**girl's**
 88:20

**give**
 5:16 6:21
 16:18
 18:9,14
 20:18
 21:3
 29:16
 34:14
 45:3 72:2
 73:17,22
 82:20
 91:6,22

**gold**
 18:12

**good**
 35:21
 36:13,20
 38:25
 49:11
 50:17
 52:4 53:3
 56:8
 82:24
 90:24

**grammar**
 91:13
 92:6

**grammatical**
 91:10

**great**
 36:23
 64:14

**grief**
 11:18

**ground**
 5:17

**group**
 48:16
 57:11
 65:13
 67:8

**groups**
 25:7

**guess**
 8:18
 17:21
 20:20
 21:12
 24:1
 30:11
 31:10
 34:7 40:1
 52:18
 54:1,2
 71:5 75:2

**guessing**
 71:10

**guided**
 8:13

**guy**
 88:19

**guy's**
 87:14
 88:21

**guys**
 33:1

**H**

**hair**
 78:10,17,
 22 79:6,
 18 80:5
 81:14,21,
 24

**Hall**
 58:24

**hallway**
 80:25

**hand**
 13:8
 27:15
 43:8
 48:16
 76:8,20
 77:6

**handbooks**
 17:13

**handed**
 26:11

**handle**
 38:13
 62:1

**handled**
 62:5

**handwriting**
 49:2,4
 51:12
 52:10
 53:9

**happened**
 21:22
 42:22
 44:14
 80:1
 87:17

**happening**
 73:4

**harassed**
 69:24
 70:3

**harassment**
 54:25
 56:5
 61:18,21
 62:1
 69:19
 70:8
 71:16

**head**
 6:7 50:5

**hear**
 10:6
 81:10

**heard**
 9:18,19
 41:23,24
 79:10
 87:19

**held**
 14:24

**helped**
 91:15

**helpful**
 10:2

**helping**
 8:13

**Hendrix**
 32:20
 33:18
 58:4
 62:10
 68:8,15,
 17,21
 69:3,18
 71:8
 72:7,25
 73:10
 75:2
 78:1,21
 83:18,22

**Hendrix's**
 69:7 70:8
 74:14,18,
 22

**hey**
 62:23
 77:2

**higher**
 79:1

**hire**
 66:25
 68:2,3

**hired**
 12:12
 51:23

**history**
 71:15

**home**
 26:3,4

**honest**
 13:6
 25:21
 30:24
 31:2
 44:12
 91:11

**honestly**
 47:25



ALBERTO M. REYES
SOLE vs. TYLER PERRY

April 25, 2016
Index: hour..L-e-n-o

hour
  52:17

hourly
  52:16,22

hours
  21:23
  22:21
  53:1

house
  21:10
  26:4

HR
  17:18

—————————
          I
—————————

I-9's
  17:16

identificat
ion
  13:19
  27:23
  43:12
  48:14

impanel
  24:19

inappropria
te
  73:11
  74:15

incident
  21:20

include
  68:14

independent
  25:9 52:6

indicating
  39:20
  92:21

industry

25:8
62:21,22

influence
  7:7

informed
  75:14

initial
  15:17
  29:8 33:2

initially
  11:10
  14:9
  63:18

injured
  5:7

innocent
  76:9

inquire
  83:15

Instagram
  76:17

Insurance
  18:22

interacted
  59:4,7

interaction
s
  31:9
  56:18
  73:13

interview
  14:10
  15:15,17
  32:24,25
  33:5
  63:25
  64:1,10,
  12,23
  65:1
  87:7,11,
  12,18

interviewed
  43:4
  87:16,23

intimacy
  72:15

intimate
  71:23
  72:7,14

involved
  20:4
  24:23,25
  89:13,18

items
  31:4
  57:22

—————————
          J
—————————

jail
  21:8,10

Jay
  91:19

Jerome
  79:15,20

Jimmy
  25:3

job
  19:1,2
  57:16,24
  82:24

jobs
  69:10

Josh
  8:20,21
  9:4,5,18
  15:21,25
  16:4
  29:15,22
  32:5
  43:15
  44:20

Josh's
  36:11

Joshua
  10:17
  33:19

July
  56:16
  77:19
  83:19

June
  12:21
  27:11
  28:25
  30:5 44:1
  45:13
  77:19

jury
  24:19

juvenile
  20:11,19

—————————
          K
—————————

K-y-l-e
  19:9

kind
  5:4 7:8
  9:20,24
  14:1
  22:16,19
  26:21
  35:1
  44:13
  50:11
  64:5 65:5
  66:12,20
  67:10,24,
  25 73:17,
  18,22,25
  74:1
  86:11
  87:17
  89:3,4

91:15

King
  7:19,21
  8:5 39:22
  40:5,9,
  12,18,25
  41:5,10,
  19 42:17
  47:1,14,
  17 48:8,9
  93:12

knew
  22:17,18
  41:9 48:5
  50:2
  56:24
  62:18,20,
  22 67:10
  73:19
  75:9
  82:15
  83:7

knocked
  21:24
  22:24

knocking
  22:1

knowledge
  61:11
  62:5
  69:2,18
  70:7
  71:15,17,
  19 88:3

Kwame
  47:4
  90:20,21

Kyle
  19:7

—————————
          L
—————————

L-e-n-o



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 105 of 144

ALBERTO M. REYES                                April 25, 2016
SOLE vs. TYLER PERRY                     Index: lawsuit..Mike

89:11

**lawsuit**
5:2,4
41:1

**lawyer**
25:21
37:25
38:2,6,8,
13,19,20,
24 40:3,
19 75:15

**lawyers**
48:6

**lead**
58:2,3,6,
8 66:18
67:13

**leave**
74:6

**led**
75:7

**left**
35:5
72:11
74:8
77:17
85:2

**left-hand**
51:2 53:9

**Leno**
89:10,11

**letter**
46:12

**lies**
75:17

**life**
59:18

**listed**
58:25

**listened**

83:5

**listening**
89:5

**literally**
20:15
25:23

**litigation**
43:17

**live**
18:17

**living**
21:25

**LLC**
4:5 33:14
51:16,19
61:12,13
69:4
71:16,17
93:3

**local**
25:9

**located**
8:24 19:4
60:11

**locating**
25:17

**location**
56:11

**locations**
75:4

**long**
18:25
28:24
34:25
37:22

**longer**
67:7

**looked**
23:15
44:10

63:11

**lot**
59:12
66:14

**loud**
5:19

**Love**
53:19

**Loving**
53:19

———————

**M**

**machine**
35:22

**made**
15:4
61:18
76:11
78:2

**main**
57:24

**make**
12:2,15
15:4 54:2
61:20
68:18
72:20
75:17
78:20
81:14
82:11,24
83:13
91:12,16

**makes**
82:23

**making**
73:7,24

**management**
68:22

**manager**
78:14
79:6
80:19
87:7,10

**manner**
65:24

**mark**
27:13
28:16
86:24
92:13

**marked**
13:9,18
27:15,22
43:8,11
48:13,17

**marriage**
24:11

**matter**
42:18
43:5 45:2
47:13
76:13

**meant**
57:4
70:20

**medications**
6:24 7:3

**Melissa**
84:8

**member**
25:7,15

**Memorial**
64:15

**memory**
6:25
12:20
28:20
53:24
92:24

**mentioned**
36:24
76:19

**mess**
82:18

**message**
10:20
12:24
30:15
33:3
35:13
36:1,2,8
40:3
43:14,20
44:9
63:12,16,
17

**messaged**
34:13,18
35:6

**messages**
14:4
35:15,20,
25 39:6,
7,8

**met**
10:15
40:5 47:8
87:12

**Michelle**
49:22
50:2,3
84:2,3,8
85:6

**middle**
23:1

**Miguel**
4:17

**Mike**
58:12
60:17
72:5



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 106 of 144

ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                               Index: military..part

military
  24:7

mine
  78:11

minimal
  23:17

minimized
  22:5

minimum
  52:24

minute
  27:10
  88:6

minutes
  20:14

missed
  50:15

mistake
  75:19

mistaken
  70:15

misundersto
od
  79:12

mom
  20:3,17,
  24

moment
  15:5

Monday
  37:16
  64:15

month
  10:7 24:2
  34:21,22
  35:7

months
  19:3

moon
  35:3

Moreland
  25:4

morely
  52:19

morning
  36:14,20

Morris
  58:12
  72:5,7
  73:1,10
  74:3,5,6,
  13,17

mother
  76:1

mouth
  42:22

move
  30:12,13

— N —

name's
  84:8

named
  60:16

names
  19:16
  50:4 59:6

needed
  30:12
  31:7,15,
  18 46:22,
  23 57:20
  91:14

Neighbor
  53:19

nephew
  75:25
  76:2

night

26:6,9

Nodding
  51:11

nonunion
  52:7

normal
  60:7

Northeast
  18:11

northern
  4:7 24:10

note
  71:7

notice
  51:15

number
  29:14,18,
  24 39:17

— O —

oath
  7:12 90:1

obtain
  31:5

obtained
  39:22

obvious
  71:24

occasions
  34:5

occurring
  21:2

odd
  74:7

office
  47:10
  52:13
  60:9 84:1

88:22,24
90:19

on-boarding
  64:18
  68:1

onboard
  50:8 56:2

open
  50:11
  60:21

Orange
  21:15

organizatio
ns
  25:12

organizing
  64:8
  67:14

orientation
  17:21

original
  12:24
  15:14
  43:20
  71:7

Orlando
  21:15

overtime
  53:2

overtures
  68:18

— P —

p.m.
  37:17
  38:22,23
  93:19

PA
  41:21

52:15
57:17
58:3,6,
12,15
66:17,18,
22 71:23
88:17

packet
  56:1,6

packets
  56:4

pages
  53:5
  54:24

paid
  23:18
  52:24
  53:1
  65:24
  66:1

paper
  26:11
  76:20

papers
  33:2
  76:16

paperwork
  17:18
  49:7
  50:10,14
  64:21
  65:3

paragraph
  67:25

parents
  24:15

Parkway
  19:5

part
  6:16,17
  24:10
  49:6



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 107 of 144

ALBERTO M. REYES                                          April 25, 2016
SOLE vs. TYLER PERRY                                      Index: PAS..price

55:25

PAS
  67:7
  88:18

passed
  9:23
  44:11
  62:16

past
  15:25
  17:8 69:7

Patrick
  54:20
  56:19
  57:2,5
  65:21,22
  80:8,23
  81:16,20
  84:1,7,19
  85:12,17,
  18 86:2
  92:15,19

pay
  16:18
  52:18
  80:16

paying
  40:21
  41:13

payroll
  50:19
  88:23

penalties
  7:12

pending
  4:6

people
  22:2
  42:19,22
  47:7 50:4
  54:16
  59:3,10,

12,14,16
  60:14
  64:18,21
  75:5,21
  83:25
  88:9

period
  16:18
  21:12
  59:9

periods
  91:14,15

perjury
  7:12

Perry
  4:5 9:25
  12:13
  15:10
  16:15
  21:20
  22:14,15
  31:9,17
  33:14
  42:21
  49:8
  61:12,17,
  25 66:4
  68:23
  69:24
  71:16
  73:15
  77:4,7

person
  10:12
  26:10
  42:3
  89:14
  91:10

personal
  61:11
  88:2

personally
  42:20

petty
  70:23

phone
  10:23
  14:10
  15:16
  26:24
  30:15
  33:5
  34:14
  35:22
  63:25
  64:1,3,23
  87:6
  88:7,15

photo
  59:20
  76:14

photographs
  75:11

photography
  60:6
  75:14,20

photos
  76:9

pick
  20:17

picks
  80:15
  86:4

picture
  57:21,23
  69:14
  76:5 77:5

pictures
  57:19,20,
  22 69:11
  75:22,23
  77:3

piece
  37:11,12
  52:10

place
  59:9 61:2

plaintiff
  32:4

plant
  23:1,2

play
  69:14
  87:8

plays
  69:12
  87:1

plead
  23:12,22

plenty
  75:21

point
  74:11

police
  20:22,24
  21:9 22:4

policies
  53:5

policy
  54:25
  55:3,6,14
  56:6
  75:14

poor
  69:6

portion
  90:13

position
  64:9 84:4

possession
  16:23
  32:14

post
  76:17

posted
  62:19
  75:23

posting
  63:5,8,14

premises
  15:9 49:8

prep
  37:22

prepare
  25:19
  91:8,25

prepared
  28:10
  30:4 34:6
  44:22

preparing
  34:8

present
  41:3
  75:25
  90:13

presently
  61:16

press
  43:4

pressure
  64:10

pretty
  16:17
  20:16
  21:8
  64:13
  65:9 74:7
  87:24

previously
  16:23
  69:19

price
  38:14,15



print
   13:2
   30:18,24,
   25  31:1,
   2,8,11,
   12,15
   33:21

printed
   14:7
   45:25
   46:1
   51:3,13

prior
   29:3
   77:21

problems
   68:15

procedures
   53:6

PROCEEDINGS
   4:1

process
   26:14
   64:18

produce
   33:22

produced
   31:25
   43:17

producer
   53:16,21
   86:25

production
   51:22
   54:14,15,
   19  57:7
   58:9
   61:17
   66:8  80:9
   84:5

professiona
l

   25:11

proof
   14:6
   31:16

proper
   91:13

property
   5:5,8
   22:2

provided
   15:2,8

pull
   34:14
   67:21

pulled
   48:18

put
   10:21
   50:6
   57:22
   75:16

putting
   35:22

————————

Q

question
   5:25  6:2,
   12  12:15
   13:13
   51:6,9
   56:6  57:5
   64:13
   66:16
   69:6  83:2

questioned
   38:5,6

questions
   5:19
   55:20
   64:5,11

   91:2
   93:11,14

quick
   13:8  91:5
   92:12

quotes
   36:25

————————

R

radio
   41:24

raise
   73:13

raised
   73:16

range
   21:1

rate
   52:16,20,
   21,22,23

reach
   9:1  89:12

reached
   9:3,17,20
   11:2
   12:3,11,
   17  44:19
   76:24
   80:8
   84:2,14
   86:23

read
   25:20
   35:19
   36:2
   49:22

ready
   30:11

real
   13:8  91:5

   92:12

reason
   6:20  14:8
   15:17
   24:18
   54:4,7
   76:22

reasoning
   42:24

reasons
   19:25
   78:24

reassured
   66:17

recall
   7:25  13:5
   17:3,7
   20:19
   42:12
   44:6,15
   53:2
   55:13
   65:7
   77:16
   87:5

received
   17:13,14
   56:1

receiving
   55:13

recent
   43:24

recently
   47:14

recognize
   13:13
   34:24
   43:19
   53:13
   54:13

recollectio
n

   31:4  44:4

record
   4:16
   12:15
   14:22
   23:16,17
   29:21
   33:25
   35:20
   36:2
   89:25

recording
   57:18

records
   16:14,16

recross
   93:10

refer
   12:25
   27:17
   29:24
   63:2

reference
   86:10

referral
   33:18

referred
   8:6,7  9:5
   39:24
   42:3
   62:17
   75:18

referring
   27:25
   71:6,25
   72:17
   88:11

refresh
   12:20
   28:19
   53:23
   92:23



regular
    17:18
    23:20
    59:4
relate
    15:9
related
    16:25
    33:18
    75:2
relating
    32:3,18
    33:13
relationshi
p
    61:11
relatives
    24:9
Relax
    80:14
    86:2
remember
    9:10
    15:22
    16:3
    17:4,9
    18:2,5,6
    20:13
    23:15
    29:17,18,
    19 58:21
    59:6,18,
    21,22
    60:2
    64:11
    83:24
    86:21
    87:13,14,
    15 88:21
remembering
    27:10
rep
    38:14

repeat
    5:25
rephrase
    6:1
replied
    37:1,16,
    20 38:1,
    7,24
    63:22
replies
    37:18,24
    38:5,10,
    12,21
report
    19:6
    65:20
    68:20
reported
    57:1
    65:10,11
    74:18,21
reporter
    5:20 6:8
    7:10 51:8
reporting
    64:23,25
    65:8
represent
    7:21
    41:15
representat
ive
    11:13,16
    49:15,21
representat
ives
    32:6,10
represented
    7:15
    47:18

representin
g
    39:22
reprimandme
nt
    83:1
request
    81:15
requesting
    13:21
residences
    18:16
resident
    5:6,7
responded
    10:20
    11:4
    14:12
responding
    63:6
response
    36:20
    37:6
responsible
    65:16
responsive
    14:2
rest
    6:18
restroom
    90:12
resume
    14:11
    33:4
    63:16,23
    87:2,4
retain
    7:21
retained
    40:18

review
    13:13
    43:25
    49:15
    55:17
reviewed
    30:11
Reyes
    4:4,11,
    17,18
    15:1
    27:14
    35:18
    43:7
    48:15
    89:24
ring
    50:1
romantic
    68:18
romanticnes
s
    72:23
room
    5:11,21
    41:4
    60:19,21
rough
    20:12
rules
    5:17
run
    59:11
Ryan
    62:15,25
    63:8

————————
        S
————————

sat
    73:20

Saturday
    36:13,19,
    20 40:13,
    14
scan
    45:21
    46:2,3,
    10,13
scanned
    46:11
scenario
    5:18
school
    20:11,22
scratch
    54:18
secretary
    88:18,22
section
    49:14
    50:23
selected
    76:4
send
    14:11
    30:18
    33:3
    45:14,24
    46:14
    63:22
    87:2
sentence
    79:5
separately
    19:24
    20:1
September
    24:4,5
series
    5:18



ALBERTO M. REYES
SOLE vs. TYLER PERRY

April 25, 2016
Index: serve..spoken

**serve**
26:8

**served**
8:2 13:14
26:2 37:5

**server**
26:14

**set**
25:9
52:15
57:13,19
58:14,16
60:12,17,
22,24
75:12,19,
22 76:5,6
77:3
78:11
85:23
87:7

**setting**
60:8

**sexual**
54:25
56:5
61:18,20
62:1
69:19
70:8,23,
24 71:15

**sexually**
69:22,23
70:3

**shaking**
6:7

**Sheedy**
54:20
56:19
80:8
84:20,23
92:20

**shit**
81:3

**shoot**
59:20

**short**
14:24
35:21
89:23

**show**
14:6
16:11
23:16
53:16
80:15
86:4

**shows**
14:9

**shunned**
22:3

**sic**
21:22
42:14
52:20
72:23
81:16
83:2 84:2
92:16

**side**
51:2 53:9
89:14

**sidetracked**
26:22

**sign**
17:5

**signature**
28:3
45:23
46:3,12
49:20,21
51:4,13
53:14,24
54:8,13
55:5

**signed**

17:6,21
45:13,21
49:7
54:10
55:23

**signing**
17:14

**silent**
89:3

**similar**
9:21

**similarly**
7:5

**sister**
24:21
76:1

**sit**
50:9
72:21

**site**
61:16

**situation**
9:18
70:22
71:3

**slightly**
71:3

**Slow**
36:17

**small**
66:20

**Sneedy**
81:16
84:1,7,
19,22
92:16
93:1

**snickered**
74:1

**social**

25:6

**Sole**
4:5 8:21
10:17
11:13,16,
23 12:3
32:5
33:19
41:13
43:16,21
61:16
69:23
70:6 71:8

**Sole's**
41:1,10,
19 43:1,5
47:4

**Solis**
16:5

**sooner**
35:11

**sort**
6:7 25:15
60:7 75:1
77:10

**Soul**
16:7

**sounded**
9:21

**Sounds**
49:11
50:17
53:3

**speak**
9:7 11:5
29:1,21
30:7
40:11
78:13
86:11

**speakerphone**

25:6

**25:6**

83:25
88:8
89:20

**specifically**
81:11,20,
23

**speculating**
74:11

**spell**
19:8 42:8
91:20

**spent**
61:3

**spoke**
9:22
10:10,17
11:3
26:24
27:4
28:20
30:3
34:5,11
39:12
79:8
80:23
83:24
84:1,18
85:22,24
86:24
87:22
88:7

**spoken**
10:22
11:1
15:25
29:7
39:18,20
40:8,10
41:20
42:17
47:3,8
71:21
83:18,21



Case 1:15-cv-01700-LMM    Document 68    Filed 05/26/16    Page 111 of 144

ALBERTO M. REYES                                                April 25, 2016
SOLE vs. TYLER PERRY                              Index: stage..third-grader

84:11

stage
  87:7,10

stalker
  81:3

stamps
  76:18

stand
  60:4

standard
  64:12

standing
  78:24

start/close
  48:25

started
  41:4 49:7
  56:10
  62:10
  64:16
  66:13,16

state
  4:15 21:8
  24:10
  35:25

statement
  10:4 11:9
  12:23
  14:17
  25:20
  27:8,25
  28:10,25
  30:4
  34:7,8
  42:4
  44:10,23
  45:8 48:1
  56:14
  58:18,25
  63:2
  66:15
  67:21

68:11,14
72:19
75:10,13
91:6,23
92:7

States
  4:7

stay
  83:4

staying
  26:3

story
  9:21,24
  36:23
  37:19
  38:18

Studios
  4:5 9:25
  12:13
  15:10
  16:15
  21:21
  22:14,15
  31:17
  33:14
  42:21
  49:9
  61:13,17,
  25 66:5
  68:23
  69:25
  71:16
  73:15
  77:4,7

stuff
  17:14
  22:24
  31:8

Subject
  93:10

subpoena
  8:2
  13:14,21

14:2,19,
20 31:23,
24 33:11

sued
  5:7

suggest
  92:2

summarizing
  33:12
  75:3

summary
  75:4

Sunday
  33:6
  36:16,22
  64:2

supervisor
  21:24
  54:14,19
  56:23,25
  57:5,8
  58:2

supervisors
  60:24

supposed
  75:11

swear
  4:9

Swinton
  86:24

swore
  7:11

sworn
  4:12

————————

        T
————————

Tabernacle
  25:3

table

23:2
60:9,10
72:13

taking
  5:20 6:25
  57:18,19
  75:11

talk
  10:16
  30:14
  37:7
  40:16
  66:7
  77:10
  90:22

talked
  25:21
  26:10,18,
  23 40:17
  42:23,24
  68:3
  71:13
  89:6,8
  90:6,8,
  16,18

talking
  32:2
  42:25
  59:14
  72:3 75:5
  78:25

tasks
  65:13

teenager
  20:3

telephone
  10:11,13,
  14 39:15

telling
  26:18,22
  75:15

temporary
  22:17,18

ten
  53:1

tent
  50:12

terminate
  86:14

testified
  4:13

testify
  7:1

testimony
  6:21
  37:20
  90:22

text
  35:19
  39:6,7,8,
  17 40:2,
  14

texted
  30:8

thing
  4:25 6:8
  31:20
  73:25
  74:1
  76:10
  79:9
  86:1,22

things
  17:6,15
  57:20
  66:14
  73:18
  77:9

thinking
  29:17
  80:18

third-
grader
  91:17



ALBERTO M. REYES
SOLE vs. TYLER PERRY

April 25, 2016
Index: Thompson..United

**Thompson**
47:4
90:7,18
93:13

**thought**
17:2
31:7,15
35:1,2,11
44:18
47:5 48:1
74:14
76:8
80:13
84:21

**three-**
21:12

**threw**
17:2

**Thursday**
7:24,25
26:6
37:4,16

**Thy**
53:19

**ticket**
23:20

**till**
10:7

**time**
9:10
10:8,10,
18,19,22
12:3
13:5,12
15:25
16:1,9,20
19:21,24
20:12,19
21:5,19
22:1,17
26:23
27:3,5,6
28:21,23

29:7,10
34:8,11
36:3
37:11
41:8
44:8,9,
15,19,22
46:10,18,
19 47:7
55:22
59:2
61:1,3
65:9
76:18
83:1 85:1
91:12
93:17

**times**
20:13,20
21:11
23:5
39:11,12
74:5

**today**
4:20 5:12
6:22 7:4,
13,16
14:14
15:2,8
25:18
27:19
31:5,15
32:11,15,
21 39:22
40:6,9,
19,22
41:2,14
46:5
47:19
48:19
93:18

**told**
10:5
11:18
23:4,14,

16 26:1,
7,24 34:4
52:21
62:23
63:8,11
64:8,24
77:12
78:1,6,
21,23
79:22
80:14,24
81:7
83:11
86:2

**tomorrow**
37:7,19

**Tony**
58:24

**top**
48:24
49:13
50:5 51:2
52:6,10

**touch**
10:1,21
30:10

**treated**
23:19

**trial**
25:25
34:19
47:24

**Troy**
7:19

**truth**
38:18

**truthful**
6:21

**Tuesday**
64:14

**turn**
52:5 53:4

54:23
55:2

**turned**
34:17

**Tye**
8:8,9
9:5,7,15,
23 26:18
36:7,8,
10,22
37:3,8,9,
13,18,24
38:5,12,
21

**Tyler**
4:5 9:25
12:13
15:10
16:14
21:20
22:14,15
31:9,16
33:14
42:20
49:8
61:12,16,
25 66:4
68:23
69:24
71:16
73:15
77:4,7

**type**
15:23

**typed**
16:9

—————————

**U**

—————————

**uh-huh**
5:15 8:10
14:16
17:23
49:3,16,

18,24
52:8
55:10
73:22
87:9

**ultimate**
56:22,25

**unaware**
47:24
80:20
85:25
86:1

**unclear**
22:11

**uncomfortable**
66:14

**underneath**
49:1
54:12

**understand**
4:18 5:24
7:11
11:15
45:5
48:2,3
53:20
67:6 68:6
89:25

**understanding**
51:19
66:22
78:21
82:6

**understood**
6:3 11:12
51:25
93:7

**union**
25:14

**United**



ALBERTO M. REYES                                                    April 25, 2016
SOLE vs. TYLER PERRY                                        Index: unwelcome..ZIP

4:7

**unwelcome**
74:2

**upcoming**
34:19

_____

**V**
_____

**verbally**
6:6 85:11

**verification**
49:15

**versus**
4:5

**Victory**
25:2

_____

**W**
_____

**W-9's**
17:15,16

**WA**
54:3

**waiting**
41:4

**walk**
38:16,17,
20 82:12

**walked**
40:6,9
83:10
88:12

**wanted**
46:12
62:22
66:12
79:6 83:3

**wardrobe**
79:6

**ways**
38:12

**Wednesday**
25:23
37:2

**week**
7:22
13:15
25:23
29:3,4
44:18
45:6,7
77:14

**weeks**
34:21
61:5

**whirlwind**
44:14

**White**
60:3

**Windward**
19:5

**witnessed**
71:22

**woman's**
87:13

**word**
42:21
45:16

**work**
16:25
18:21
21:21
25:8
37:22
57:25
58:22
60:8 64:9
65:17
67:14
82:21

**worked**
21:25
28:13
41:21
59:15,16
61:16
62:21
65:9,19
78:11
79:18
84:7,10,
12 86:20
87:15

**working**
16:14
22:11,15
31:16
46:9,10
49:8
53:17
56:10
57:12
62:10
86:24

**works**
62:20
88:24
90:19

**worry**
80:14

**wrapper**
76:20

**write**
10:4 27:7

**writing**
48:1

**written**
66:15

**Wrong**
53:19

**wrote**
11:8,10
58:17

91:17

_____

**Y**
_____

**year**
9:8,9,11
10:8 16:1
26:19
27:11
29:1 35:9

**York**
8:25
84:7,10

_____

**Z**
_____

**ZIP**
18:14



AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Georgia

| | | |
|---|---|---|
| JOSHUA SOLE | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  1:15-CV-1700-LMM |
| TYLER PERRY, TYLER PERRY STUDIOS LLC, | ) | |
| BRETT HENDRIX, and AND ACTION LLC | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                       ALBERTO MIGUEL REYES

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place:  HAWKINS PARNELL THACKSTON & YOUNG LLP  303 Peachtree Street NE, Atlanta, Georgia 30308 | Date and Time:  04/25/2016 12:00 pm |
|---|---|

The deposition will be recorded by this method:   Stenographic and Videographer

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

SEE EXHIBIT "A" HERETO.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     04/19/2016

CLERK OF COURT

OR

|  | /s/ Matthew A. Boyd |
|---|---|
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendants Tyler Perry Studios LLC, Brett Hendrix, and And Action LLC                        , who issues or requests this subpoena, are:

Matthew A. Boyd, 303 Peachtree St. NE, # 4000, Atlanta GA 30308 (404) 614-7400 mboyd@hptylaw.com

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**DEFENDANT'S EXHIBIT**

PENGAD 800-631-6989

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:15-CV-1700-LMM

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____              _____
                                           *Server's signature*

                                           _____
                                           *Printed name and title*

                                           _____
                                           *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT "A" TO SUBPOENA

## I. DEFINITIONS

(1)    The term "Plaintiff" as used herein is intended to and shall include Joshua Sole, and his attorneys, agents, employees, representatives, investigators and other persons or agencies who are in possession of, or may have obtained information from, for, or on behalf of Plaintiff.

(2)    The terms "you" or "your" as used herein are intended to include Alberto Miguel Reyes a/k/a Albe Reyes, and your attorneys, agents, employees, representatives, investigators and other persons or agencies who are in possession of, or may have obtained information from, for, or on behalf of Mr. Reyes.

(3)    The term "Defendants" as used collectively herein is intended to and shall include Tyler Perry, Tyler Perry Studios LLC, And Action LLC, and Brett Hendrix, their attorneys, agents, employees, representatives, or other individuals or entities who are in possession of, or may have obtained information from, for, or on behalf of Tyler Perry, Tyler Perry Studios LLC, And Action LLC, and/or Brett Hendrix.

(4)    The term "Complaint" refers to the Complaint filed by Joshua Sole in the U.S. District Court for the Northern District of Georgia on May 13, 2015.

(5)    The term "document" includes all communications recorded in any form, including letters, correspondence, memoranda, records, reports, notes, e-

mails, text messages, videos, audio recordings, MMS messages, and photographs, whether handwritten, typewritten, printed, or electronically recorded, including electronically stored information contained in e-mail databases, shared network drives, internal/external hard drives, internet file storage sites, and any other recorded matter or recording of symbols in tangible form, however produced or reproduced, of every kind and regardless of where located, which is in your possession, custody or control; or in the possession, custody or control of any servant or agent of you or your attorneys.

## II. DOCUMENTS TO BE PRODUCED AT DEPOSITION

(1)    All documents evidencing or relating to conversations or communications you had with Plaintiff, his attorneys, or representatives.

(2)    All documents evidencing or relating to conversations or communications you had with Brett Hendrix.

(3)    All documents relating to your employment with And Action LLC and/or any temporary job assignments or other work you performed at or for Tyler Perry Studios LLC.

(4)    All documents that refer or relate to Brett Hendrix or Joshua Sole.

I started working for Tyler Perry Studio's in May of 2014. I learned about an opening for a Production Assistant in the Set Decorating Department at Tyler Perry Studios from a friend of mine Ryan Baker. Mr. Baker had seen the position posted on Facebook and told me to apply. I quickly responded to the posting via email by reaching out to the lead Production Assistant in the Set Decorating department, Brett Hendrix. After Mr. Hendrix received my email he replied back to me the next day requesting I interview with him via phone. Upon completion of the interview I was offered the position. I assumed my position as a PA in the set decorating department the day after Memorial Day under the direction of Mr. Hendrix.

Mr. Hendrix informed me that my length of employment was not was not assured. However, the show that I would be working on would be in production for at least six-eight weeks. During my first week I expressed interest in learning any additional skill sets within my department as well as other departments. I was advised and encouraged that if I seemed active and engaged I could gain enough knowledge to further myself and possibly remain employed at the studio.

I was very excited for the opportunity to work for TPS and I had expectations that my hard work ethic and skills would help me to develop while employed. However, after a few days it was clear that favoritism and mental anguish where going to play a large part in my employment at the studio. Mr. Hendrix was very aware of my mode of transportation when I was hired and in spite of this he favored Mike Morris over myself concerning our schedules. I was required to stay late while Mr. Morris was granted the option of leaving earlier. While it was not that great of an issue, this act by Mr. Hendrix set the tone for my time at the studio and I was made to feel as a crazed stalker of disposable value.

Because of my enthusiasm I was asked a couple of times to assist in other departments. I'd like to think of myself as a passionate person, I attempted to be as friendly and courteous as possible. Considering that I was a new employee, I saw every opportunity as a way to make a good enough impression to gain the attention of my superiors and other coworkers. I spoke to everyone I came into contact with, and even attempted to make outside connections via social media. Mr. Hendrix however, when notified of my socialization, expressed disapproval and told me that I was presenting myself as nothing more than an opportunist. I also wanted to learn more about being a Set Decorator at the studio but Mr. Hendrix dismissed my inquiry as a frivolous attempt at making an impression just for me.

After a few weeks tenure I was told by Mr. Hendrix's superiors as well as other persons of authority that the best way to learn as much as possible is to introduce myself to people and to express interest in other upcoming projects. I had a brief encounter with Production Manager Patrick Sheedy, I sent him my resume per his request and he told me that other projects are always up and coming and that he would keep me in mind. Mr. Sheedy also suggested I introduced myself to Mark Swinton a producer at Tyler Perry Studios, After speaking with Mr. Swinton he encouraged me to forward my resume to his assistants and when they had any upcoming projects that fit my experience I would be contacted.

Occasionally I would spend my lunch break in the cafeteria socializing with others as a way to gain knowledge and make connections. Nevertheless these actions were frown on by Mr. Hendrix and he instructed Toni Hall, a buyer in the Set Decorating department to "talk" with me. Ms. Hall told me that



DEFENDANT'S
EXHIBIT

PENGAD 800-631-6989

Mr. Hendrix advised her to talk to me, because we worked closely together, and to inform me on how I should conduct myself while at the studio. In so many words Ms. Hall expressed how Mr. Hendrix was displeased with my socializing and attempts at advancing within the studio. I approached Mr. Hendrix that same day (with this being our second "ONE on ONE" meeting) to inquire why he sent Ms. Hall to speak with me and not come speak with me himself. He told me exactly what Ms. Hall had said, he suggested Ms. Hall speak with me because we worked closely together and he didn't want to seem like he was coming down on me. Mr. Hendrix would tell me how he kept hearing things from other people, and how people perceived me. Mr. Hendrix did not reprimand me for things he saw with his own eyes or heard with his own ear, instead he chastised me about "things he'd heard from other people". I tried to explain that the things Mr. Hendrix was hearing where being falsified and the information that Mr. Hendrix was receiving was misguided. Feeling uncomfortable, I tried to keep the conversations between Mr. Hendrix and myself short and unresponsive because I didn't want to seem as an insubordinate. Mr. Hendrix would constantly remind me that my time at Tyler Perry Studios was temporary and that everything I do or didn't do would determine my future at the studios.

During my down time and lunch breaks I would visit Jerome Allen, a friend of mine who worked in "Actors Row" as a hair stylist to the actors and actresses. Although I would initially frequent the area in my downtime, I didn't spend much time per visit. After Mr. Hendrix got notice of my visits, he informed me that I was not allowed over in Actors row while working, nor was I allowed to fraternize with the actors or actresses. I informed Mr. Hendrix that I only went to the area on breaks and during lunches and he rebutted me saying that other employees where complaining about my presence in the area. After that encounter I reduced my visits to actor's row as an attempt to show compliance with Mr. Hendrix's requirements. I made it a point to only speak to my friend Jerome during lunch or at the end of the day when I was leaving. Because I had made frequent visits to Actors row, I became familiar with some of the actors and actresses; one in particular was April Parker. We developed a friendly/ platonic relationship and would socialize whenever we would come in contact.

During a day of filming my close friend and her son who I view as a sister and nephew were selected to be extra's on the show in which I was working. Upon their arrival I introduced my nephew to a few of the crew me members I had become acquainted with as he walked through the building to his destination. Later in the day I took a picture with my nephew and posted it to my Facebook and Instagram. I was informed of the "No photography policy" with in my new hire paperwork. My understanding of the policy, however, exclusively referred to photos of the facility and of the set. The photo I took with my nephew was strictly of him and me with very little background in the back. Mr. Hendrix became aware of this because he had access to view my Facebook and Instagram page at that time.

One afternoon April and I were in the court yard outside in the studio and I informed her that it was my last week working there. April then informed me that it was her last day and that she would be wrapping filming and requested my phone number so that we could keep in touch. She invited me to actor's row so that she could get her phone, Mr. Hendrix was passing by as that happened and gave me a considerable self-righteous look and muttered "Where are you going?", I informed him that April asked me to come with her to actors row for a second. Later in the day when I returned to my desk in the set

decorating department Mr. Hendrix inquired again about my being in Actor's Row with April. I informed Mr. Hendrix that April told me it was her last day and that she wanted my number so that she can keep in touch with me. Mr. Hendrix doubtfully inquired: "Did April ask or did you ask?" I replied "No, April asked for my number, I didn't receive hers". Mr. Hendrix then walked away from my desk.

During my final week of service there I was returning to the building from set and for the first time of my employment there I crossed paths with Mr. Tyler Perry. As I was passing him I stopped and said, Mr. Perry my name is Al Be and I really have enjoyed working for you and I am grateful for this experience. Mr. Perry replied by saying "Hello Al Be I want you to do me a favor and hold something for me", Mr. Perry asked me to stick out my hand and he placed a balled up piece of candy wrapper into my hand and said I want you to hold that for me. I laughed and said okay he said have a good day and we both walked our separate ways. Amused and slightly enlightened by the humorous and genuine encounter with Mr. Perry, I posted my experience on my social pages, with a picture of the wrapper in my hand. Again, I never for a second thought I was doing anything wrong.

The next day towards the end of the day I was approached by Mr. Hendrix who informed me that I need to pack my belongings because I was being escorted out of the premises. Confused and unaware I even joked and said "sounds like I'm being booted from the property" Mr. Hendrix with a straight face said "Well you are". Again confused I asked why and Mr. Hendrix replied "I'll tell you when we get to security." Mr. Hendrix escorted me through the hallways of the building towards the security gate, during that time I noticed people staring at me in the hallway with looks of confusion and disappointment. Once we arrived at the security gate I was asked by Mr. Hendrix to turn in my badge and told I am not allowed back on the premises. I asked Mr. Hendrix why was I being terminated and banned from the property, Mr. Hendrix replied that he "...tried to warn me that my behavior would get me kicked out", he made reference to me posting pictures, over stepping boundaries, and talking with the actors. Mr. Hendrix stated he got a call from superiors saying they wanted me gone. When I asked him who made the decision he never gave me a name, the only time he referred to a particular person was when Mr. Hendrix stated that the supervisor in the hair dressing department asked for me to be removed. Mr. Hendrix reiterated that it was "beyond his control" and that "the decision had been made." I asked if there was anyone in HR I could talk to get more clarification for my termination, and to defend myself, Mr. Hendrix replied and said that it "wasn't possible."

Mr. Hendrix then told me I was a good worker and he was very pleased with the way I had worked, but the decision "wasn't his" and that it "couldn't be changed." I asked if this was a permanent decision and Mr. Hendrix replied that he couldn't say but if I needed a referral for someplace else he would provide it. At that point I left the studios as instructed.

At first I didn't think to inquire as to why I was terminated in such a distasteful manner. I was under the impression that because Mr. Hendrix "hired" me he was able to fire me, so I took his word for it and started to count it as a loss. But after a couple of days I started to make phone calls. I called Ceret who was also a PA with me in the set decorating department and she told me that it was Brett's decision to have me "walked off the property". Ceret stated that Mr. Hendrix was going around the studio stating that I "was on some stalker shit and I had to go." Ceret also informed me that I was not fired, Brett had

no authority to fire me. This sparked my interest so I started to email and call other superiors that I had spoken with while employed at Tyler Perry Studios, The only one that answered and replied was Patrick Sheedy who informed me he wasn't even aware of any issues, and didn't know I was terminated. When I explained my side of the story to him and the situation with Mr. Hendrix he told me to relax, I was not fired and that in August when the show starts up again I would return.

After that conversation, I continued to receive random phone calls from a few employees, some of them confused as to what happened, and other informing me about what Mr. Hendrix had did and the same as Ceret did.

I worked at Tyler Perry Studios from May 27th 2014 till July 11th. I was told by Brett Hendrix via email at the beginning of the week that my final week was that week due to the wrapping of the show. I later found out that I was the only one from the Set Decorating department let go. Again all decisions were made by Brett Hendrix. I eventually got in touch with the Set Decorator Dennis Donegan, he told me he only thought I was gone because the show was wrapping. He was unaware that I was fired and said he was very pleased with my work, and apologized for what had happened. Mr. Donegan also stated he would give me a referral if needed.

This is my sworn statement.

_A. Reyes_

Al Be Reyes

_06/05/2015_

Date



## Al Be Reyes

 **Al Be Reyes**

Hello my name is Al Be Reyes, I was an employee at Tyler perry studios right before you u were under the supervision of Brett Hendrix. I was fired by him for slightly the same reasons, and no one was willing to listen to my story. So I would really like to talk with u if possible and even am willing to testify on ur behalf if needed. Please feel free to hit me up.

Yesterday at 6:36am · Sent from Mobile

 



DEFENDANT'S
EXHIBIT
3

PENGAD 800-631-6989

# ease

**START/CLOSE FORM**

EASE-103 (3/14)

| PRODUCING CO. AND ACTION LLC | PICTURE TITLE IF LOVING YOU IS WRONG - PILOT | ACCOUNT-MAJOR/MINOR 2041-03 GA |
|---|---|---|

| EMPLOYEE NAME Al Be Reyes (Alberto) | SOCIAL SECURITY NUMBER ▮▮▮8 | START DATE 05/27/2014 | HIRE DATE 05/27/2014 | UNION |
|---|---|---|---|---|

| EMPLOYEE STREET (MAILING ADDRESS) ▮▮▮▮▮ | OCC CODE | SCHEDULE | JOB DESCRIPTION Office Set Dec. Asst |
|---|---|---|---|

W2 ADDRESS (IF DIFFERENT)

| PHONE ▮▮▮ | BIRTHDATE ▮▮▮ | GENDER (M) F Please circle | ETHNICITY (OPTIONAL) | WH White/Caucasian    OL Hispanic    AI American Indian |
|---|---|---|---|---|

| EMAIL ADDRESS ▮▮▮ | | | | AA African American    OA Asian    OT Other |

GUARANTEED WORK HOURS

Overtime to be computed at base overtime rate of $ _____ per hour

NOTE: Overtime calculations at 1.5x on all hours worked in excess of 8 per day or 40 per week, as required by law or by contract. All information must be completed prior to payment being made.

| TERMS OF EMPLOYMENT | STUDIO | DISTANT |
|---|---|---|
| RATE PER HOUR | 10.7143 | |
| RATE PER WEEK | | |
| GUARANTEED HOURS | 12 | |
| IF RATE DOES NOT INCLUDE | | PAY 6th DAY AT $          PAY 7th DAY AT $ |
| IDLE BOX RENTAL | | |
| CAR RENTAL | | |

By signing this form, I agree that the employer may take deductions from my earnings to adjust previous overpayments if and when said overpayments may occur.

| AGREED-EMPLOYEE SIGNATURE *A. Reye* | AUTHORIZED SIGNATURE |
|---|---|

**FORM W4 EMPLOYEE'S WITHHOLDING ALLOWANCE CERTIFICATE**

1  First Name and Middle Initial  Alberto  Miguel    Last Name  Reyes    2  Your social security number

3  ☑ Single  ☐ Married  ☐ Married, but withhold at higher Single rate.
Note: If married, but legally separated, or spouse is nonresident alien, check the Single box.

4  If your last name differs from that on your social security card, check here and call 1-800-772-1213 for more information · · · · · ▶ ☐

5  Total number of allowances you are claiming · · · · · · · · · · · · · · · · · · · ·  5
6  Additional amount, if any, you want withheld from each paycheck · · · · · · · · · ·  6 | $
7  I claim exemption from withholding and I certify that I meet **BOTH** of the following conditions for exemption:
· Last year I had a right to a refund of all Federal income tax withheld because I had no tax liability; and
· This year I expect a refund of all Federal income tax withheld because I expect to have no tax liability.

If you meet both conditions, write "Exempt" here · · · · · · · · · · · · · · · · · · · · ▶  7 | Exempt

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate or I am entitled to claim exempt status.

Employee's signature (Form is not valid unless you sign it) ▶ *A. Reyes*    Date ▶ 05/27/2014

# ease

8383 Wilshire Blvd., Beverly Hills, CA 90211

DEFENDANT'S EXHIBIT 4    PENGAD 800-631-6989



# Employment Eligibility Verification

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-9**
OMB No. 1615-0047
Expires 03/31/2016

▶**START HERE.** Read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work-authorized individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because the documentation presented has a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Attestation** *(Employees must complete and sign Section 1 of Form I-9 no later than the **first day of employment**, but not before accepting a job offer.)*

| Last Name *(Family Name)* | First Name *(Given Name)* | Middle Initial | Other Names Used *(if any)* |
|---|---|---|---|
| Reyes | Alberto | M | AlBe |

| Address *(Street Number and Name)* | Apt. Number | City or Town | State | Zip Code |
|---|---|---|---|---|

| Date of Birth *(mm/dd/yyyy)* | U.S. Social Security Number | E-mail Address | | Telephone Number |
|---|---|---|---|---|

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):

☑ A citizen of the United States

☐ A noncitizen national of the United States *(See instructions)*

☐ A lawful permanent resident (Alien Registration Number/USCIS Number): _____

☐ An alien authorized to work until (expiration date, if applicable, mm/dd/yyyy) _____ . Some aliens may write "N/A" in this field.
   *(See instructions)*

   *For aliens authorized to work, provide your Alien Registration Number/USCIS Number OR Form I-94 Admission Number:*

   1. Alien Registration Number/USCIS Number: _____

   **OR**

   2. Form I-94 Admission Number: _____

   If you obtained your admission number from CBP in connection with your arrival in the United States, include the following:

   Foreign Passport Number: _____

   Country of Issuance: _____

   Some aliens may write "N/A" on the Foreign Passport Number and Country of Issuance fields. *(See instructions)*

**3-D Barcode**
**Do Not Write in This Space**

| Signature of Employee: A. Ruya | Date *(mm/dd/yyyy)*: 05/22/2014 |
|---|---|

**Preparer and/or Translator Certification** *(To be completed and signed if Section 1 is prepared by a person other than the employee.)*

I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Signature of Preparer or Translator: | Date *(mm/dd/yyyy)*: |
|---|---|

| Last Name *(Family Name)* | First Name *(Given Name)* |
|---|---|

| Address *(Street Number and Name)* | City or Town | State | Zip Code |
|---|---|---|---|

 *Employer Completes Next Page* 

## Section 2. Employer or Authorized Representative Review and Verification

(Employers or their authorized representative must complete and sign Section 2 within 3 business days of the employee's first day of employment. You must physically examine one document from List A OR examine a combination of one document from List B and one document from List C as listed on the "Lists of Acceptable Documents" on the next page of this form. For each document you review, record the following information: document title, issuing authority, document number, and expiration date, if any.)

Employee Last Name, First Name and Middle Initial from Section 1:

| List A<br>Identity and Employment Authorization | OR | List B<br>Identity | AND | List C<br>Employment Authorization |
|---|---|---|---|---|
| Document Title:<br>GA DL | | Document Title:<br>Social SecurityCard | | Document Title: |
| Issuing Authority:<br>DMV | | Issuing Authority:<br>Social Security | | Issuing Authority: |
| Document Number: | | Document Number: | | Document Number: |
| Expiration Date (if any)(mm/dd/yyyy): | | Expiration Date (if any)(mm/dd/yyyy): | | Expiration Date (if any)(mm/dd/yyyy): |
| Document Title: | | | | |
| Issuing Authority: | | | | |
| Document Number: | | | | |
| Expiration Date (if any)(mm/dd/yyyy): | | | | |
| Document Title: | | | | |
| Issuing Authority: | | | | 3-D Barcode<br>Do Not Write in This Space |
| Document Number: | | | | |
| Expiration Date (if any)(mm/dd/yyyy): | | | | |

## Certification

I attest, under penalty of perjury, that (1) I have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of my knowledge the employee is authorized to work in the United States.

The employee's first day of employment (mm/dd/yyyy): 05/27/2014 (See instructions for exemptions.)

| Signature of Employer or Authorized Representative | Date (mm/dd/yyyy)<br>05/28/2014 | Title of Employer or Authorized Representative<br>Payroll Acct |
|---|---|---|
| Last Name (Family Name)<br>Gopins, Michelle | First Name (Given Name) | Employer's Business or Organization Name |
| Employer's Business or Organization Address (Street Number and Name)<br>541 TENTH STREET, # 172<br>ATLANTA, GA 30318 | City or Town | State | Zip Code |

## Section 3. Reverification and Rehires (To be completed and signed by employer or authorized representative.)

| A. New Name (if applicable) Last Name (Family Name) First Name (Given Name) | | Middle Initial | B. Date of Rehire (if applicable) (mm/dd/yyyy): |
|---|---|---|---|

C. If employee's previous grant of employment authorization has expired, provide the information for the document from List A or List C the employee presented that establishes current employment authorization in the space provided below.

| Document Title: | Document Number: | Expiration Date (if any)(mm/dd/yyyy): |
|---|---|---|

I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative: | Date (mm/dd/yyyy): | Print Name of Employer or Authorized Representative: |
|---|---|---|



## AUTHORIZATION AGREEMENT FOR PAYROLL DIRECT DEPOSIT

I hereby authorize Ease Entertainment Services, LLC, hereinafter called Company, to initiate Payroll Direct Deposit credit entries to my account(s) based on these percentages or flat dollars of net pay per check:

| | | | | | | |
|---|---|---|---|---|---|---|
| Checking | 100 | % | OR | $ | | Priority: |
| Savings | | % | OR | $ | | Priority: |

The funds will be remitted to the depository financial institution(s) named below; hereafter called Depository, and will credit the specified account(s). I acknowledge that the origination of Automated Clearing House (ACH) transactions to my account must comply with the provisions of U.S. law.

Additionally, I hereby authorize Company to initiate debit entries to my account and the Depository to debit the same to such account, in the case where the incorrect payroll amount has been credited to such account in error.

This authority is to remain in full effect until Company or Depository has received written notification from me of its termination in such time and manner as to afford Company or Depository a reasonable opportunity to act on it, or until Company or Depository has sent me a ten (10) day written notice of Company or Depository's termination of this agreement.

Checking Depository Name _Suntrust_

City _Atlanta_    State _ga._    Zip _30345_

Checking Depository's Transit Routing Number

Checking Account Number Information

| | | | |
|---|---|---|---|
| Savings Depository Name | | Address | |
| City | | State | Zip |

Savings Depository's Transit Routing Number

Savings Account Number Information

| | | | | | |
|---|---|---|---|---|---|
| Employee Name: _Alberto M. Reyes_ | Company Name: _AND ACTION LLC_ | Employee ID (if applicable) | |
| Signed: _A. Reyes_ | Date: _05/27/2014_ | Production title _Lyw Pilot_  _Set. Dec_ |

PLEASE ATTACH VOIDED CHECK

NOTE: DIRECT DEPOSIT WILL BE EFFECTIVE FOR ONLY THE PRODUCTION NAMED ABOVE.



# STATE OF GEORGIA
## DECLARATION OF RESIDENCY

The purpose of this form is to determine principal residency in accordance
To Article 4G of the union contract

| Name | Alberto M. Reyes | Social Security Number | |
|---|---|---|---|
| Permanent Address | | | |
| | | Phone Number | |
| Title of Television Project | If Loving you is wrong - Pilot | | |

1. Are you presently a resident of Georgia? _____ yes

2. Do you anticipate changing your residency status during the time that you are
   expected to work on the television project? _____ NO

3. I am a member of Local _____ DeKalb

4. I live approximately _20_ miles from Tyler Perry Studios

RESIDENCY: "Resident" or "resident of Georgia" means a natural person and for the
purpose of determining principal residency, any person domiciled in the state
of Georgia and who maintains a permanent place of abode within the state.

I declare under penalty of perjury that I have examined this document and to the best
of my knowledge and belief it is true, correct and complete.

_____
Signature

_05/27/2014_
Date

Independent Contractor
Non-Union Crew Agreement

Producer: AND ACTION LLC

"Tyler Perry's If Loving You Is Wrong" - Pilot

Independent Contractor: Albe Reyes          SS #: ▮▮▮▮▮

Loan Out Corp. (If applicable):          F.I.D.# (If applicable):

▮▮▮▮▮          Phone 1: ▮▮▮▮▮

Phone 2:

Position: Office Asst          Approximate Start Date: 05/27/2014
Rate (Hourly): 10.7143/126          Per Diem (If applicable):
Or          Box Rental (If applicable):
Rate (Daily): $150          Car Rental (If applicable):
Or
Rate (Weekly):

Emergency Contact: Domo Linsey          Phone: ▮▮▮▮▮

MISCELLANEOUS: (TO BE FILLED IN BY UNIT PRODUCTION MANAGER ONLY AND MUST BE INITIALED BY PRODUCER TO BE
INCORPORATED INTO THE AGREEMENT):    See Attached Rider

_____

_____

_____

## NO FORCED CALLS WITHOUT PRIOR APPROVAL OF PRODUCTION MANAGER.

1.      SERVICES:  During the Engagement Period (as defined below) Independent Contractor shall render on an exclusive basis as an independent
contractor, all _____ and other services ("Services") for Producer as are customarily rendered by persons rendering similar
services in connection with first-class, television series in the United States motion picture industry, as, when, and where reasonably required by Producer in
connection with such project(s) as Producer may designate from time-to-time (hereinafter, individually and collectively, "Series"). Independent Contractor
agrees that Producer shall have the controlling decision with respect to all matters concerning the Series including but not limited to all matters with respect
to art and taste.  For clarity, all crew work and/or other Services to be performed by Independent Contractor hereunder shall occur in the State of Georgia.

2.      ENGAGEMENT PERIOD:  The "Engagement Period" shall commence (if ever) on approximately _____(the "Start Date") (except
Producer may cancel or move the Start Date forward or backward in Producer's sole discretion), and shall continue until Independent Contractor has
completed all Services as required by Producer (the "Engagement Period"). The engagement created hereunder shall be an "at will" engagement and as such,
Independent Contractor may be terminated at any time without notice.  It is agreed that except as specifically set forth in this Agreement and/or any exhibits
attached hereto and executed by Producer (if any), this is a daily assignment with no other guarantee of the period of engagement. Producer reserves the right
by notice (the "Termination Notice") to terminate Independent Contractor at any time, with or without cause, subject only to the obligation to pay the
balance of any Compensation earned and actually accrued (if any) by Independent Contractor, but unpaid by Producer as of the date of termination, so long
as Independent Contractor is not in breach of this Agreement.

3.      COMPENSATION:

a.      Provided that Independent Contractor fully and faithfully performs all of the services and obligations required hereunder and is not in default of
the material provisions hereof, Producer agrees to pay Independent Contractor, and Independent Contractor agrees to accept, as full and complete
compensation for all rights granted herein and all undertakings and services of Independent Contractor hereunder the "Compensation" set forth above.
Independent Contractor shall only be compensated for hours (if an hourly rate is indicated), days (if a daily rate is indicated) or full weeks (if a weekly rate is

12714-CC

indicated) actually worked.  In the case of a weekly rate, in the event of any partial weeks worked, then the Compensation shall be pro-rated based upon a five (5) or six (6) day week (whichever is applicable).

b.        Flat Fee: Producer and Independent Contractor agree that the Compensation is an all inclusive "flat fee."  As such, except as specifically set forth in this Agreement and/or any exhibits attached hereto and executed by Producer (if any), Independent Contractor shall not be entitled to, and shall not receive any additional compensation, overage compensation, or contingent compensation for any services rendered by Independent Contractor hereunder (whether during the development, pre-production, production or post-production phases or otherwise) or with respect to Producer's use and exploitation of the services, and/or all of the results and proceeds therefrom (including, without limitation, the Series and all copyrights therein and otherwise), or otherwise.

4.        CREDIT: Except as specifically set forth in this Agreement and/or any exhibits attached hereto and executed by Producer (if any), credit, if any, shall be granted in Producer's sole discretion.  If Producer provides Independent Contractor with credit, Independent Contractor's name shall read as follows:_____(BLOCK PRINT NAME)

5. SPECIAL PROVISIONS:

a.        INDEPENDENT CONTRACTOR ACKNOWLEDGES THAT INDEPENDENT CONTRACTOR MAINTAINS THE RIGHT TO OBTAIN, AT INDEPENDENT CONTRACTOR'S SOLE EXPENSE, INDEPENDENT LEGAL COUNSEL OF INDEPENDENT CONTRACTOR'S SOLE CHOICE PRIOR TO THE SIGNING OF THIS AGREEMENT AND INDEPENDENT CONTRACTOR ACKNOWLEDGES THAT INDEPENDENT CONTRACTOR HAS FULLY EXERCISED SUCH RIGHT AND FULLY UNDERSTANDS AND ACCEPTS THE FULL CONTENT OF THIS DOCUMENT.

b.        The Standard Terms and any other exhibits which are attached hereto are incorporated into this Agreement by this reference.

c.        Producer and Independent Contractor agree that this Agreement shall be subject to, construed and interpreted pursuant to the laws of the state of California as it applies to contracts entered into and performed wholly within California.

d.        Notwithstanding anything to the contrary contained herein and for purposes of clarification hereunder, Independent Contractor acknowledges that if Independent Contractor elects to render services hereunder as an "individual" and elects not to use a "Lending Company" (defined below), then Independent Contractor will be prohibited from switching-over mid-season to use a "Lending Company," and Independent Contractor will only have the opportunity to switch from an "individual" status to a "Lending Company" after the completion of all services on the then applicable production series year (i.e., Independent Contractor will only have the opportunity to switch to a "Lending Company" at the end of a production season of the Series).  All paperwork must be completed and any election to use a "Lending Company" must be made at the time the initial "start-up" paperwork is submitted to Producer.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

PRODUCER

_____
Signature

_____
Print Name

_____
Title

_____
Date

INDEPENDENT CONTRACTOR

_____
Signature

_____
SS#

05/27/2014
Date

Loan-Out - Independent Contractor Inducement (If applicable):

If Independent Contractor's services are provided by a personal services or so-called "loan-out" corporation ("Lending Company"), then Independent Contractor warrants, represents and agrees that Independent Contractor has read the Agreement and consents to the execution thereof and hereby joins in, ratifies and confirms all acknowledgments, representations, warranties, consents, and agreements of Lending Company contained therein.  Without limiting the generality of the foregoing, Independent Contractor hereby confirms that Lending Company has the full right and authority to grant all rights granted in the Agreement, and Independent Contractor hereby agrees to be bound by all of the terms thereof and to render all services required of Independent Contractor pursuant thereto whether or not Lending Company performs its obligations under its employment contract with Independent Contractor and whether or not such contract remains in effect and whether or not Lending Company or its successors in interest should be dissolved, become insolvent or cease to exist or for any other reason whatsoever (including without limitation entering into any type of bankruptcy or similar proceeding) fail, be unable or refuse to perform and observe any or all of the conditions of the foregoing letter agreement requiring performance or compliance on its part.  Independent Contractor further agrees to look solely to Lending Company (and Producer agrees to pay Lending Company) for any and all compensation to which Independent Contractor may be entitled by reason of the Agreement or any services rendered by Independent Contractor pursuant thereto.  Further, Independent Contractor hereby guarantees full performance by Lending Company of all terms of the Agreement and agrees that under said Agreement, Producer may proceed directly against Independent Contractor, in the event of any breach or default under said Agreement, as though Independent Contractor were a direct party thereto.  Lending Company shall discharge all obligations of an employer under any and all applicable laws and regulations, including, but not limited to, taxes, unemployment compensation and/or insurance, social security, disability, tax withholding, and filing of contributions required of an employer.  Lending Company agrees that, for the purpose of applicable Workers' Compensation laws, Independent Contractor is the "special employee" of Producer, and all of Independent Contractor's rights and remedies and/or the rights and remedies of Independent Contractor's heirs, executors, administrators, successors, and assigns against Producer and/or Producer's agents and/or employees and/or licensees and/or assigns and/or successors by reason of injury, illness, disability, or death arising out of and/or occurring in the course of Independent Contractor's engagement in connection with Series shall be governed by and limited to those provided under such Worker's Compensation laws.  If the applicability of any Worker's Compensation laws to the engagement of Independent Contractor's services is depended upon or may be affected by an election on the part of Lending Company, myself and/or

_____
Initials

Producer, such election is hereby made in favor of such application. Independent Contractor will indemnify and hold Producer, Producer's employees, officers and assigns harmless from and against any and all taxes which Producer may have to pay and any and all liabilities (including judgments, penalties, interest, damages, costs, expenses and reasonable attorneys' fees, whether or not litigation is actually commenced) which may be obtained against, imposed or suffered by Producer or which Producer may incur by reason of Producer's failure to deduct and withhold from the compensation payable under the Agreement any amounts required or permitted to be deducted and withheld from the compensation of an employee under the provisions of any applicable statute or law.

Signature, Independent Contractor

SS#: ___

Initials

## STANDARD TERMS

1.    INDEPENDENT CONTRACTOR:  Independent Contractor hereby warrants and represents that Independent Contractor is rendering services hereunder as an independent contractor.  Independent Contractor further acknowledges and agrees that the foregoing representation and warranty will be relied upon by Producer for the purpose of determining whether or not it is necessary to make withholdings and deductions from monies being paid to Independent Contractor hereunder, and Independent Contractor agrees that if the proper withholdings and deductions are not made from the payments to Independent Contractor hereunder, and it is thereafter determined that withholdings or deductions were legally required, Independent Contractor will indemnify and hold Producer, Producer's employees, officers and assigns harmless from and against any and all taxes which Producer may have to pay and any and all liabilities (including judgments, penalties, interest, damages, costs, expenses and reasonable attorneys' fees, whether or not litigation is actually commenced) relating thereto.

2.    ASSIGNMENT:  Producer shall have the right, in Producer's sole discretion, to assign, transfer, license, delegate and/or grant, without limitation, this Agreement and/or any of its rights or obligations herein (in whole or part), to any person, entity or third party, and upon such assignment, Producer shall be released and discharged of and from any and all of its duties, obligations and liabilities arising under this Agreement.  This Agreement shall inure to the benefit of Producer and its successors and assigns.  Independent Contractor shall not assign this Agreement or any of Independent Contractor's rights or obligations herein except upon Producer's prior written consent (except from Independent Contractor to Producer as set forth in this Agreement).  Any purported assignment by Independent Contractor in violation of this paragraph shall be null and void and of no effect.

3.    WARRANTIES:  Independent Contractor hereby represents and warrants that Independent Contractor has the full right and authority to enter into this Agreement; the Results shall be wholly original with Independent Contractor;  at all times, Independent Contractor shall promptly comply with all of Producer's instructions, directions, and requests in all matters related to this Agreement provided they are consistent with the terms of this Agreement; Independent Contractor is legally authorized to perform the Services in the location as required by Producer (and Independent Contractor shall provide proof of Independent Contractor's identity and legal ability to perform the Services in the location as required by Producer; Independent Contractor shall not divulge or make known to any person any of the material terms, covenants or conditions of this Agreement without the express prior written consent of Producer.  Independent Contractor shall indemnify, defend and hold harmless Producer, its parent, subsidiaries, affiliates, assignees, licensees, sublicensees, distributors, sub-distributors and dealers, and the directors, officers, agents, consultants and representatives of the foregoing (the "Producer Indemnities"), from any and all claims, costs, liabilities, obligations, judgments or damages (including reasonable attorneys' fees), arising out of or for the purpose of avoiding any suit, claim, proceeding or demand or the settlement thereof, which may be brought against any of the Producer Indemnities by reason of the breach or alleged breach of any of the warranties, representations or obligations made by Independent Contractor under this Agreement.  The terms of this paragraph shall survive termination of this Agreement.  All of Producer's obligations under the Agreement are conditioned upon Independent Contractor being lawfully authorized to perform the Services in the location as required by Producer.

4.    WORK FOR HIRE:  With respect to the results and proceeds of Independent Contractor's services under this Agreement, including, without limitation, all copyrights therein and thereto, (the "Results"), Independent Contractor does hereby expressly acknowledge and agree that all of the Results are and will be created by Independent Contractor as a "work made for hire" within the meaning of the United States Copyright Act of 1976 (as amended) for Producer, prepared by Independent Contractor within the scope of Independent Contractor's engagement for Producer or specially ordered or commissioned by Producer for, without limitation, the use(s) delineated under the definition of "work made for hire" under Title 17 Chapter 1 Section 101 of the United States Copyright Act of 1976 (as amended) (e.g., as a part of a motion picture or other audiovisual work), for the purposes of U.S. Copyright law and as a "work made in the course of employment" for Producer for the purposes of Canadian Copyright Law and, as such, Producer is and shall be considered the sole author of the Results (including, without limitation, all copyrights therein and thereto) for all purposes and Producer is the sole and exclusive owner of all right, title and interest in and to the Results and each and every part thereof (including, without limitation, all copyrights therein and thereto, including all extensions or reversions, together with the rights generally known as the "moral rights of authors", "droit moral" rights and any similar or analogous rights under the applicable laws of any country).  Independent Contractor hereby agrees that in the event that the Results (including, without limitation, all copyrights therein and thereto) are ever determined by a court of competent jurisdiction not be a "work made for hire" by Independent Contractor for Producer within the meaning of the United States Copyright Act of 1976 (as amended), or not to be a "work made in the course of employment" for Producer within the meaning of the Canadian Copyright law, or if Producer is ever determined by any such court not to be the sole author of the Results and/or the sole and exclusive owner of all right, title and interest in and to the Results and each and every part thereof (including, without limitation, all copyrights therein and thereto, including all extensions or reversions, together with the rights generally known as the "moral rights of authors", "droit moral" rights and any similar or analogous rights under the applicable laws of any country throughout the universe), then this Agreement shall operate as an irrevocable assignment by Independent Contractor to Producer whereby Independent Contractor irrevocably and exclusively assigns, grants, transfers and sets over to Producer the Results, all right, title and interest in and to the Results and each and every part thereof (including, without limitation, all copyrights therein and thereto, including all extensions or reversions, and all rights generally known as "moral rights of authors", "droit moral" rights and any similar or analogous rights under the applicable laws of any country throughout the universe), throughout the universe, in perpetuity, and without limitation, in and in connection with any and all media and any means of communication, transmission, distribution, exploitation, and use(s) now known or hereafter devised, and no right of any kind, nature, or description is reserved by Independent Contractor (the "Irrevocable Rights Assignment").  In connection with the Irrevocable Rights Assignment, at Producer's request, Independent Contractor will execute and deliver such further documents and perform such further acts as may be or become necessary or desirable to effectuate the purposes of this Irrevocable Rights Assignment.  Without limiting Independent Contractor's obligations hereunder, Independent Contractor hereby appoints Producer the true and lawful attorney-in-fact of Independent Contractor to execute and deliver any documents and perform any acts in the event Independent Contractor fails or refuses to do so in accordance with this Agreement (which appointment is coupled with an interest and is irrevocable) with full power of substitution and delegation.  The compensation paid to Independent Contractor under this Agreement shall be deemed to be inclusive of the full and final consideration for this Irrevocable Rights Assignment.  To the extent the rights generally known as "moral rights of authors", "droit moral" rights and any similar or analogous rights under the applicable laws of any country throughout the universe, may not be granted or assigned, then, to the maximum extent possible, Independent Contractor hereby irrevocably and unconditionally waives in perpetuity, including any extensions or reversions, if any, all rights under any law relating to "moral rights of authors", "droit moral" rights and any similar or analogous rights under the applicable laws of any country throughout the universe, or resulting from any alleged violation of such rights.  Independent Contractor shall not institute any action, without limitation, on the ground that any changes, deletions, additions, or other use of the Results violate such rights.  All rights granted by Independent Contractor under this Agreement are irrevocable and shall vest in Producer and its licensees and assigns whether this Agreement expires in normal course or whether Independent Contractor's engagement hereunder or this Agreement is sooner terminated for any reason.

5.    NAME/LIKENESS/PUBLICITY:  For no additional compensation (as the compensation payable to Independent Contractor under this Agreement for the Series shall be deemed to include compensation for all rights granted pursuant to this Paragraph), in Producer's sole discretion, Producer shall have and is hereby granted the right to photograph, film, videotape or otherwise record Independent Contractor's likeness in any manner Producer desires for use in connection with the Series and the advertising, marketing, publicizing, packaging, distribution, merchandising and/or commercial tie-up

Initials _____

purposes and other exploitation thereof (including, without limitation, in connection with soundtrack/score albums, and "behind-the-scenes" or "making of" productions by Producer or other third parties), as well as the exclusive and perpetual right throughout the universe, in all media now known or hereafter devised to use and license others the right to use Independent Contractor's name, voice (including, without limitation, interviews with Independent Contractor by Producer or other third parties, and DVD commentaries done during and/or following the Production Period, and the exclusive right to use master recordings of Independent Contractor's voice from the soundtrack of the Series in a soundtrack/score album(s) of the Series), filmed, videotaped and/or photographed likeness, simulated likeness and/or biography in connection with the Series and the advertising, marketing, publicizing, packaging, distribution, merchandising and/or commercial tie-up purposes and other exploitation thereof (including, without limitation, in connection with soundtrack/score albums, and "behind-the-scenes" or "making of" productions by Producer or other third parties) and in connection with any distributor, exhibitor, or broadcaster of the Series. If Producer so reasonably requests, Independent Contractor shall render (without charge) reasonable services customarily required by the distributor of the Series in connection with a reasonable amount of publicity concerning the Series (after reasonable notice to Independent Contractor), subject to Independent Contractor's professional availability, but Independent Contractor shall use good faith efforts to be available to render such publicity.

6.    UNIQUE SERVICES:  Independent Contractor hereby acknowledges that the services Independent Contractor are to perform hereunder are of a unique, unusual, extraordinary and intellectual character involving high skill and giving them peculiar value, the loss of which cannot be reasonably or adequately compensated by damages in an action at law, and that a breach of this Agreement by Independent Contractor shall cause Producer irreparable injury and damage.

7.    NO INJUNCTIVE RELIEF:  Independent Contractor hereby recognizes and confirms that in the event of any failure or omission by Producer constituting a breach of any of Producer's obligations under this Agreement, the damages, if any, to Independent Contractor are not irreparable or sufficient to entitle Independent Contractor to injunctive or other equitable relief. Consequently, Independent Contractor does hereby acknowledge and agree that Independent Contractor's rights and remedies in connection with this Agreement or otherwise, shall be limited to the right, if any, to seek damages at law, and Independent Contractor shall have no right in any event (and Independent Contractor does hereby waive all such rights (if any)) to seek or obtain injunctive or other equitable relief, to rescind this Agreement or any of the rights granted to Producer hereunder, or to enjoin or restrain the production, distribution or exhibition of any motion picture(s) or other productions produced in connection with the Series or otherwise.

8.    EMPLOYMENT OF OTHERS/ PURCHASE ORDERS/PETTY CASH:    Independent Contractor shall not employ any person to serve in any capacity nor contract for the purchase or renting of any article or material nor make any agreement committing Producer to pay any sum of money for any reason whatsoever in connection with the Series or services to be rendered by Independent Contractor hereunder or otherwise without prior written approval from Producer. All purchases and rentals MUST be accompanied by Purchase Orders issued by the Production Accountant and approved by the Production Manager. All purchased items approved by Producer (if any) are the property of the Producer. Independent Contractor is responsible for all Accounting for a loss form). All recoverable items must be turned into the production office by wrap. The disposition of assets at wrap may be made only recoverable items purchased. Any theft, loss or damage to an asset must be reported in writing immediately to the accounting department of the Series (see upon approval of the Producer. All product placement or other promotional activities must be approved by Producer. Time cards (if applicable) must reflect hours worked, not hours guaranteed (if any). No overtime or turnaround will be paid unless authorized IN ADVANCE by Producer. Time cards must be turned in on the last workday of the week at wrap. Independent Contractor is responsible for Independent Contractor's hotel incidentals (if applicable). Kit and/or car rentals (which must be pre-approved in writing by Producer) (if any) should be submitted weekly on the time card (if applicable) and they will be prorated for any partial week worked, and shall be to Producer's standard guidelines. Producer shall not be responsible for any loss or damage to box or contents thereof nor for any loss or damage to Independent Contractor's vehicle. Petty Cash expenses not accompanied by original receipt will not be reimbursed. Petty cash advances and unsettled hotel incidentals (if any) will be deducted from Independent Contractor's payroll check if not settled prior to termination. All per diems, mileage payments and kit/box rentals and other expense reimbursements will be subject to any and all applicable tax deductions/laws and will be reported to the required tax authorities as required by any applicable law. It is Independent Contractor's responsibility to keep records for personal tax purposes.

9.    CONFIDENTIAL INFORMATION:  Independent Contractor acknowledges that Independent Contractor's engagement hereunder may expose Independent Contractor to various confidential and/or proprietary information of Producer. In this connection, Independent Contractor agrees that Independent Contractor shall not use or disclose any such information to any third party without the prior, written consent of Producer. Independent Contractor further agrees that Independent Contractor shall not authorize the publication of any news story, magazine article or other publicity relating to the Series, Producer and/or Independent Contractor's services hereunder, without the prior written consent of Producer. No personal photography is permitted on or around the set.

10.    CREDIT:  Except as specifically set forth in the Agreement, credit (if any) shall be granted in Producer's sole discretion. If the Agreement states that Independent Contractor is entitled to credit, then such credit shall be conditioned upon Independent Contractor not being in breach of the Agreement and Independent Contractor fully rendering all Services as required by Producer hereunder. If the Agreement states that Independent Contractor is entitled to "main title credit", the "main titles" may appear in the beginning or end of the Series in Producer's sole discretion. All matters relating to credit, including, without limitation, the placement, size and style of type, will be determined by Producer in its sole discretion, and all credit obligations are subject to Producer's standard exclusions, and exceptions. No failure by Producer, and no failure by any third party, to comply with the credit provisions of this Agreement shall constitute a breach hereof by Producer. In the event of any such failure, upon written notice from Independent Contractor, Producer shall use commercially reasonable efforts to correct any such failure on a prospective basis only, and in no event shall Producer be required to recall any prints or any advertising created or committed to.

11.    DRUGS/ALCOHOL: Independent Contractor acknowledges that Producer has a strict policy prohibiting the use of illegal (or un-prescribed) drugs or alcohol during working hours and failure to comply with this policy shall be cause for immediate dismissal.

12.    DRIVING/TEXTING:  Independent Contractor acknowledges that Producer has a strict policy prohibiting texting and any other activity which violates any city, state and/or federal law, statute, ordinance, rule, regulation public policy, etc., while driving, regardless of whether in Independent Contractor's vehicle or in a vehicle owned/leased by Producer. Violation of this policy and failure to follow this policy, while Independent Contractor is performing work for Producer hereunder, or under any other contract which Independent Contractor has with Producer, shall be cause for immediate termination of this Agreement.

13.    VIOLATIONS OF ANY LAW: Independent Contractor acknowledges that Producer has a strict policy prohibiting Independent Contractor from engaging in any activity which violates any city, state and/or federal law, statue, ordinance, rule, regulation public policy, etc., during the rendition of any services to Producer hereunder or under any other contract which Independent Contractor has with Producer. Violation of this policy and failure to follow this policy, while performing work for Producer, shall be cause for immediate termination of this Agreement.

Initials

14.    GENERAL:  All other aspects of Independent Contractor's engagement hereunder shall be in accordance with Producer's standard terms for persons rendering similar services. This Agreement expresses the entire understanding of the parties hereto and replaces any and all former agreements, negotiations or understandings, written or oral, relating to the subject matter hereof. This Agreement shall not be modified except by a written document executed by both parties hereto. No waiver by either party hereto of any failure by the other party to keep or perform any covenant or condition of this Agreement shall be deemed a waiver of any preceding, succeeding or continuing breach of the same, or any other covenant or condition.  Nothing herein contained shall be construed so as to require the commission of any act contrary to law and wherever there is any conflict between any provision of this Agreement and any present or future law, contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event, the provision(s) of this Agreement effected shall be curtailed and limited only to the extent necessary to bring it within the requirements of such law. Nothing contained in this Agreement shall be construed so as to require Producer actually to develop, produce or release the Series or actually to utilize or continue the utilization of Independent Contractor's services or the results and proceeds thereof in connection therewith. This Agreement may be executed in one or more counterparts, each of which when taken together shall constitute one and the same agreement, and each of which shall constitute an original copy of this Agreement. In addition, this Agreement may be executed via facsimile and such facsimile copy shall constitute an original copy of this Agreement. The captions used in connection with the sections, paragraphs and subparagraphs of this Agreement are used only for purposes of reference and shall not be deemed to govern, limit, modify or in any manner effect the scope, meaning or intent of the provisions of this Agreement or any part thereof, nor shall such captions be given any legal effect.  The Independent Contractor is aware that it is a material breach of this contract to engage in conflicts of interest.  No compensation shall be paid for days not worked which includes, without limitation, "sick days," "idle days," "holidays" and "travel days" not worked, or any other days which Producer does not require Independent Contractor's Services, and no additional compensation shall be paid for services rendered at night, or in excess of any number of hours.  There shall be no overtime or forced calls unless approved by Producer.  Independent Contractor is obligated to comply with the injury and illness prevention procedures per Producer's guidelines. Producer shall have the customary rights of suspension and termination by reason of any event beyond Producer's control which materially hampers production of the Series including but not limited to force majeure, incapacity of Independent Contractor, director, director of photography, or any other cast or crew member.  Independent Contractor authorizes Producer to deduct and withhold from Independent Contractor's compensation hereunder any and all overpayments, unauthorized charges, or other required amounts. Producer may secure (and Independent Contractor shall cooperate in connection therewith) life, health, accident, or other insurance covering Independent Contractor, and Independent Contractor shall have no right, title, or interest in or to such insurance (and if Producer is unable to obtain such insurance, then notwithstanding anything set forth in this Agreement, Producer may terminate this Agreement, and shall have no further obligations to Independent Contractor whatsoever, be it financial or otherwise).  Producer and Independent Contractor agree that this Agreement shall be subject to, construed and interpreted pursuant to the laws of California as it applies to contracts entered into and performed wholly within California.

14.    DISABILITY/FORCE MAJEURE:  In the event of Independent Contractor's disability hereunder, and/or in the event of an event of force majeure (i.e., an event of "force majeure" shall exist hereunder if Producer's operations with respect to the Series, or the conduct of Producer's business generally, are impaired, hampered, interrupted, prevented, suspended, postponed or discontinued by reason outside Producer's control), all of Producer's obligations to Independent Contractor under this Agreement (financial and otherwise) shall be suspended, and the running of time shall be suspended and the continuance of such disability and/or event of force majeure or within a reasonable time thereafter, and in the event of such a termination, notwithstanding any financial or other guarantees to the contrary, Producer shall have no further obligations to Independent Contractor (financial or otherwise) other than to pay Independent Contractor any compensation actually earned and vested under this Agreement prior to such disability and/or event of force majeure.

15.    NO OBLIGATION:  Nothing herein shall be deemed to obligate Producer to use Independent Contractor's services or the Results, in the Series or to produce, release or distribute the Series or otherwise exploit any rights granted to Producer hereunder.  Producer shall have fully discharged Producer's obligations hereunder by payment of the Compensation earned hereunder (if any).

16.    NON-UNION:  Independent Contractor acknowledges and agrees that this Agreement shall not be subject to any union agreement.

17.    DEDUCTIONS/WITHHOLDINGS:  All unemployment and disability insurance, workmen's compensation contributions, social security, income tax, and other withholdings, deductions and payments required by federal, state, or local laws to be made in connection with Independent Contractor's services under this Agreement are Independent Contractor's sole responsibility, and Independent Contractor agrees to indemnify and hold Producer harmless from any claims and liability in connection with these deductions and payments.  Notwithstanding the foregoing, Producer may deduct and/or withhold from the amounts to be paid to Independent Contractor under this Agreement any sums required by federal, state or local laws, regulations or orders now or subsequently in force to be deducted and/or withheld from such sums.

18.    INDEPENDENT CONTRACTOR'S RESPONSIBILITY:  Independent Contractor will be responsible for any and all replacement costs and expenses with respect to any non-returned/missing badges and/or keys at the expiration and/or early termination of the Engagement Period.  In addition, Independent Contractor will also be responsible for covering any and all costs, expenses and/or damages caused to any housing, rental cars and/or other equipment (excluding normal wear and tear) used by and/or under the possession of Independent Contractor.

Initials _____

<u>ACCOUNTING POLICIES AND PROCEDURES</u>:

I HAVE READ THE COMPANY POLICY AND PROCEDURE MANUAL TO ITS ENTIRETY AND AGREE TO
ABIDE BY THE COMPANY POLICIES. I KNOW THAT ANY VIOLATION CAN CAUSE FOR IMMEDIATE
TERMINATION.

AGREED TO & ACCEPTED BY:

_Aibe (Alberto) Reyes_
Print Name

_A. Reyes_
Signature

_Set Dec._
Department

_05/27/2014_
DATE

APPROVED BY:

_____
Producer

_____
Production Supervisor

_6/2/14_
DATE

6

## CONFIDENTIALITY AGREEMENT

This agreement (the "Agreement"), dated as of OS/27/2014, is entered into by and between the undersigned, Albe Reyes (referred to hereunder as "you" or "your") and The Tyler Perry Companies (collectively "Perry"), and you understand that the term "Perry" as used herein shall include, but is not limited to, The Tyler Perry Company, Tyler Perry Studios, MB Aviation, and Tyler Perry and any and all of their related or affiliated entities, and each of their respective agents, employees, directors, officers, attorneys, business managers, representatives, executives and family members. In consideration of the engagement your services and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

In the course of your services for Perry, you may have access to or come into possession of sensitive, private and/or confidential information, whether personal or business related, concerning Perry and Perry's family, employees and various business entities and/or transactions in which Perry has an interest. In that regard, any and all information concerning the businesses, projects, employees, financial matters, legal matters, contractual matters, personal life, medical matters, investments, plans, performances, professional relationships or other information regarding the personal and business affairs of Perry and/or Perry's family, employees and various business entities, and any letter, memorandum, contract, photograph, film, video or sound recording or other document or material in any way relating to any of the foregoing (including, without limitation, all information regarding this Agreement, any transactions in which Perry has an interest, any projects developed or considered by Perry, any creative concepts, pitches, screenplays, scripts or other creative materials and ideas, the location, floor plans, or photographs of interior and exterior spaces of any site where Perry resides and/or does business, items and materials used in the design and décor of such location(s) and any and all other information of any nature concerning or related to Perry or Perry's family, employees and various business entities in which Perry has an interest) is collectively referred to as the "Confidential Information."

You shall keep all Confidential Information in strict confidence and will not at any time whether during the term of your services or otherwise, use or disclose, directly or indirectly, to any third party (expressly including, without limitation, Los Angeles Times, New York Times or New York Post and/or any other newspaper or tabloid or magazine or blog or any other third party) any Confidential Information obtained by you except: (i) to the extent necessary, but only to the extent necessary, to perform your services as required by Perry; (ii) any such Confidential Information which you may be required to disclose pursuant to applicable laws, judicial process, governmental regulations or regulatory process (but only to the extent you are required to do so, and provided that you will give Perry prompt written notice of any request for disclosure and will cooperate with Perry's efforts to obtain a protective order or other similar protection); (iii) to law enforcement personnel in the event you observe or become aware of conduct that you reasonably and in good faith believe constitutes criminal conduct; and (iv) on a need-to-know basis to any officer and/or employee of Global Protective Services, Inc. and/or its independent contractors performing security services for Perry, and your directors, officers, employees, accountants, consultants, attorneys and representatives (collectively, "Representatives"); provided that such Representatives have been advised of the existence of this Agreement and have agreed to be bound hereby and not to disclose any Confidential Information. You further agree that any such disclosures of Confidential Information to any such Representatives shall be made only to the extent such Representatives reasonably require access to such information to perform his or her function as such function relates to your services for Perry.

JH-4-4-13

In that regard, you agree to be responsible for the breach of the terms of this Agreement by any of your Representatives. In addition, you agree, and you agree to cause your Representatives to agree not to disclose to any third parties that Perry, or any entity owned or controlled by Perry, is engaging your services. Notwithstanding the foregoing, you shall not be held responsible if any Confidential Information is generally available to the public or becomes public knowledge provided that such information has become public by means other than as a result of a disclosure by you or your Representatives (other than as required to comply with applicable laws, judicial process, governmental regulations or regulatory process). Nevertheless, even if such Confidential Information does become public, through no fault or action by you or your Representatives, you agree to continue to treat such information as Confidential Information.

You further agree that you will not issue, release, authorize or in any way participate in any publicity, press releases, interviews, advertisements or promotional activities relating to your services to Perry or any other Confidential Information, without the prior written consent of Perry in each instance, which consent Perry shall not be obligated to give. If Perry approves any such publicity, which he has no obligation to do, no such publicity, whether personal publicity about you or otherwise, shall contain derogatory mention of Perry.

You agree to inform Perry immediately if anyone offers to pay you or your Representatives money for, or to provide you or your Representatives with any other form of compensation for, or solicits, or seeks by legal process, the disclosure of any Confidential Information.

This requirement of confidentiality applies during and after your dealings with Perry and extends to disclosures to friends and members of your family. You also agree to avoid any discussion of the Confidential Information in public places, such as elevators, restaurants, and restrooms, as these conversations may be overheard by others. In addition, you agree not to leave Confidential Information in any form, including, without limitation, in the form of written or photographic materials, in open view and not to remove such Confidential Information from the premises where you perform your duties. You also agree not to make any disparaging statements about Perry, his family, his business entities, representatives or business practices.

You acknowledge and agree that any breach by you of this Agreement will or might result in irreparable injury to Perry and will entitle him to seek a temporary restraining order or injunctive relief prohibiting any such breach, plus attorneys fees and expenses. Furthermore, if you breach this Agreement by selling information about Perry or his family, business entities, representatives or business practices, you agree that, in addition to any damages to which Perry may be entitled, the proceeds from such sale will be transferred to Perry and in that regard you hereby grant to them a lien on any such monies. Neither this provision, nor exercise by Perry of any of Perry's rights hereunder, will constitute a waiver by Perry of any rights which Perry may have for compensatory damages, punitive damages or otherwise.

This Agreement shall be construed and enforced in accordance with, and governed by, the substantive laws of the Georgia, without regard to conflicts of law principles. You agree that any dispute hereunder shall be submitted to final and binding arbitration, on a private, confidential basis, to be held in Fulton County, Georgia, in accordance with JAMS/Endispute Comprehensive Arbitration Rules and Procedures ("Rules"). If you refuse to perform any obligation under the final arbitration award, then provided that an entry of judgment or other enforcement action may be filed or pursued in any necessary jurisdiction.

JH-4-4-13

Any dispute or claim that is not arbitrable pursuant to any applicable state or federal law shall be subject to the exclusive jurisdiction and venue of the state and federal courts sitting in Fulton County, Georgia, provided that an entry of judgment or other enforcement action may be filed or pursued in any necessary jurisdiction after the dispute has been adjudicated. Notwithstanding the foregoing, Perry shall be entitled to injunctive or other equitable relief from any state or federal court sitting in Fulton County, Georgia, or any other court of competent jurisdiction, to prevent or prohibit any breach or alleged breach by me hereunder. Perry shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding hereunder. In the event that you prevail in any arbitration or other legal proceeding initiated by Perry, you shall be entitled to recover from Perry all reasonable outside attorneys' fees and expenses incurred by you therein.

Please indicate that you have read, understood and agreed to the above by signing below.

Very truly yours,
The Tyler Perry Companies

Understood, Acknowledged and Agreed:

Signature: _A. Reyes_ _A. Reyes_

Print Full Name (clearly): _Al Be (Alberto) Reyes_

Address: ███████████████████████████

City: ███████████████████████

Telephone#: ███████████████

DL# or State ID#: ████████████   State Issued: _Ga_

Company/Affiliation: _____

Purpose of Visit: _Start Work_

Occupation/Services: _Set Dec. PA_

TPS Point of Contact: _Brett Hendrix_

## ##

**Office Use Only:**

_____ *has confirmed that this document has been properly*
*filled out.*
*Print Name*

_____
*Signature*

_____
*Date*

JH-4-4-13

*DISCRIMINATION AND SEXUAL HARASSMENT POLICY*

<u>POLICY</u>

The Company, and its parents, and its affiliates (collectively "Company") are committed to providing equal employment opportunity and a work environment free from discrimination prohibited by law, including sexual harassment, and discrimination because of an individual's race, religion, creed, color, national origin, ancestry, medical condition, mental and/or physical disability, marital status, sex, age, veteran status or sexual orientation. In keeping with this commitment, Company prohibits such discrimination or sexual harassment in all areas of employment, including, by way of example, recruitment, hiring, training, promotion, discipline, separations, benefits and compensation, and requires reasonable accommodation of qualified individuals with mental and/or physical disabilities whose needs are known to Company.

No employee of Company has the authority to condition any employment term, condition or benefit on the granting of sexual favors or on tolerating unwelcome sexual conduct or on any other conduct prohibited by this policy. All employees are also prohibited by this policy from taking retaliatory action of any kind against an employee because the employee made a good faith complaint about sexual harassment or discrimination prohibited by this policy. Any violations of this policy shall be treated as serious misconduct and will result in appropriate disciplinary action, which may include termination of employment.

All employees, whether supervisors or non-supervisors, and non-employees during business contacts with Company employees or while visiting Company premises, are expected to comply with this policy.

<u>DEFINITION</u>

This policy prohibits all forms of conduct - such as verbal, physical, or visual conduct which are unwelcome and indicate race, religion, sex, creed, color, national origin, medical condition, ancestry, age, marital status, veteran status, physical or mental disability or sexual orientation.

<u>Sexual harassment</u> is defined as including, but is not limited to, unwelcome sexual advances, requests for sexual favors, and other verbal, physical or visual conduct of a sexual nature when either (1) submission to such conduct is made either explicitly or implicitly a term or condition of the individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

This policy seeks to prevent *unwelcome* discriminatory-based conduct, examples of which are listed below. It is important for employees to avoid conduct on their part which could be construed by others as unwelcome conduct directed at them (e.g., telling jokes of a sexual nature).

<u>Examples of Prohibited Conduct:</u>

- Offering employment benefits, such as favorable assignments, reviews, promotions or the like, in exchange for sexual favors;

- Making or threatening reprisals after a negative response to sexual advances or to other discriminatory conduct;

- Making unwelcome sexual advances, propositions, flirtations or repeated unwelcome requests for or efforts to make social contact;

- Using verbal abuse of a sexual or gender-based or other discriminatory basis, such as using sexually degrading or vulgar words to describe an individual or making derogatory sexual, gender-related or discriminatorily-based (i.e., race religion, age, national origin, disability, sexual orientation, etc.) comments, slurs, taunts, jokes, language or epithets;

- Asking questions about sexual conduct or sexual orientation or disclosing or spreading rumors about such information concerning yourself or others;

- Making verbal commentaries about an individual's body, sexual prowess, sexual orientation or sexual deficiencies;

- Whistling at, touching, pinching, brushing the body, assaulting, impeding or blocking the movements, or coercing sexual acts or engaging in any such physical conduct in the context of other discriminatory-based conduct;

- Leering or making sexual, derogatory, insulting, obscene or other discriminatory-based (i.e., race, religion, age, national origin, disability, sexual orientation, etc.) comments or gestures;

- Displaying in the workplace sexually suggestive, gender-based or discriminatorily-based (i.e., race, religion, age, national origin, disability, sexual orientation, etc.) objects, pictures, posters or cartoon;

- Sending sexually suggestive or obscene letters, gifts, notes or invitations;

- Retaliating against an employee for refusing to participate in such behavior or for complaining about such behaviors.

### TIMELY REPORTING

An important objective of this policy is to prevent a working environment from developing which because of such prohibited conduct unreasonably interferes with an employee's work or is intimidating, hostile or offensive. It is therefore essential and required that employees *immediately report* conduct which is believed to be in violation of this policy. Such timely reporting is necessary so that a complaint can be investigated while information is most available, a problem can be remedied before a harassing situation develops, and the potential for the spread of harmful rumors can be reduced.

### COMPLAINT PROCEDURE

Any employee who believes that he or she has been subjected to conduct in violation of this policy by an employee, supervisor, agent, business contact or visitor of Company or its parents & affiliates should report the facts of the incident and the names of the individuals involved to his/her immediate supervisor or, in the alternative, to the Chief Executive Officer or Chief Operating Officer. If the employee is uncomfortable discussing the matter with any of these individuals for any reason, including any one of them is believed to be involved in the conduct, the employee must instead report the matter to any member of management with whom the employee is comfortable.

If the employee is comfortable addressing the situation directly, and believes it would be helpful, the employee is encouraged to *immediately* tell the other person when his or her behavior is considered inappropriate and unwelcome and to request that the conduct stop. Persons so told should comply immediately and graciously with such requests.

Supervisors must *immediately* report conduct which is believed to be in violation of this policy, whether or not the concerned parties are subordinates of the supervisor, to the Chief Executive Officer or Chief Operating Officer or to the position designated in the supervisors applicable business group.

### INVESTIGATION PROCESS

A report of an alleged violation of this policy will be promptly investigated. The findings will be reported to personnel with authority to take appropriate corrective action. Appropriate disciplinary action will be taken against any person who has violated this policy and other action will be taken as appropriate to remedy problems caused by the misconduct. The

outcome of the investigative process will be reported to relevant parties, as is considered to be practical and/or appropriate.

## CONFIDENTIALITY

Confidentiality will be maintained to the extent considered by Company to be practicable and appropriate in order to meet the purposes of investigating, responding to claims, complaints and charges, and achieving the other objectives of this policy.


05/22/2014
Date

A. Reyes
Employee Signature

# TYLER PERRY STUDIOS

## VISITORS AND GUESTS

## WAIVER AND RELEASE AND CONFIDENTIALITY AGREEMENT

The undersigned hereby waives and releases Tyler Perry and the Tyler Perry Studios ("TPS") from any and all liability with regards the undersigned's visit to the Tyler Perry Studios in Atlanta, Georgia.

As a guest of the TPS, the undersigned acknowledges that TPS is assuming no liability or responsibility for the safety of the undersigned, and further the undersigned guest is visiting TPS on his/her own, and accepts responsibility and liability for any accident or injury that might be sustained while on the premises of TPS.

The undersigned acknowledges that TPS makes available visits and tours of the TPS facilities, and also allows guests and visitors to watch the taping and/or filming of both television shows being produced by TPS as well as movies being produced by TPS. The undersigned may be participating as an audience member at one or more taping event or live event at TPS, and agrees that all matters that the undersigned may observe, watch, see, hear or otherwise become aware of, are highly confidential and under no circumstances may the undersigned discuss or otherwise communicate anything whatsoever that transpires at TPS, or that the undersigned sees, hears or learns by virtue of being on and in the facilities of TPS.

It is further understood and agreed that all information that the undersigned comes across, learns, sees, hears or otherwise becomes aware of, without limitation, including but not limited to information about Tyler Perry, TPS, any employee of TPS or of any production being taped or filmed at TPS, anything concerning the business affairs of Tyler Perry or of TPS, any information about Tyler Perry's family, any employees of TPS, of any nature whatsoever, shall be considered "Confidential Information" and the undersigned agrees to keep all such Confidential Information in strict confidence, and private, and not to discuss with any person or organization any of such information, all at the risk of substantial damage to Tyler Perry of TPS. The undersigned also agrees that any breach of this Confidentiality Agreement may result in substantial damages being awarded to Tyler Perry and/or TPS as a result of your breach of this Confidentiality Agreement.

The undersigned further agrees that he/she shall assume all responsibility, risk and other liability for any injury or illness that the undersigned may suffer while at the Tyler Perry Studios. In addition, the undersigned waives and releases Tyler Perry and the Tyler Perry Studios from any financial obligation whatsoever, and from any financial liability for any injury or illness suffered by the undersigned in connection with the undersigned's presence at TPS. The undersigned further acknowledges that Tyler Perry and the Tyler Perry Studios have made no representations or warranties as to the fitness or condition of the facilities and/or the studios located at the TPS, and further acknowledges that the undersigned's presence on the premises of TPS is done by the undersigned at his/her sole risk.

The undersigned further agrees that he/she will not take any photographs, pictures, videos or engage in other similar activities which might result in an unauthorized picture, image or other depiction of any part of the TPS or any person who may be located thereon, whether such person is a member of the cast or crew of any activity taking place at TPS, and the undersigned further agrees that in the event he/she is found to be using any type of photographic or similar equipment while on the premises of TPS, that he/she understand and agree that any TPS employee of independent contractor shall be able to confiscate such photographic or similar equipment and that the same will not be returned to the undersigned. The undersigned hereby waives and releases from any and all liability Tyler Perry and the Tyler Perry Studios and any employee or representative of the said Tyler Perry and the Tyler Perry Studios in connection with the confiscation of said photographic or similar equipment.

The undersigned further agrees to hold harmless and indemnify Tyler Perry and the Tyler Perry Studios against any loss, whether financial or otherwise, in connection with any claim of injury or loss incurred at the facilities of TPS, and the Tyler Perry Studios shall have no legal or other liability or responsibility for the actions of the undersigned or any other party who might be present on the premises of TPS.

Signed this _27_ day of _May_, 20 _14_.

_A. Reyes_
Signature

_AlBe Reyes_
Print Name

Visitor, Guest or Audience Member

## 

---

Office Use Only:

_____ has confirmed that this document has been properly filled out.
Print Name

_____
Signature

_____
Date

Revised January 18, 2011