IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOSHUA SOLE,

     Plaintiff,

v.

                          CIVIL ACTION NO.
                          1:15-CV-1700-LMM-LTW

TYLER PERRY, TYLER PERRY
STUDIOS, LLC, BRETT HENDRIX,
and AND ACTION LLC,

     Defendants.

## MAGISTRATE JUDGE'S ORDER AND
## REPORT AND RECOMMENDATION

      This case is presently before the Court on two motions for sanctions filed by Defendants And Action LLC ("AA"), Tyler Perry Studios, LLP ("TPS"), and Brett Hendrix ("Hendrix") (Docs. 48, 66), and Defendants AA, TPS, and Hendrix's motions for summary judgment (Docs. 61, 62, 63). For the reasons set forth below, Defendants' initial Motion to Extend Discovery and For Sanctions is **DENIED AS MOOT** (Doc. 48). Because the undersigned is recommending granting the moving Defendants' motions for summary judgment, this Court is also **RECOMMENDING** that the moving Defendants' renewed Motion for Sanctions be **GRANTED IN PART AND DENIED IN PART** should the District Court elect to retain jurisdiction. (Doc. 66). Additionally, the undersigned **RECOMMENDS** that the moving Defendants' motions for summary judgment be **GRANTED** with regard to Plaintiff's federal claims, and that Plaintiff's

state law claims be **DISMISSED**.  (Docs. 61, 62, 63).

## BACKGROUND

Plaintiff Joshua Sole ("Plaintiff") filed the instant employment discrimination action on May 13, 2015, and soon after moved to amend his complaint (Docs. 1, 18; Docket Entry dated Jan. 7, 2016).  In the Amended Complaint, Plaintiff contends that Defendants Tyler Perry ("Perry"), TPS, and AA – his alleged joint employers – discriminated against him on the basis of his sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), as a result of Defendant Hendrix's sexual harassment of Plaintiff, and Perry's, TPS's, and AA's refusal to take appropriate corrective action after Plaintiff complained of the inappropriate conduct.  (Am. Compl., Doc. 18-1, ¶¶ 16-48).  Plaintiff also contends that Defendants Tyler Perry, TPS, and AA retaliated against him in violation of Title VII because they discharged him after he complained of Hendrix's sexual harassment.  (Am. Compl. ¶¶ 27-36, 49-52).  Plaintiff also asserts a number of state law claims based upon the same conduct:

- Against Perry, TPS, and AA, claims for negligent and reckless failure to provide a safe work environment; negligent and wrongful hiring, supervision, and retention (Am. Compl. ¶¶ 52-59);

- Against all Defendants, a claim for intentional infliction of emotional distress ("IIED") (Am. Compl., ¶¶ 60-62); and

- Against Defendant Hendrix, claims for battery and invasion of privacy

2

(Am. Compl. ¶¶ 63-69).

Finally, based upon an alleged social media message posted by Defendant Perry "referring to Plaintiff as someone who ha[d] to be 'mentally disturbed,'" Plaintiff asserts a state law claim against Perry for libel.  (Am. Compl. ¶¶ 70-74).  Plaintiff seeks in excess of $1,000,000.00 in damages for lost pay and benefits, emotional distress and mental anguish, and punitive damages, as well as attorneys fees and costs as a result of Defendants' alleged bad faith in forcing Plaintiff to pursue this litigation.  (Am. Compl., at 14-15).

Defendants AA, TPS, and Hendrix have moved for summary judgment as to all of Plaintiff's claims.  (Docs. 61-63).  With regard to Plaintiff's federal claims, Defendant AA contends (1) that all of Plaintiff's Title VII claims fail because they were untimely asserted against AA; (2) that Plaintiff's Title VII harassment claims are subject to summary judgment because the alleged harassment was not sufficiently severe or pervasive, because the perpetrator was merely a co-worker and AA had no reason to know of the conduct, and because the Faragher/Ellerth defense bars liability since AA had a reasonable anti-harassment policy that Plaintiff unreasonably failed to take advantage of; (3) Plaintiff's Title VII retaliation claim is meritless because Plaintiff did not engage in protected activity, because his discharge was not causally related to any protected activity, and because there is no evidence of pretext.  (Doc. 61).  Defendant TPS argues the undisputed evidence demonstrates that TPS did not employ Plaintiff, and therefore, TPS cannot be held liable under Title VII – either as a single or joint employer

3

with AA; TPS also argues that even if it could be held liable as an employer under Title VII, the same arguments made by AA apply equally to Plaintiff's claims against TPS. (Doc. 62).

With regard to Plaintiff's state claims, AA argues (1) that the negligence claims fail because there is no evidence that it should have known of any tendencies by Hendrix to commit wrongdoing; (2) that Plaintiff's IIED claim fails because an employer is not liable for an employee's intentional torts and because evidence does not support the elements of the claim; and (3) that Plaintiff's litigation expenses claim is derivative of the other substantive claims, all of which are subject to summary judgment. (Doc. 61). TPS again argues all of Plaintiff's state law claims fail for the same reasons outlined by AA because they are premised upon TPS employing Plaintiff. (Doc. 62). Finally, Defendant Hendrix argues summary judgment should be granted on all of Plaintiff's claims against him because (1) the conduct demonstrated by Plaintiff does not support a claim for either IIED or battery under Georgia law; (2) that the close relationship between Plaintiff and Hendrix precludes an invasion of privacy claim; and (3) Plaintiff's litigation expenses claim is derivative of his other inadequate claims. (Doc. 63).

## **DEFENDANT TYLER PERRY**

As an initial matter, apart from being named in the Complaint and Amended Complaint, Defendant Tyler Perry has never been involved in the litigation before this Court. Plaintiff has not presented any evidence of service on Defendant Perry, Defendant Perry has not made an appearance, on his own behalf or through counsel, and

AO 72A
(Rev.8/82)

Defendant Perry has not answered the Complaint or Amended Complaint.  Plaintiff has made no effort to seek entry of default or default judgment against Defendant Perry, and Plaintiff has not presented the Court with any reason whatsoever for why service has not been effectuated on Defendant Perry.

Rule 4 of the Federal Rules of Civil Procedure, which governs service, provides in relevant part:

> A summons shall be served together with a copy of the complaint. The plaintiff is responsible for service of a summons and complaint within the time allowed under subdivision (m) and shall furnish the person effecting service with the necessary copies of the summons and complaint.

Fed. R. Civ. P. 4(c).  Unless service is waived, the person effecting service must file proof of service with the Court in the form of a server's affidavit.  Fed. R. Civ. P. 4(l). Rule 4(m) requires that a plaintiff serve the complaint within 90 days of filing it.  Fed. R. Civ. P. 4(m).  Failure to comply with this rule will result in dismissal of the complaint without prejudice unless the plaintiff can show good cause why service was not made within that period.  Id.  "Good cause exists 'only when some outside factor, such as reliance on faulty advice, rather than inadvertence or negligence, prevented service.'" Lepone-Dempsey v. Carroll Cty. Comm'rs, 476 F.3d 1277, 1281 (11th Cir. 2007) (quoting Prisco v. Frank, 929 F.2d 603, 604 (11th Cir. 1991)).  Even if good cause is not shown, a "court may relieve a plaintiff of the consequences of . . . this subsection," when, for example, "a defendant is evading service or conceals a defect in attempted service." Horenkamp v. Van Winkle and Co., 402 F.3d 1129, 1132-33 (11th Cir. 2005).

5

Here, Plaintiff originally filed the Complaint on May 13, 2015. (Doc 1). The allotted period for service has passed, and Plaintiff has failed to provide the Court with proof of service upon Defendant Perry. Plaintiff has neither attempted to show good cause for any failure to serve Defendant Perry, nor requested additional time to effectuate proper service. Plaintiff also has not presented any argument that Defendant Perry should remain in the litigation. Additionally, no circumstances exist that would warrant the Court overlooking these failures. Under Rule 4(m), "the court – upon motion <u>or on its own</u> after notice to plaintiff – must dismiss the action without prejudice." (Emphasis added).[1] Accordingly, Plaintiff's claims against Defendant Perry should be **DISMISSED WITHOUT PREJUDICE** for insufficiency of service of process within the time required under Rule 4(m).[2]

## **DEFENDANTS' MOTIONS FOR SANCTIONS**

Defendants AA, TPS, and Hendrix (together, "Moving Defendants") move for sanctions against Plaintiff for alleged spoliation of evidence and discovery abuses. (Docs. 48, 66). The Court will address these motions prior to evaluating Moving

---

[1] <u>Nelson v. Barden</u>, 145 F. App'x 303, 310 (11th Cir. 2005) (notice to plaintiff of deficient service in magistrate judge's report and recommendation satisfied notice requirements of Rule 4(m), as objection period provided to plaintiff prior to dismissal by district court).

[2] Because service of process is a jurisdictional requirement, a "'court lacks jurisdiction over the . . . defendant when that defendant has not been served.'" <u>Jackson v. Warden, FCC Coleman-USP</u>, 259 F. App'x 181, 183 (11th Cir. 2007) (quoting <u>Pardazi v. Cullman Med. Ctr.</u>, 896 F.2d 1313, 1317 (11th Cir. 1990)). Accordingly, the Court does not evaluate the merits of any claims asserted against Defendant Perry.

6

Defendants' motions for summary judgment.

## I.   **BACKGROUND**

Defendant TPS served Plaintiff with interrogatories, requests to admit, and document requests, which required Plaintiff to identify and to produce relevant documents and/or materials in his possession in June 2015.   During subsequent depositions – in particular, the depositions of Plaintiff and Defendant Hendrix in November and December 2015 – it became apparent that additional responsive unproduced discovery materials existed.

First, during his deposition, Plaintiff testified that on the date of his discharge, he made video of various events, including his own conduct, which were recorded on his phone and subsequently saved to a computer and/or hard drive(s).  (Pl.'s Dep.  29-31, 243-44).  Plaintiff further testified that he had both a laptop computer and a separate external hard drive containing the video and/or documents that may be relevant to this case, and testified that he still had at least one external hard drive with the video in his possession.[3]  (Id).  Because such video was not only responsive to discovery requests but also directly related to the Moving Defendants' defenses,  that is, the video showed Plaintiff's actions directly leading to his termination,  and defense counsel requested during Plaintiff's Deposition that Plaintiff retain and produce the computer and hard drive(s) for inspection.  (Pl.'s Dep. 31, 243-44).  Plaintiff agreed to do so.  (Id.).  Plaintiff

---

[3] During his deposition, Plaintiff testified that he thought one hard drive was damaged, but also stated that one hard drive containing the video was still available. (Pl.'s Dep. 243-44).

AO 72A
(Rev.8/82)

was also served with additional requests for production in relation to the videop footage. Plaintiff's counsel later represented to the Court during a January discovery hearing that the hard drive(s) containing the video were all either damaged and/or lost. Plaintiff maintains that he left the undamaged hard drive with the video footage (and/or computer containing the hard drive) in Denver and could not relocate it upon his return to Denver.[4] Plaintiff could not explain what might have happened to the hard drive referenced in the deposition that contained the video or how it was lost. Plaintiff's counsel only informed Defendants of the loss of the hard drive(s) during that January hearing before the Court.

Separately, during the deposition of Defendant Hendrix, Plaintiff attempted to use and/or introduce – for the first time – previously obtained but not produced information relating to Alberto Reyes ("Reyes"), including a sworn statement by Reyes. Until that point, Plaintiff had not identified Reyes as a person with knowledge about the claims in this case. (Deposition of Brett Hendrix, dated Decl. 2, 2015 ("Hendrix Dep."), 161-65). Plaintiff's counsel represented to the Court at the January hearing that Plaintiff only rediscovered and provided Reyes's sworn statement the week of Hendrix's deposition; however, Plaintiff's counsel also admitted he did not supplement Plaintiff's disclosures or production prior to the deposition. Plaintiff's counsel further admitted that he did not properly supplement discovery with information and materials relating to Reyes until over a month after Hendrix's deposition.

---

[4] All hearing references hereinafter refer to a hearing concerning discovery issues held on January 25, 2016 (the "January hearing").

Following objections by Plaintiff and a dispute between the parties, the moving Defendants filed a motion seeking to compel the production of both the computer and hard drive(s), to preclude Reyes from providing testimony or evidence on behalf of Plaintiff, and to obtain other sanctions relating to the hard drive(s) and video footage. The Court held a hearing on January 25, 2016, to resolve the outstanding discovery issues (the January hearing referenced above). At the conclusion of the hearing, the Court granted the motion in part, ordering Plaintiff to produce the relevant computer and hard drive(s) – to the extent they still existed – for inspection.[5] The Court also extended the discovery period for that production, the deposition of Reyes, and the reopening of Plaintiff's deposition as necessary to address the discovery issues raised by the moving Defendants. (See also Doc. 37 (Motion to Compel Discovery, for Sanctions and for Expenses ("Motion to Compel") and Docket Entry dated Jan. 28, 2016 (Minute Order reflecting Court granting in part and denying in part the Motion to Compel). At the January hearing, the Court took Defendants' request for sanctions under advisement. (Id.).

Upon the joint motion of the parties, the Court provided two further extensions of discovery; ordered Plaintiff to produce the computer and hard drive(s) for forensic inspection by March 23, 2016; ordered the moving Defendants to complete their inspection of the computer and hard drive(s) and other discovery outlined in the January

---

[5] The Court asked the moving Defendants to make sure to return the computer within a reasonable period of time, which the moving Defendants' counsel represented would be a matter of days.

28, 2016 Minute Order by April 25, 2016; and set the dispositive motions deadline for May 25, 2016.  (Docs. 44, 47).[6]

In a March 23, 2016 email, the moving Defendants provided instructions to Plaintiff on how to prepare his computer and/or hard drive(s) in preparation for a forensic analysis. (Decl. of Matthew A. Boyd ("Boyd Decl."), dated Apr. 15, 2016, Doc. 48-1, Exhibit A).  After being prompted multiple times by defense counsel to provide Plaintiff's computer and confirm that no other storage devices exist, Plaintiff belatedly[7] produced a properly prepared computer on March 25, 2016.  (Boyd Decl.; see also Decl. of Evelyn Persinger ("Persinger Decl.") dated May 23, 2106, Doc. 60-1; see also Doc. 56-2 (emails regarding delivery of computer and Defendants' request for confirmation that no other media exists).  Following forensic imaging of the computer, it was then

---

[6] On April 15, 2016, the moving Defendants filed a motion requesting an extension of the discovery period and sanctions against Plaintiff in relation to the production of the hard drive.  (Doc. 48, Motion to Extend Discovery and For Sanctions).  Because briefing on that motion was not completed until two days prior to the dispositive motion deadline, the moving Defendants indicated their intention to withdraw both the request for an extension of the discovery period and for sanctions, the latter withdrawal made in order to refile the request to better articulate their request for sanctions following the filing of their motions for summary judgment.  (Doc. 60).  Accordingly, the moving Defendants' initial Motion to Extend Discovery and For Sanctions is **DENIED AS MOOT**.  (Doc. 48).

[7] There is disputed testimony regarding the reasons for the delay.  (Compare Boyd Decl., Persinger Decl. with Aff. of Joshua Sole, dated Apr. 29, 2016, Doc. 56-1).  Based upon that testimony, the Court finds that, except as discussed below, both parties substantially complied with the Court's orders made during the January 25, 2016 hearing and in its January 28, 2016 Minute Order.  To the extent either party requests sanctions in relation to the production, inspection, and return of Plaintiff's laptop in March and April 2016, such requests are **DENIED**.

made available to Plaintiff on March 28, 2016. (Persinger Decl.). It is undisputed that Plaintiff has not produced any of the drives he identified during his deposition as having relevant video footage from the date of his discharge.

The moving Defendants also deposed Reyes. During his deposition, Reyes confirmed that he communicated with a representative of Plaintiff as early as June 2015, and provided a statement around the same time. (Depo. of Alberto Reyes, dated Apr. 25, 2016 ("Reyes's Dep."), Doc. 68, 26-30, 58-67). It is undisputed that Plaintiff first provided Reyes's statement to Defendants during the deposition of Hendrix, many months after such information was requested by Defendants, and days after Plaintiff's counsel represented that he had produced all responsive documents requested. (See Pl.'s Dep. 313-14). Additionally, Plaintiff has testified that he retained his present counsel in November 2014, that counsel filed the present action on May 13, 2015; thus, Plaintiff was represented at the time the statement was prepared. (Pl.'s Dep. 108-09; see also Doc. 1). Further, Plaintiff testified that he provided the information regarding Reyes to his counsel. (Pl.'s Dep. 152).

In Defendants' renewed Request for Sanctions, Defendants AA, TPS, and Hendrix move for sanctions based upon Plaintiff's destruction/loss and/or failure to produce the video and hard drive(s) and Plaintiff's withholding of information about Reyes during discovery. Defendants seek dismissal of the action, or in the alternative, adverse inferences regarding the missing video evidence, exclusion of Reyes's withheld

11

testimony, and monetary sanctions. (Doc. 66). Plaintiff's responded briefly[8] that his hard drive(s) were damaged and/or lost through no fault of his own; that Reyes's statement was obtained prior to Plaintiff's retention of counsel,[9] he did not intentionally withhold the Reyes's statement, and his actions caused no harm. Accordingly, Plaintuff asserts no sanctions should be imposed. (Doc. 74).

## II.  PRODUCTION OF HARD DRIVE(S) AND VIDEO

### A.  Standard of Review

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Graff v. Baja Marine Corp., 310 F. App'x. 298, 301 (11th Cir. 2009). The imposition of spoliation sanctions is governed by federal law, as spoliation sanctions are considered an evidentiary matter. Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005). However, where applicable, courts may look to Georgia law as "[f]ederal law in this circuit does not set forth specific guidelines" regarding spoliation sanctions and as "Georgia state law on spoliation is wholly consistent with federal spoliation principles." Id.

The moving Defendants, as the parties seeking spoliation sanctions,[10] must prove

---

[8] Plaintiff's response is four pages long.

[9] Based upon the timeline of representation outlined above, this assertion appears to be patently false.

[10] While the Defendants largely frame Plaintiff's failure to produce either the hard drive(s) or the video footage as a violation of this Court's orders (Doc. 66, at 5-8),

that (1) the missing evidence existed at one time; (2) Plaintiff had a duty to preserve the evidence; and (3) the evidence was crucial to Plaintiff's prima facie case or their defense. In re Delta/AirTran Baggage Fee Antitrust Litig., 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011); Se. Mech. Servs., Inc. v. Brody, 657 F. Supp. 2d 1293, 1299 (M.D. Fla. 2009). Moreover, under Georgia law, "spoliation of critical evidence may warrant the imposition of sanctions . . . ." Flury, 427 F.3d at 945. "To determine whether spoliation sanctions are warranted, a court must consider the [Flury] factors" as follows:

> (1) whether the [movant] was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the [spoliator] acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded.

Graff, 310 F. App'x. at 301. The Eleventh Circuit has acknowledged the broad discretion afforded to district courts in determining whether to impose sanctions. Flury, 427 F.3d at 944.

### B.    Legal Analysis

As to the moving Defendants' initial burden, this Court finds they have established that the evidence (video footage record by Plaintiff on the day of his discharge) existed at one time and that Defendant was under a duty to preserve the footage. First it is undisputed that the video footage once existed because Plaintiff admitted during his deposition that he created the video on the date of his termination and saved the footage

---

as they later acknowledge, this issue is one of spoliation (Id., p. 10-11), since Plaintiff cannot comply with an order to produce that which has been lost or no longer exists. Plaintiff, however, almost entirely ignores the issue of spoliation. (Doc. 74).

on both his laptop and an external hard drive. Plaintiff further admits that at the time of his deposition, the external hard drive was in his possession. (Pl's Dep. 29-31, 243-443). Additionally, its is clear that Plaintiff was under a duty to preserve the video footage because Plaintiff knew shortly after his discharge that litigation might occur. Plaintiff had retained his current counsel within days of his discharge, was involved in litigation with Defendant TPS within weeks of his discharge, and had filed his charge of discrimination within a few months of his discharge.[11] A party's obligation to retain evidence is triggered when litigation is reasonably anticipated. See Managed Care Sols., Inc. v. Essent Healthcare, Inc., 736 F. Supp. 2d 1317, 1324-25 (S.D. Fla. 2010). Thus, Plaintiff's duty to retain evidence arose when Plaintiff could have "reasonably foreseen" civil litigation. See Walker v. I.R.S., No. 4:07-cv-0102, 2009 WL 1241929, at *1 (N.D. Ga. Feb. 26, 2009) ("Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use in pending or reasonably foreseeable litigation" (citation omitted)). In this case, Plaintiff could foresee litigation almost immediately upon his discharge, when TPS filed a complaint seeking a restraining order against him. At a minimum, Plaintiff should have foreseen litigation when he filed his charge of discrimination. See E.E.O.C. v. SunTrust Bank, No. 8:12-cv-1325-T-33MAP, 2014 WL 1364982 (M.D. Fla. Apr. 7, 2014) (finding SunTrust had a legal duty to

---

[11] As discussed below, Plaintiff was discharged on October 30, 2014. Defendant TPS and Tyler Perry moved for a restraining order against Plaintiff soon after, which was granted during a hearing on November 21, 2014, at which time Plaintiff was represented by present counsel. (See Pl.'s Dep. Ex. 19 (Tr. of TRO Hrg.)).

preserve evidence, including surveillance videos, when an employee reported to a human resource representative that she was the victim of sexual harassment, she had not been paid for overtime, and she had retained a lawyer); Simon Prop. Grp., Inc. v. Lauria, No. 6:11-cv-1598-Orl-31KRS, 2012 WL 6859404 (M.D. Fla. Decl. 13, 2012) ("A party has an obligation to retain relevant documents when litigation is reasonably anticipated."). Plaintiff confirmed during his deposition that he was in possession of at least one hard drive with the video footage.

The Court also concludes that the evidence is crucial to Plaintiff's prima facie case of retaliatory discharge under Title VII and Defendants' TPS and AA's defense to the same. As discussed in detail below, to survive summary judgment, Plaintiff must establish that retaliatory animus was connected to his termination decision; conversely, Defendants may offer legitimate, non-retaliatory reasons for his termination to avoid liability. Defendants here contend that Plaintiff's conduct on the date of discharge – recorded at least in part on the destroyed or lost video – defeats any connection and provides a non-retaliatory reason for his discharge. (Docs. 61, 62).

Having determined that the relevant video existed, that Plaintiff had a legal duty to preserve video footage, and that the video was crucial to Plaintiff's claims and Defendants' defenses, the Court must now determine whether Defendants have met the Flury factors.[12] As to the first factor, the Court must ask whether Defendants were

---

[12] As in many cases applying the Flury factors, the fifth factor (the potential for abuse if expert testimony about the evidence was not excluded) is not at issue in this case. Accordingly, the fifth Flury factor will not be discussed herein.

AO 72A
(Rev.8/82)

prejudiced as a result of the destruction or loss of evidence. As discussed above, because the video footage is crucial to the retaliation claim and defenses, this Court finds Defendants have shown prejudice or damage to their legal position by the destruction or loss of the video. The video footage would have been unbiased, direct evidence about Plaintiff's conduct on the day his employment was terminated. Without the video footage, the parties must now engage solely in "he-said, she-said" arguments, which might have been avoided to a meaningful extent had the video been preserved.

Next, this Court must consider whether the prejudice can be cured. For the same reason that this Court found prejudice, this Court also finds that Plaintiff or other witness testimony are not equivalent substitutes for the video and that the prejudice cannot be cured. Moreover, such testimony cannot be substituted for the jury's opportunity to observe both Plaintiff, his conduct and demeanor, and the actions of others in the events leading to Plaintiff's termination.

As to the third factor, this Court must consider the practical importance of the evidence. Again, this Court cannot conclude that the video footage is irrelevant and immaterial. The video footage is relevant evidence and the footage has practical importance in terms of Defendants' ability to show that Plaintiff's conduct that day was a sufficient and non-retaliatory reason for his discharge.

Having determined that the relevant video footage existed; Plaintiff had a legal duty to preserve video footage; Defendants were prejudiced as a result of the destruction or loss of the evidence; the prejudice could not be cured; and the video footage was of

16

practical importance, the Court must now determine whether Plaintiff acted in bad faith. Here, there is no direct evidence showing that Plaintiff deliberately destroyed or lost the footage (or damaged or lost the computer/hard drive(s)) in an effort to gain an unfair advantage in this suit. Moreover, this Court acknowledges – as Plaintiff urges – that "mere negligence in losing or destroying the records is not enough for an adverse inference." Bashir, 119 F.3d at 931.

However, the bad faith standard can also be met by the presentation of circumstantial evidence. In Britton v. Wal-Mart Stores, E., L.P., No. 4:11-cv-32-RH/WCS, 2011 WL 3236189 (N.D. Fla. June 8, 2011), the plaintiffs (a mother and her minor children) sued Walmart after Walmart accused the minor children of stealing a digital camera and forcibly detained them, the stress of which caused their mother to sustain a heart attack. The Walmart manager admitted that surveillance tapes were available showing all of the events in question, but he did not take any action to prevent the images from being taped over. Id. at *21-22. A manager reviewed the tapes, but allowed the tapes to be recorded over. Id. at *22. The Britton court found that the manager "fully understood the importance of the indoor surveillance videos of the Britton children, looked at them, knew that the videos would disappear over time if not preserved . . . and consciously chose to let that happen since the videos were damaging to Walmart's defense against claims that might be brought by the Britton family." Id. at *21-22. As to bad faith, the court noted:

> "[B]ad faith" does not mean malice, that is, intentional misconduct.

17

> While evidence of intentional destruction of evidence would surely show "bad faith," it is not a condition precedent. Indeed, proof of malicious destruction of evidence would rarely be available where one party has full control of the evidence. Instead, . . . "bad faith" exists in a case like the case at bar where, (1) the evidence is plainly central to a potential claim that might arise and the party knows it or reasonably should know it, (2) the lack of the evidence will significantly benefit the party who fails to preserve it, (3) the evidence of what happened is unsettled and probably would be significantly clarified if the lost evidence [was] still available, and (4) the reasons given [ ] for not preserving the critical evidence are suspiciously irrational.

Id. at *38.

This Court concludes that (1) the destroyed or lost video footage was central to a potential claim that might arise, and Plaintiff, represented by his present counsel, knew or reasonably should have known that fact; (2) the lack of the video evidence benefits Plaintiff, who failed to preserve it, since testimonial evidence may be a poor substitute for objective video evidence; (3) the evidence of what happened on the date of Plaintiff's discharge probably would be clarified if the lost video evidence was still available; and (4) Plaintiff's failure to preserve the video footage – the hard drive purportedly went missing in Denver – is suspicious at best. Plaintiff testified that, as of the date of his deposition in November 2015, he still had the video. (Pl.'s Dep. 244 ("Q: Okay. Did you save it [the video]? A: To that hard drive. Q: Okay, so it's still on the hard drive? A: The hard drive was broke or -- Q: Right, but the one you still have, correct? A: Yes."). Plaintiff also was asked to preserve it then. (Pl.'s Dep. 31 ("Q: Do you still have the external hard drive that you just referenced? A: I believe so. Q: Okay. Again, we'd ask you to preserve that piece of equipment for purposes of this lawsuit.")). After

18

that time, however, the hard drive and video were simply and inexplicably "lost." Plaintiff's only argument against sanctions is that Plaintiff "made a diligent search" and "was not able to locate said drive."  (Doc. 74, p. 3).  Neither Plaintiff nor Plaintiff's counsel attempt to explain the disappearance of the hard drive and/or video footage. Likewise, Plaintiff and his counsel do not otherwise explain or contradict the testimony from Plaintiff's deposition, either at the January hearing or in response to the moving Defendants' Motion for Sanctions.  After review, this Court finds that the moving Defendants have shown something more than mere negligence in Plaintiff's loss or destruction of the video footage.  Instead, the combined totality of the circumstances are sufficient to attribute bad faith to Plaintiff's loss of the video and hard drive(s).

After weighing the Plaintiff's culpability and the resulting prejudice to the moving Defendants, and considering the other Flury factors, this Court finds that the factors weigh in favor of sanctions, though this finding is mitigated somewhat by the lack of evidence of any active malice or intentional misconduct on Plaintiff's part.  Accordingly, this Court also finds that an award of all reasonable costs and fees, including attorneys' fees, incurred by the moving Defendants in bringing the Motion for Sanctions as it relates to the video footage and missing hard drive(s) should be **GRANTED**.[13]  With

_____

[13] Included in this amount are the costs and fees associated with bringing the initial Motion to Compel Discovery, for Sanctions and for Expenses.  (Doc. 37). However, Defendants' costs and fees for bringing the Motion to Extend Discovery and for Sanctions, since withdrawn, are not included, nor are costs associated with the searches of the laptop produced by Plaintiff.  If this Report and Recommendation ("R&R") is adopted by the District Court, the District Court may want to retain jurisdiction solely to determine the award of costs and fees.  The District Court may

19

regard to Defendants' request for an adverse inference that the destroyed or lost video footage contained evidence that was favorable to them, Plaintiff's request is **MOOT** if this Report and Recommendation is adopted by the District Court. Accordingly, Plaintiff's request for an adverse inference is **DENIED WITHOUT PREJUDICE** at this time with leave to refile with the District Court, if necessary.

## III.   <u>FAILURE TO DISCLOSE REYES'S IDENTITY OR STATEMENTS</u>

Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires a party to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Likewise, under Rule 26(e)(1)(A), supplementation of incomplete or incorrect responses are required, and thus, "the obligation to disclose pertinent parties is continuing [throughout the case]." <u>F.T.C. v. Nat'l Urological Grp., Inc.</u>, 645 F. Supp. 2d 1167, 1179 (N.D. Ga. 2008). There is no dispute that Plaintiff failed to disclose Reyes in accordance with Rule 26 or in response to Defendants' discovery requests.

In the face of discovery abuses, the Court has various remedies at its disposal, and can impose sanctions under Federal Rule of Civil Procedure 37, as well as its "inherent powers" to control litigation. See <u>Mallard v. United States Dist. Ct. for the S.D. of Iowa</u>,

---

also want to require Defendant to submit a request and an itemized accounting of such reasonable costs and fees within thirty (30) days of the entry date of the District Court's Order adopting the R&R. The District Court may also want to allow Plaintiff (15) days thereafter to object.

490 U.S. 296, 308-09 (1989). Rule 37, in particular, states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." See also Goodman-Gable-Gould v. Tiara Condo. Ass'n, Inc., 595 F.3d 1203, 1209-12 (11th Cir. 2010) (affirming exclusion of evidence based discovery violations and failure to make proper disclosures under Rule 26); Frierson v. Atlanta Indep. Sch. Sys., 22 F. Supp. 3d 1264, 1283-87 (N.D. Ga. 2014) (excluding witness and declarations in employment discrimination case for plaintiff's failure to list witnesses in initial disclosures or in subsequent responses to discovery requests).

In this case, as argued by Plaintiff, in response to Plaintiff's initial Motion to Compel, the Court granted additional discovery in order to allow Defendants to depose Reyes and uncover any relevant information. As a result, it is not clear to this Court what harm was suffered as a result of Plaintiff's failure to timely disclose Reyes or other related information. Because Plaintiff's failure to disclose Reyes appears to be harmless, the Motion for Sanctions should be **DENIED** with regard to the moving Defendants request that Plaintiff be prohibited from using any of Reyes's testimony. Nevertheless, because Defendants were forced to resort to Court intervention, this Court finds that an award of all reasonable costs and fees, including attorneys' fees, incurred by Defendants

in bringing the Motion for Sanctions as it pertains to Reyes should be **GRANTED**.[14]

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

As discussed Defendants AA, TPS, and Hendrix have moved for summary judgment with regard to all of Plaintiff's claims. (Doc. 61, 62, 63).

## I.    FACTUAL BACKGROUND[15]

### A.    Defendants AA and TPS

---

[14] Once again, included in this amount are the costs and fees associated with bringing the initial Motion to Compel Discovery, for Sanctions and for Expenses. (Doc. 37). However, Defendants' costs and fees for bringing the Motion to Extend Discovery and for Sanctions are not included, nor are costs associated taking the deposition of Reyes. As with the request and itemized accounting detailed above, Defendants are **ORDERED** to submit a request and an itemized accounting of such reasonable costs and fees associated with bringing the Motion to Compel and Motion for Sanctions, and Plaintiff's shall have (15) days thereafter to object.

[15] All facts taken directly from the Defendants AA, TPS, and Hendrix's Statements of Material Facts in Support of Summary Judgment (hereinafter "AASMF," "TPSSMF," and HSMF," respectively) or Plaintiff's Statement of Additional Facts ("PSMF") remain undisputed. This Court must accept as admitted those facts in the moving party's statement that have not been specifically controverted with citation to the relevant portions of the record by the opposing party. LR 56.1B.2(2), (3), NDGa. Subjective perceptions, conclusory allegations, or allegations that are otherwise unsupported by record evidence do not create genuine issues of material fact in order to withstand summary judgment. See Chapman v. AI Transp., 229 F.3d 1012, 1051 n.34 (11th Cir. 2000) (en banc); Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); Carter v. City of Miami, 870 F.2d 578, 585 (11th Cir. 1989). Thus, this Court will not consider any fact (1) not supported by citation to evidence (including a page or paragraph number); or (2) stated as an issue or legal conclusion. Additionally, this Court will assess any objections to the admissibility of any evidence presented through declarations or any other method as part of its assessment of Defendants' motions for summary judgment. The Court will then rule on the evidence implicitly or explicitly in the consideration of the motion. See Linscheid v. Natus Med. Inc., No. 3:12-CV-67-TC, 2015 WL 1470122, at *1 (N.D. Ga. Mar. 30, 2015) (considering objections when the challenged evidence became relevant to the decision on the motion); Smith v. Se. Stages, Inc., 479 F. Supp. 593, 594-95 (N.D. Ga. 1977).

AO 72A
(Rev.8/82)

Plaintiff was employed by AA, a local company that produces films and television shows.  (AASMF ¶¶ 1-2).[16]  AA hires, supervises, and compensates the personnel involved in creating the programs it produces.  (AASMF ¶¶ 2-3).  TPS, on the other hand, operates a media production facility in southwest Atlanta, whose function is to oversee the TPS property and operations of the TPS campus, which contains multiple buildings used to film movies and television shows.  (AASMF ¶¶ 6-8).[17]  AA and TPS are separate legal entities.  (AASMF ¶ 9).  AA contracts with TPS to use TPS's campus when AA wants to produce a show, and pays a fee to use the facilities.  (AASMF ¶ 4).  AA employees have access to portions of the TPS campus during productions there (AASMF ¶ 5), and use access badges provided by TPS.  (Decl. of Ozzie Areu, dated May 23, 2016 ("Areu Decl."), Doc 61-9, ¶ 11).  Having a TPS access badge does not make one a TPS employee; badges are issued to numerous individuals whom TPS does not employ.  (TPSSMF ¶ 13).  Beyond controlling access to its various facilities, TPS does not control the terms and conditions of AA employee's employment.  (Areu Decl.,

---

[16] In many cases, Defendants AA, TPS, and Hendrix repeat identical facts with identical citations; Plaintiff likewise opposes them in the same manner.  Out of convenience and clarity, and because it was first filed, the Court will cite only to Defendant AA's Statement of Material Facts for facts duplicated in this manner that remain undisputed.

[17] Plaintiff repeatedly invokes Federal Rule of Civil Procedure 56(d) to respond that he has insufficient knowledge to admit or deny facts asserted in AA's Statement of Material Facts.  Under Local Rule 56.1B.2(3), this is not an acceptable response, because Plaintiff has not complied with the requirements of Federal Rule 56(d).  See Fed. R. Civ. P. 56(d); LR 56.1B.2(3), NDGa.  Plaintiff has not presented any affidavit or declaration showing that or why he has insufficient essential facts to justify his opposition.  Accordingly, such facts are deemed admitted.

¶ 11).  Plaintiff has no personal knowledge regarding the corporate structure of either AA or TPS.  (TPSSMF ¶ 12).

**B.    AA's Sexual Harassment Policy**

AA's Discrimination and Sexual Harassment Policy (the "Policy") prohibits harassment of any kind, including sexual harassment.  (AASMF ¶ 36).  The Policy defines harassment in detail, provides examples of potentially harassing behavior and states that such conduct will not be tolerated.  (AASMF ¶ 37).  The Policy requires employees to immediately report any harassment, and provides a complaint procedure.  (AASMF ¶ 38).  The Policy allows employees to report sexual harassment through several channels, including "any member of management with whom the employee is comfortable."  (AASMF ¶ 39).  AA provided Plaintiff with a full copy of the Policy at the time AA hired him, Plaintiff had the opportunity to review it, and he signed it.  (AASMF ¶ 40).  AA's usual practice is to provide a full copy its Policy to new employees, and the Policy was available to Plaintiff while he was employed with AA.  (AASMF ¶¶ 41-42).

Prior to the present matter with Plaintiff, neither AA nor TPS has been subject to any sexual harassment lawsuit or EEOC charge.  (AASMF ¶ 43).  Prior to the accusations by Plaintiff, Hendrix had never been accused of sexual harassment, and AA had no notice of any such conduct ever occurring.  (AASMF ¶ 25).

**C.    Hendrix's Team of Production Assistants at AA**

AA employed Defendant Hendrix as a Production Assistant ("PA"), the lowest

24

entry-level position with the AA.[18] (AASMF ¶ 11). Hendrix testified that he considered himself to be an independent contractor with AA, and that he had titles that included both production assistant and continuity coordinator. (Dep. of Brett Hendrix, dated Dec. 2, 2015, ("Hendrix Dep."), 19-20, Doc. 86). AA classified Hendrix as a non-exempt employee for purposes of the Fair Labor Standards Act ("FLSA") and paid Hendrix $10.71 per hour until around January 2015,[19] when he received a raise during his final show at AA; Plaintiff also made $10.71 per hour during his time at AA. (Areu Decl. ¶15; Hendrix Dep. 25, 31-32; Pl. Dep. 38). As a PA and continuity coordinator, Hendrix assisted with AA's set decoration group; he and the other PAs in the group (1) recorded AA's purchase of set decorations and props; (2) photographed set decorations and props; and (3) entered this information into spreadsheets so that AA would have written and photographic records of its set decorations and could locate them for continuity purposes in the future. (AASMF ¶¶ 13-14). Hendrix's supervisor, Patrick Sheedy, testified that

_____

[18] Hendrix told Plaintiff in a text that he worked "at" TPS, but explained to Plaintiff that he "worked at the premises," and did not present himself as an employee of TPS. (Hendrix Dep. 56-57). Hendrix also explained to Plaintiff that in his position, he worked as a "continuity coordinator for shows." (Id.). Hendrix testified that he was an independent contractor with AA, and that he had titles that included both production assistant and continuity coordinator. (Id. at 19-20). Hendrix's supervisor, Patrick Sheedy ("Sheedy"), allowed Hendrix to use the title continuity coordinator after Hendrix asked if he could have a job title other than PA; however, the change in job title was not a promotion, did not involve a change in his pay rate, and did not change any job duties or responsibilities. (Decl. of Patrick Sheedy, dated May 20, 2016, ("Sheedy Decl."), Doc. 61-9, ¶¶ 10-11).

[19] This raise occurred after Plaintiff's employment was terminated. (AASMF ¶ 31)

these tasks are clerical and entry-level, requiring little or no prior experience or training.[20]  (Sheedy Decl. ¶ 14).  Hendrix testified that he was also "tasked with paperwork and accounting books, purchases, departmental purchases, and [] shown what information to look for that needed to be given to my supervisor."  (Hendrix Dep. 28).

Sheedy testified that because AA's filming was episodic and seasonal, PAs were typically hired on a short-term, temporary basis lasting from one to three months.  (Sheedy Decl. ¶ 4).  Hendrix was more experienced than most PAs, because he returned to work for AA across multiple shows (AASMF ¶ 17); Hendrix had worked for two years on different short-term projects (Hendrix Dep. 32-33).  Because of Hendrix's experience, Sheedy, a Production Supervisor, considered him a veteran PA, and used him as a conduit to assign tasks among PAs within the set decoration group.  (Sheedy Decl. ¶ 8).

### D.    Plaintiff Meets Hendrix and Joins PA Team at AA

Plaintiff met Hendrix at a party in early July 2014, and the two quickly became close friends.  (AASMF ¶ 26; HSMF ¶¶ 1-2).[21]  Hendrix testified that shortly after they

---

[20] Although Hendrix testified that his supervisor was responsible for "training" him, Hendrix did not use any special software, and Hendrix had all of the required job skills prior to his employment with AA.  (Hendrix Dep. 28-29).

[21] As noted by Defendant Hendrix (see Doc. 83), Plaintiff did not respond to Defendant Hendrix's Statement of Material Facts (see Doc. 73).  Unfortunately for Plaintiff, under the Local Rules, that failure has significant consequences – those facts are deemed admitted.  See LR 56.1B(2)(a)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's

26

met, Plaintiff asked Hendrix to help him get a job working for AA, though Plaintiff testified that he was not sure who was or would be employing Hendrix at the time. (Decl. of Brett Hendrix, dated May 25, 2016 ("Hendrix Decl."), Doc. 61-5, ¶ 10; Pl.'s Dep. 38, 112, 345). Hendrix forwarded Plaintiff's resume to Sheedy, and AA hired Plaintiff to work as a PA in its set decoration group. (AASMF ¶¶ 28-29). Other than forwarding Plaintiff's resume and putting in a good word with Sheedy, Hendrix played no other role in Sheedy's decision to hire Plaintiff. (AASMF ¶ 30).

Plaintiff worked for AA as a PA for less than three months, from August 11, 2014, until October 30, 2014. (AASMF ¶ 31). When hired, Plaintiff reviewed and/or signed a number of documents, including the "Discrimination and Sexual Harassment Policy." (Pl.'s Dep. 137-38, Ex. 10). Most of the documents indicate that Plaintiff would be working for AA, though one references "Tyler Perry Companies" as the group of companies within which AA was grouped.[22] (Pl.'s Dep. 34-35, 42-43, 46, Exs. 1-4, 10). Plaintiff personally wrote AA as his employer on some of the forms (AASMF ¶ 35), and

---

fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1B(1)."); see also Digioia v. H. Koch & Sons, Div. of Wickes Mfg. Co., 944 F.2d 809, 811 n.6 (11th Cir. 1991) (per curiam) ("the facts as set out in [defendant's] concise statement of facts not at issue are deemed admitted" by operation of the Local Rules because they were not controverted); Barnett v. Leiserv, Inc., 968 F. Supp. 690, 692 n.1 (N.D. Ga. 1997) (same), aff'd, 137 F.3d 1356 (11th Cir. 1998). To the extent that Defendant Hendrix reiterates identical facts as AA and/or TPS, however, the Court will consider Plaintiff's objections to those facts.

[22] On one, Plaintiff listed Hendrix as a Contact, but also personally identified AA as the company with which he was associated. (Pl.'s Dep. Ex. 2, at 3).

testified that he knew that he was included amongst the production crew that AA was employing (Pl.'s Dep. 70, Ex. 6), even if at some point he was confused as to who was to employ him (Pl.'s Dep. 38, 112, 345).[23]  Plaintiff's time cards all state that he was employed with AA, and are signed by Plaintiff, and his payroll statements similarly list AA as his employer.  (AASMF ¶ 34; Pl.'s Dep. Ex. 5).

When Plaintiff was hired, he was assigned as a PA – again the lowest entry-level position at the company – to set decoration along with Hendrix and two other PAs, Shanika Peterson ("Peterson") and Michael Morris ("Morris").  (Hendrix Dep. 27; HSMF ¶ 6).  Plaintiff testified that Sheedy told Plaintiff that he would report to Hendrix. (Pl.'s Dep. 348).  Although Hendrix's title was technically "continuity coordinator," he had the same job duties and pay as Plaintiff.  (Sheedy Decl. ¶ 11).  Sheedy would tell Hendrix what needed to be done and who should perform required tasks, and Hendrix would relay those instructions to the group; Hendrix would also collect the group's work for Sheedy.  (AASMF ¶ 22).  Except as described above, Hendrix had the same tasks as the other PAs assigned to the set decoration group.  (Sheedy Decl. ¶ 8; Hendrix Dep. 28-29, 46).  Hendrix was not authorized by AA to hire, fire, or discipline employees.[24]

---

[23]  Plaintiff admitted filling out all his onboarding documents with AA, submitting time cards with AA, and receiving all his pay stubs from AA, but still said that he was not entirely clear during his employment about who he "specifically . . . work[ed] for," though he could not explain why.  (Pl.'s Dep. 112-13).  As noted initially in the factual background section above, it is undisputed that AA was in fact Plaintiff's employer.  (AASMF ¶ 1).

[24]  While Hendrix accepted a prospective PA's resume, interviewed him, and informed him that he would be hired, that PA was aware that Hendrix did not have

(Areu Decl. ¶¶ 16-17; Hendrix Decl. ¶ 9; Hendrix Dep. 26-29).

Hendrix, Plaintiff, Peterson, and Morris had desks near one another in a large open room, and both Peterson and Morris could clearly see any interactions between Hendrix and Plaintiff. (Decl. of Shanika Peterson, dated May 25, 2016 ("Peterson Decl."), Doc. 61-11, ¶ 7; Decl. of Michael Morris, dated May 20, 2016 ("Morris Decl."), Doc. 61-7, ¶ 7). Although Plaintiff stated that Peterson told him that Hendrix was "possessive" of Plaintiff, both Peterson and Morris testified that they did not observe any inappropriate conduct between Hendrix and Plaintiff. (Peterson Decl. ¶¶ 5, 7-9; Morris Decl. ¶¶ 5, 7-9).

### E.    Plaintiff's Relationship with Hendrix and Alleged Harassment

Between July[25] and October 2014, Plaintiff spent considerable amounts of time with Hendrix, went out with Hendrix to socialize at least once a week, and stayed overnight at Hendrix's home whenever they had to work at AA the following day. (Pl.'s Dep. 172-96; see specifically, Pl.'s Dep. 173-75). Thus, Plaintiff and Hendrix established a pattern of socializing together. (AASMF ¶ 54). Plaintiff and Hendrix socialized together for several hours at a time on various occasions. (Pl.'s Dep. 180-84). Plaintiff and Hendrix exchanged over 1000 text message during the July-to-October

---

authority to hire or fire anyone at AA, and that Hendrix was "really just a PA." (Reyes Dep. 58-67). Similarly, while Plaintiff believed Hendrix had some sort of managerial capacity, he was not sure, and had no personal knowledge to that effect. (Pl.'s Dep. 348).

[25] As noted, Plaintiff did not begin his employment with AA until August 11, 2014. (AASMF ¶ 31).

timeframe, most texts being unrelated to work.  (Pl.'s Dep. Ex. 11).  Plaintiff and Hendrix went to movies, restaurants, and/or bars, partied together, and gave one another rides.  (Pl.'s Dep. 96, 175, 180-82, 195, 221-23).  Around the end of July 2014, Plaintiff told Hendrix by text that he liked having Hendrix around him, and that he "ha[dn't] felt a reason to be reserved or uncomfortable" around Hendrix.  (Pl.'s Dep. 187-88, Ex. 11, p. 7).

Hendrix often uses nicknames with close friends and does not intend them to have sexual connotation.  (AASMF ¶ 56).  With regard to Plaintiff, Hendrix called him "Baby boy" and "Daddy O" and referred to him as handsome; Plaintiff testified that he did not like being called by anything other than his name or by some other "neutral term" like "Homey."  (Pl.'s Dep. 175-78, 184, Ex. 11).  Even so, Hendrix used these terms with Plaintiff before AA employed Plaintiff, Plaintiff never objected to Hendrix using these terms, and most of the instances when Hendrix used unwanted nicknames appears to have occurred prior to Plaintiff's employment and/or outside of work.  (Id.; AASMF ¶ 57).

Hendrix testified that he never engaged in unwelcome sexual advances, propositions, flirtations, or repeated, unwelcome requests to make social contact at work.  (Hendrix Dep. 145-46).  Plaintiff did testify, though, that Hendrix put his hand on Plaintiff's legs while leaning into him two or three times after Plaintiff had asked Hendrix for help at his desk; Hendrix would "pull his chair up next to mine and lean like into my lap and . . . touch my legs and work on my computer . . . to find whatever [I had

asked about].'' (Pl.'s Dep. 87-90). Plaintiff never told Hendrix that the contact made him uncomfortable. (Pl.'s Dep. 90). Peterson and Morris testified that on a couple occasions, after Plaintiff asked Hendrix a question about something work-related on Plaintiff's computer, Hendrix "moved over and leaned towards" Plaintiff "[s]o that both of them could look at the computer screen at the same time." (Morris Decl. ¶¶ 8-9; Peterson Decl. ¶¶ 8-9). Peterson and Morris found nothing sexual or inappropriate about the behavior and would not have had an issue if Hendrix had done the same to them. (Id.).

Outside of work, Hendrix invited Plaintiff to sleep in his bed, laid his head on Plaintiff's lap, tried to hug Plaintiff while Plaintiff was brushing his teeth after staying overnight at Hendrix's house, attempted to kiss Plaintiff on the neck (which Plaintiff explained he was not interested in), and purportedly flirted with Plaintiff; even so, Plaintiff could not recall Hendrix saying he (Hendrix) actually wanted to have sex, have a sexual relationship with, or otherwise sexually proposition Plaintiff. (Pl.'s Dep. 85, 92,188-90, 352-53). Other than the attempted kissing and invitation to sleep in the same bed, Plaintiff did not verbalize any complaint or discomfort, though he did avoid unwanted contact. (Id.).

Even after Hendrix engaged in the conduct Plaintiff argues was harassing, Plaintiff nevertheless continued to go over to Hendrix's apartment, invited him out socially, shared rides, and spent time with him outside of work. (AASM ¶ 64).

## F.    **Affect of Hendrix's Conduct on Plaintiff's Employment**

31

Plaintiff testified that Hendrix's conduct did not affect his job performance and that he (Plaintiff) did not intend to quit as a result. (Pl.'s Dep. 208-10). Hendrix was never critical of Plaintiff's work and never commented to Plaintiff or anyone else that Plaintiff would not be recommended back.[26] Additionally, Plaintiff was never disciplined or written-up for any infraction or poor performance. (Pl.'s Dep. 211-16). Nevertheless, Plaintiff thought that because of Hendrix's conduct, their relationship was something he had to "deal[]" with, since it had been "tainted";[27] and as a result, he testified, he was not sure he would be invited back on later productions, despite no evidence to the contrary. (Pl.'s Dep. 209-12).

Ultimately, Hendrix never criticized Plaintiff's work, or conditioned any tangible job action on Plaintiff consenting to any type of sexual advance, and Plaintiff had no intention of quitting his job based upon Hendrix's alleged conduct. (AASMF ¶¶ 60-61). Plaintiff testified that he did not tell anyone at AA or TPS about his concerns regarding Hendrix's alleged sexual harassment. (Pl.'s Dep. 144-49, 258). Plaintiff did not tell Hendrix or his supervisors that Hendrix's conduct was unwelcome or inappropriate, but did recall discussing at some point how Hendrix was "very possessive" of him with

---

[26] The production Hendrix and Plaintiff had worked on wrapped by the end of October 2014, which Plaintiff knew, but he also understood that following a break between November 2014 and April 2015, there would be an opportunity to come back for additional work. (Pl.'s Dep. 210-11).

[27] Plaintiff also speculates, based entirely upon the conduct described above, that Hendrix helped him get the job with AA in order to entice him into a relationship. (Pl.'s Dep. 368-70).

32

fellow PA Peterson and denying that anything was going on between them.  (Pl.'s Dep. 73-75, 94-96, 188-93).  Plaintiff testified that he also complained to Peterson, Jack Segars, and Jesus Diaz that it "seemed like" Hendrix was interfering with his application process for union membership, though Plaintiff did not explain how and admitted that nothing Hendrix said or did actually affected that application.  (Pl.'s Dep. 73-77).

Plaintiff never complained about Hendrix to Sheedy, the Production Supervisor responsible for hiring and supervising the group of PAs to which Hendrix and Plaintiff belonged, and Plaintiff never reported any form of inappropriate conduct or sexual harassment in the workplace to Sheedy.  (Sheedy Decl. ¶¶ 1-2, 14-15).  Similarly, Ozzie Areu, the Manager of AA and its most senior officer, had no knowledge of any improper conduct Hendrix directed towards Plaintiff.  (Areu Decl. ¶¶ 1, 19-20).  Plaintiff has not identified a supervisor or manager at AA or TPS to whom he reported Hendrix's allegedly harassing or discriminatory conduct.  (See, e.g., Pl.'s Dep. 258).

## G.    Termination of Plaintiff's Employment

As noted, the shows on which Hendrix and Plaintiff worked completed production in mid-October 2014, and Plaintiff believed his last day of work for AA would be October 31, 2014.  (AASMF ¶¶ 67-68).  Plaintiff testified that during his lunch break on October 30, 2014, he and Hendrix smoked marijuana which may or may have not contained other illicit substances.  (AASMF ¶ 69; Pl.'s Dep. 240-41, 262-67).[28]  Plaintiff

---

[28] Plaintiff summarily objects to the admissibility and materiality of AA's facts numbered 69 through 91.  (Doc. 71-1, at 16-21).  Plaintiff has not identified any grounds upon which such facts should be deemed inadmissible, and has not explained

was still under the influence when he returned to work that day.  (AASMF ¶ 70; Pl.'s Dep. 242-43).  At that point, Plaintiff left his work area, rode a bicycle around the sets, and then accessed the building containing TPS's executive suites, using an underground utility tunnel.  (AASMF ¶¶ 71-72; Pl.'s Dep. 243-48).  Plaintiff then went into the access-controlled executive suite.  (AASMF ¶ 73; Pl.'s Dep. 267-68).  Still under the influence of drugs, Plaintiff confronted accountant Lorraine Morgan, and demanded to see Tyler Perry.  (AASMF ¶ 74; Decl. of Lorraine Morgan, dated May 20, 2016, ("Morgan Decl."), Doc. 61-6, ¶ 4; Pl.'s Dep. 269-71).  Surprised that Plaintiff was in the access-controlled offices, and frightened by his demeanor, Morgan called security as soon as Plaintiff left her office area.  (AASMF ¶ 75; Morgan Decl. ¶ 7).

Plaintiff left Morgan's area and entered a vacant office containing boxes of copier paper.  (AASMF ¶ 76; Decl. of Lee Andrew Norman, dated May 20, 2016 ("Norman Decl."), Doc. 61-4, ¶¶ 10, 14; Pl.'s Dep. 272, 275).  Plaintiff barricaded himself in the office by stacking the heavy boxes of paper against the door.  (AASMF ¶ 77; Norman Decl. ¶ 14; Pl.'s Dep. 282).  Security personnel found Plaintiff in the barricaded office, but could not enter because of the barricade.  (AASMF ¶¶ 78-79; Norman Decl. ¶¶ 13-15; Pl.'s Dep. 276-77).  Despite multiple requests by security personnel and co-workers –

---

why such facts are not material.  (Id.).  The Court is not aware of why any particular fact that should be deemed inadmissible, and finds the facts relevant and material to the reasons why Plaintiff's employment was terminated, and therefore relevant and material to whether discriminatory animus motivated his discharge.  Because Plaintiff has not presented valid objections to the admissibility of these facts (or otherwise refuted the facts presented), they are deemed admitted.

34

including Sheedy and Hendrix – to come out of the office, Plaintiff insisted he would not come out until he spoke with Tyler Perry. (AASMF ¶¶ 80-81, Norman Decl. ¶¶ 8, 10-11; Pl.'s Dep. 278-84).

After this continued for some time, alarmed by Plaintiff's behavior, Andy Norman ("Norman"), who was in charge of TPS security, called the police. (AASMF ¶¶ 82-83; Norman Decl. ¶ 13; Pl.'s Dep. 282-85). After the police arrived, they instructed Plaintiff to leave the office. (Id.). Plaintiff ignored the police officer's instructions, at which point the officer called for back-up; a SWAT team was requested, and police had to force the door open against Plaintiff's resistance. (AASMF ¶¶ 84-85; Norman Decl. ¶¶ 13, 15; Pl.'s Dep. 284-85, 365-66). At the same time, another officer accessed the ceiling crawl space above an adjacent office and moved through the ceiling towards the office in which Plaintiff was barricaded. (AASMF ¶ 86; Norman Decl. ¶ 16). While this was ongoing, Plaintiff attempted to flee through the paneled ceiling. (AASMF ¶ 87; Pl.'s Dep. 285-86). With weapons drawn, police demanded that Plaintiff surrender; after Plaintiff surrendered, he was arrested and charged with criminal trespass and taken to jail. (AASMF ¶¶ 88-90, Norman Decl. ¶ 16; Pl.'s Dep. 287).

AA terminated Plaintiff's employment on October 30, 2014, after he engaged in the conduct described above. (AASMF ¶ 91; Areu Decl. ¶ 37). Areu made the termination decision, and Hendrix did not participate in the decision to discharge Plaintiff. (AASMF ¶¶ 92-93). Even after AA terminated Plaintiff's employment, Plaintiff contacted Hendrix, sought his company, and invited Hendrix to smoke

35

marijuana with him.  (AASMF ¶ 66).

### H.    Plaintiff's Actions After Termination

Plaintiff filed a charge of discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") against TPS on February 4, 2015; however, he did not name AA in the Charge.  (Pl.'s Dep. 107-09, Ex. 7).  Plaintiff was represented by his current counsel at that time he filed the Charge, knew that the production company he worked for was AA, that AA paid him, and had documentation showing AA as his employer.  (Pl.'s Dep. 56, 70, 107-113).  Nevertheless, Plaintiff testified generally that he was not sure about the process of filing the charge, how to depict his work environment, or who "specifically" he did "work for."  (Pl.'s Dep. 111-13).  Based upon this confusion, Plaintiff did not name AA in the Charge.  (Id.).  The Charge was dismissed very soon after on March 4, 2015, with the EEOC determining that the "facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC."  (Pl.'s Dep. Ex. 7).  Plaintiff ultimately filed a charge of discrimination against AA on July 2, 2015 (the "AA Charge"), approximately nine months after his termination, six months after his initial Charge, and two months after this lawsuit.  (Pl.'s Dep. 113-14, Ex. 8; Doc. 1).

## II.    LEGAL ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of asserting the basis for its motion.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Apcoa, Inc. v. Fid. Nat'l Bank</u>, 906 F.2d 610, 611 (11th Cir. 1990).  The movant is not required, however, to negate its opponent's claim; the movant may discharge its burden by merely "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex</u>, 477 U.S. at 325.  After the movant has carried its burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing that there is a genuine disputed issue for trial; the non-moving party may meet his burden through affidavit and deposition testimony, answers to interrogatories, and the like.  <u>Id.</u> at 324 (quoting Fed. R. Civ. P. 56(e)).

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, <u>Nat'l Parks Conservation Ass'n v. Norton</u>, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is material when it is identified as such by the controlling substantive law.  <u>Id.</u> at 248.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue

for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative."  Anderson, 477 U.S. at 249-50.  Thus, the Federal Rules mandate the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.

**B**.    **Plaintiff Did Not Exhaust his Title VII Claims Against AA**

Before commencing a civil action, a Title VII plaintiff must first exhaust his administrative remedies, beginning with the filing of a timely charge of discrimination with the EEOC.  42 U.S.C. § 2000e-5(b); see E.E.O.C. v. Summer Classics, Inc., 471 F. App'x 868, 869-70 (11th Cir. 2012); see also Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001); Clark v. Coats & Clark, Inc., 865 F.2d 1237, 1239 (11th Cir. 1989).  To be timely, a charge of discrimination must be filed within 180 days of the last discriminatory act.  42 U.S.C. §2000e-5(e)(1); Wilkerson, 270 F.3d at 1317.  A plaintiff's failure to timely file claims of discrimination bars such claims in subsequent lawsuits.  Alexander v. Fulton Cty, 207 F.3d 1303, 1332 (11th Cir. 2000).  After the EEOC's investigation into the charge, and upon receipt of the EEOC's notice of right to sue, a plaintiff must file a judicial complaint within ninety days.  42 U.S.C. § 2000e-5(f)(1) ("within ninety days after the giving of such notice, a civil action may be brought against the respondent named in the charge"); see Zillyette, 179 F.3d at 1339; see also

38

<u>Santini v. Cleveland Clinic Fla.</u>, 232 F.3d 823 (11th Cir. 2000) ("Title VII . . . actions may not be brought more than 90 days after a complainant has adequate notice that the EEOC has dismissed the Charge.") (citing 179 F.3d at 1339-41).

The purpose of requiring claimants to file a charge before the EEOC is two-fold. First, it serves to notify the charged party of the alleged violation; second, it gives the EEOC an opportunity for conciliation, which effectuates Title VII's primary goal of securing voluntary compliance with its mandates. <u>Virgo v. Riviera Beach Assocs., Ltd.</u>, 30 F.3d 1350, 1358 (11th Cir. 1994); <u>see also</u> <u>Lewis v. Asplundh Tree Expert Co.</u>, 402 F. App'x 454, 456 (11th Cir. 2010). Typically, a plaintiff's failure to name a defendant in an EEOC charge bars the plaintiff from suing that defendant in federal court. <u>Virgo</u>, 30 F.3d at 1358 (<u>citing</u> <u>Schnellbaecher v. Baskin Clothing Co.</u>, 887 F.2d 124, 126 (7th Cir. 1989)).

In this case, it is undisputed that Plaintiff did not file a timely charge of discrimination naming AA, but Plaintiff urges that an exception should be made to the timely filing rule. Courts liberally construe the naming requirement and apply an exception to the usual rule when the purposes of the charge filing requirement have been met. <u>Virgo</u>, 30 F.3d at 1358 (citations omitted). Whether those purposes have been satisfied is a function of several factors, including:

> (1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to participate in the

39

> reconciliation process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings.

Id. at 1359.  The test is not rigid, and other factors may be considered.  Id.  "One additional factor sometimes considered by this Court is whether an investigation of the unnamed party would "have reasonably grown out of [the actually-filed EEOC] charge," Lewis, 402 F. App'x at 457 (quoting Hamm v. Members of Bd. of Regents, 708 F.2d 647, 650 (11th Cir. 1983))

In this case, allowing Plaintiff to sue AA despite his failure to name it as a party in his initial Charge would not, in the whole, further the purposes of the naming requirement under Title VII.  The first factor is largely a wash – while AA and TPS only have a contractual relationship (see Lewis, 402 F. App'x at 457 (time-to-time contractor relationship insufficient for similarity of interest), AA does operate multiple productions on TPS-owned property (see Gordon v. MCG Health, Inc., 301 F. Supp. 2d 1333, 1339 (S.D. Ga. 2003) (operator of hospital owned by named entity had sufficient interest).[29] The second factor, however, weighs strongly against Plaintiff; both parties agree that Plaintiff was aware of the identity of AA at the time he filed his Charge (when he was

---

[29] Courts have said stated that sufficient similarity of interest "may exist when, 'under the circumstances, the interests of a named party are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings.'" Williams v. Lowndes Cty., No. 7:05CV69 HL, 2006 WL 2443509, at *4 (M.D. Ga. Aug. 21, 2006 ) (quoting Wong v. Calvin, 87 F.R.D. 145, 148 (D.C . Fla. 1980).  Here, AA's participation would clearly have been necessary in obtaining voluntary conciliation and compliance; if the Court had to rely solely on the first factor, it would probably weigh it against Plaintiff.

also represented by his current counsel). Plaintiff next concludes that because TPS and AA are currently represented by the same counsel, the third factor – adequate notice – is satisfied. However, Defendants' <u>present</u> joint representation allows no reasonable inference that there was any such <u>past</u> representation, much less that AA was previously placed on notice of the EEOC charge <u>prior</u> to the filing of this lawsuit. Plaintiff has provided no such evidence, and as noted, the initial Charge was resolved in speedy fashion. As such, the factor weighs against Plaintiff. With regard to the fourth factor, the parties agree that the EEOC quickly dismissed the initial EEOC Charge without engaging in a mediation, and as a result, there was no reconciliation process at all. Because AA was not named, AA was not allowed to engage in that reconciliation process, and as a result, was prejudiced by its exclusion from the EEOC proceeding. Thus, while this matter might have been quickly resolved through mediation, this single-plaintiff case has instead been heavily litigated for over a year at great cost to the parties. Facing a lawsuit without adequate opportunity to participate in the conciliation process is a prejudice the Eleventh Circuit clearly recognizes under the fifth <u>Virgo</u> factor. <u>Lewis</u>, 402 F. App'x at 457.

Additionally, given the short period of time in which the EEOC issued its no cause determination as to Plaintiff's initial Charge against the TPS, "it is difficult to say that investigation of [AA] did or reasonably could have grown out of" it. <u>Lewis</u>, 402 F. App'x at 457. While the Charge named Hendrix, it is not clear that the EEOC investigator was ever concerned with more than the substance of the very limited conduct

Plaintiff presented – that Hendrix touched his leg and leaned onto Plaintiff.  (See e.g., Pl.'s Dep. Ex. 7 (investigator notes)).  Regardless, the EEOC never investigated AA, and it cannot clearly be said that it should have.

As outlined above, the Virgo and other factors above either weigh against allowing Plaintiff to proceed against AA or do not provide clear weight one way or another.  Even construed liberally, Plaintiff has failed to provide any evidence that the two-fold purpose of the filing requirement have been met.  First, Plaintiff has provided no evidence that AA was put on notice of the alleged violation as a result of the Charge and the EEOC's brief inquiry.  Second, Plaintiff did not afford AA the opportunity for conciliation with him, thereby precluding Title VII's primary goal of securing voluntary compliance with its mandates.  Virgo, 30 F.3d at 1358; Lewis, 402 F. App'x at 456; see also Tuck v. Off Shore Inland Marine & Oilfield Co., No. 12-0379-WS-M, 2013 WL 81135, at *2 (S.D. Ala. Jan. 4, 2013) (when plaintiffs had been hired by unnamed party to do work with and in tandem to another named party on the BP oil spill, the purposes of Title VII were not fulfilled because "[t]he nexus between the two entities is not such that notice to one would serve as notice to the other, or that one would reasonably be expected to protect or advance the other's interests during EEOC administrative and conciliation proceedings.").  In filing this lawsuit prior to even naming AA in the second AA Charge, Plaintiff circumvented the primary goals of the statute, and an exception should not be made to allow Plaintiff to proceed against AA.  Accordingly, summary judgment should be **GRANTED** with regard to Plaintiff's Title VII claims against AA on this basis.

**C.    TPS Was Not Plaintiff's Employer for Title VII Purposes**

Defendant TPS argues it was not Plaintiff's employer under Title VII.  Plaintiff responds that it should be held liable under a joint employer theory.[30]  The Court agrees with TPS.  Title VII prevents unlawful discrimination and retaliation by employers.  42 U.S.C. §§ 2000e-2(a)(1), 3(a).  The statute defines an "employer" as "a person engaged in industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or proceeding calendar year." 42 U.S.C. § 2000e(b).  A person includes "corporations" under the statute.  42 U.S.C. § 2000e(a).  In construing the requirements of Title VII, courts have held that in order to qualify as an employer for purposes of liability under Title VII, there must be an "employment relationship" between the plaintiff and defendant.  Reeves v. DSI Sec. Servs., 331 F. App'x 659, 661 (11th Cir. 2009); see also Roque v. Jazz Casino Co., 388 F. App'x 402, 404-05 (5th Cir. 2010); 42 U.S.C. § 2000e(b).  The burden is on a plaintiff to demonstrate an "employment relationship" existed between himself and a defendant. Reeves v. DSI Sec. Servs., 331 F. App'x 659, 661 (11th Cir. 2009).

It is possible for two or more businesses to be held liable for violations of Title VII under the "joint employer" theory.  Virgo, 30 F.3d at 1359-61.  To be considered a joint employer, an entity must exercise sufficient control over the terms and conditions of a plaintiff's employment.  Id. at 1360.  Courts usually make such a determination by

---

[30] While Plaintiff includes a separate section heading entitled "Evidence demonstrating that TPS employed Plaintiff," there is no language or support provided for a single employer theory.  (See Doc. 72-1, at 13-15).

analyzing whether, as a matter of practice, an entity has control over: (1) the means and manner of the plaintiff's work performance; (2) the terms, conditions, or privileges of the plaintiff's employment; and (3) the plaintiff's compensation.  Llampallas v. Mini-Circuits, Inc., 163 F.3d 1236, 1245 (11th Cir. 1998).

In this case, Plaintiff points to two pieces of evidence that he asserts establishes TPS as his joint employer – a Confidentiality Agreement executed by Plaintiff in favor of the "Tyler Perry Companies," and the TPS policies and procedures that were distributed to Plaintiff by Areu, the AA manager.  (Doc. 72-1, at 15-18).[31]  This is insufficient.  As TPS points out, Plaintiff repeatedly acknowledged that he was employed solely by AA, even if at some point he believed he might (also) have been employed by TPS.  The uncontroverted evidence demonstrates that TPS and AA were/are separate corporate entities, Plaintiff repeatedly identified AA as his employer in employment documentation and testimony; Plaintiff was hired, paid, and fired solely by AA; and Plaintiff's job duties were controlled by AA through Sheedy and Areu (and/or communicated through Hendrix).  The only control TPS had over Plaintiff was his access

_____

[31] Parts of Plaintiff's argument appears unfinished, as evidenced by a word-processing program "comment."  However, it is not the responsibility of the Court to fill out any blanks left in Plaintiff's arguments.  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (en banc) (In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (internal quotation marks omitted).

to its facilities, which is not alone sufficient to establish and employment relationship. The Confidentiality Agreement and TPS policies and procedures do not save Plaintiff's argument. When Plaintiff signed the Confidentiality Agreement, he represented that his employer was AA, demonstrating the Confidentiality Agreement was signed by Plaintiff in relation to his employment by AA, even if the promises enured to the benefit of "Tyler Perry Companies" while he was working for AA at the TPS facility. (See Pl.'s Dep. Ex. 2, at 3 ("Company/Affiliation: And Action, LLC"); Pl.'s Dep. 43:20-22 (Plaintiff personally hand-wrote "And Action, LLC" on the form)). That TPS wished to maintain confidentiality during a production company's use of its facilities is understandable (and potentially necessary in relation to productions by third parties), and does not implicate control over Plaintiff's actual employment. Similarly, that the AA manager gave Plaintiff a set of TPS policies and procedures – which relates almost exclusively to access to the various TPS facilities by any person on the TPS premises – only serves to support the fact that AA was operating on another company's property, not that the property owner, TPS, was suddenly transformed into Plaintiff's employer. (Pl.'s Dep. 161-62, Ex. 14)

Regardless, the focus of the "employer" inquiry is "the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." Llampallas, 163 F.3d at 1244-45. Plaintiff has asserted claims under Title VII for harassment and retaliatory discharge, which in no way relate to the Confidentiality Agreement or to the TPS policies Plaintiff received. Plaintiff has set forth no evidence to established that TPS exercised any real control over Plaintiff, Hendrix, or any other

45

AA employee, and it is uncontroverted that Plaintiff was hired, paid, directed, and fired solely by AA without any interference by TPS. Plaintiff's mistaken and unexplained belief that he was employed by TPS will not change the facts of his objective employment situation. Accordingly, Plaintiff has not met his burden in showing that TPS was Plaintiff's joint employer under Title VII, and summary judgment should be **GRANTED** as to Plaintiff's Title VII claims for this reason alone.

### D.    Plaintiff's Substantive Title VII Claims

Even if Plaintiff's claims against AA and TPS did not fail for the reasons discussed above, Plaintiff still fails to establish a substantive claim under Title VII. Plaintiff's Amended Complaint alleges that AA and TPS are liable under Title VII (1) on the basis of Hendrix's alleged sexual harassment, and (2) for retaliating against him when he was discharged. (Am. Compl. ¶¶ 16-32). Defendants AA and TPS argue those claims fail for multiple reasons.

### 1.    Plaintiff's Title VII Harassment/Hostile Work Environment Claim

Title VII makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of the individual's sex, race, or national origin. 42 U.S.C. § 2000e-2(a)(1); Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1244 (11th Cir. 2004). A discriminatory hostile work environment is a prohibited alteration of the terms and conditions of an employee's employment under Title VII. Hulsey, 367 F.3d at 1244. To prove hostile work environment harassment under Title VII, the plaintiff must show that (1) he belongs to

46

a protected group; (2) he has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatory abusive work environment; and (5) a basis for holding the employer liable exists. Hulsey, 367 F.3d at 1245; Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). In establishing these elements, a plaintiff must present concrete evidence in the form of specific facts, not just conclusory allegations and assertions. Davis v. United States Postmaster Gen., 190 F. App'x 874, 877 (11th Cir. 2006).

Defendants argue that Plaintiff cannot make out the final two elements of his claim. To establish the "severe or pervasive" element, a plaintiff must show not only that he subjectively perceived the working environment to be abusive, but also that a reasonable person would view the environment as hostile and abusive. Miller, 277 F.3d at 1276; see also Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). In evaluating whether the harassment was objectively hostile in this respect, the Court considers the totality of the circumstances, which includes among other things, "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. Moreover, "[a]s a general proposition, employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees." Meece v. Atl. Se. Airlines, Inc., No. 1:04-CV-3698-WSD-ECS, 2006 WL 2228937, at

47

*2 (N.D. Ga. Aug. 2, 2006) (quoting P.F. v. Delta Air Lines, Inc., 102 F. Supp. 2d 132, 138 (E.D. N.Y. 2000) and citing Greer v. Marco Warehousing, Inc., 179 F. Supp. 2d 1332, 1340 (M.D. Ala. 2001). Conduct that occurs primarily off-duty between co-workers at a residence or other third-party establishment typically cannot create a sufficient nexus with a plaintiff's employment to constitute a hostile work environment. Meece, 2006 WL 2228937, at *12.[32]

In this case, Plaintiff complains only of conduct by Hendrix, a co-worker.[33] Plaintiff argues the conduct creating a hostile environment in his workplace[34] was that

_____

[32] On the other hand, "when 'a supervisor uses his authority to compel the victim of harassment to meet outside the office . . . the harassing acts might be imputed to the employer.'" Geggatt v. Deese, No. 608CV-1307-ORL-28DAB, 2009 WL 2913533, at *5 (M.D. Fla. Sept. 10, 2009) (quoting Devlin v. Teachers' Ins. & Annuity Ass'n of Am., No. 02 Civ. 3228(JSR), 2003 WL 1738969, at *2 (S.D. N.Y. Apr. 2, 2003)).

[33] The uncontested evidence demonstrates – despite Plaintiff's unsubstantiated subjective belief to the contrary – that Hendrix had no authority to hire or fire employees, Hendrix did not make any hiring or termination decisions with regard to Plaintiff (other than to put in a good word to Sheedy), Hendrix had largely the same responsibilities as Plaintiff, and Hendrix was paid the same as Plaintiff. While Hendrix was a veteran PA, and Sheedy used him as a conduit to issue work assignments to and collect information from PAs, Hendrix was not responsible for making significant decisions about Plaintiff's work assignments or position. Under controlling authority, Hendrix was no more than a co-worker for purposes of Title VII. See Vance v. Ball State Univ., 133 S. Ct. 2434 (2013). Plaintiff's conclusory arguments, without any citation to record evidence, that Hendrix could control his time off and/or could determine his work assignments and responsibilities, is not probative on the issue – both because there is no factual support for the propositions and because the undisputed evidence demonstrates that Hendrix could not in fact do these things. (See, e.g., Areu Decl. ¶¶ 14-17; Hendrix Decl. ¶¶ 2, 8; Hendrix Dep. 26, 50; Sheedy Decl. ¶ 9; Reyes Dep. 66-68, 82; Peterson Decl. ¶ 4; Morris Decl. at ¶ 4).

[34] Plaintiff argues Hendrix's conduct outside of the workplace should be considered as well, but fails to provide any connection between that conduct – at

48

(1) Plaintiff was not allowed to communicate with other employees in the workplace; (2) Hendrix touched his leg three times; (3) Hendrix used nicknames such as "Daddy O" and "Baby boy" that Plaintiff did not like; (4) Hendrix watched Plaintiff "constantly"; and (5) Plaintiff was harassed and humiliated by Hendrix in front of his co-workers.  (Doc. 81 at 10-11).  With regard to Plaintiff's first, fourth, and fifth complaints, he argues entirely in generalities and conclusions and fails to support his contentions with citation to any specific facts or record evidence; accordingly, they will not support his claim for hostile work environment.  See Davis, 190 F. App'x at 877; see also Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (mere conclusions and unsupported factual allegation are insufficient to defeat summary judgment).  Therefore, this Court will consider whether the remaining conduct can constitute a hostile work environment.

The Eleventh Circuit has stated that "[a]ll the sexual hostile work environment cases decided by the Supreme Court [have] involved patterns or allegations of extensive, long lasting, unredressed and uninhibited sexual threats or conduct that permeated the

---

Hendrix's home or out socializing – and his employment to warrant its consideration as part of a hostile work environment claim.  Meece, 2006 WL 2228937, at *2. Indeed, it is undisputed that Hendrix's conduct did not interfere with Plaintiff's job. Plaintiff testified that Hendrix's conduct did not affect his job performance or motivate him to quit.  (Pl.'s Dep. 208-10).  Hendrix was never critical of Plaintiff's work and never commented to Plaintiff or anyone else that Plaintiff would not be recommended back to future productions.  Additionally, Plaintiff was never disciplined or written-up for any infraction or poor performance.  (Pl.'s Dep. 211-16).  Thus, Hendrix never criticized Plaintiff's work or conditioned any tangible job action on Plaintiff consenting to any type of sexual advance, Plaintiff had no intention of quitting his job based upon Hendrix's alleged conduct, and it cannot be said that any off-duty conduct was connected to the workplace.  (AASMF ¶¶ 60-61).

AO 72A
(Rev.8/82)

plaintiff's work environment." <u>Webb-Edwards v. Orange Cty. Sheriff's Office</u>, 525 F.3d 1013, 1028 (11th Cir. 2008) (citing <u>Gupta v. Fla. Bd. of Regents</u>, 212 F.3d 571, 586 (11th Cir. 2000)). Even assuming that (1) there was sexual flirtation in the nicknames Hendrix used in reference to Plaintiff[35] and (2) that there was anything sexual about Hendrix touching Plaintiff's leg,[36] case law in this Circuit is clear that Hendrix's conduct here was not sufficiently severe and pervasive to constitute an actionable hostile work environment claim. <u>See e.g.</u>, <u>Corbitt, et al. v. Home Depot U.S.A.</u>, 573 F.3d 1223, 1241 (11th Cir. 2009) (frequent flirtatious or overtly sexual comments along with three instance of massages, and pressing body against plaintiff so that he touched her "privates" not sufficient), <u>reversed on other grounds</u>, 589 F.3d 1136; <u>Gupta</u>, 212 F.3d at 584-85 (comment that plaintiff was beautiful, leering and staring behavior, frequent phone calls to plaintiff's house, placing hand on plaintiff's knee and, separately, on her dress not sufficient); <u>Guthrie v. Waffle House, Inc.</u>, 460 F. App'x. 803, 807 (11th Cir. 2012) (hugging and kissing not sufficient); <u>Lockett v. Choice Hotels Int'l, Inc.</u>, 315 F. App'x 862, 863-67 (11th Cir. 2009) (sexual remarks and two instances of touching over four month period not sufficient); <u>Otu v. Papa John's USA, Inc.</u>, 400 F. Supp. 2d 1315, 1327 (N.D. Ga. 2005) (female harasser was frequently flirtatious, introduced plaintiff as

---

[35] Hendrix denies that he intended any sexual flirtation by using nicknames.

[36] The question is whether the conduct was objectively unreasonable. Peterson and Morris both testified that there was nothing sexual or inappropriate about the leg-touching incidents, and that they would not have had an issue if Hendrix did the same to them. (Morris Decl. ¶¶ 8-9; Peterson Decl. ¶¶ 8-9).

boyfriend, told him "I love you," hugged him, and rubbed her breasts against him five times); see also  Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999) (senior manager frequently visited plaintiff's work area without a business purpose, called her on her personal beeper during work hours, called her out to the hallway to talk, hung up on anyone else who answered the phone, and flirted with her); Henderson v. Waffle House, Inc., 238 F. App'x 499, 502 (11th Cir. 2007) (manager pulled plaintiff's hair, called her "Dolly," told her she looked like she was going to burst when she wore a new shirt, told her "they did not make aprons big enough for boobs like [hers]," and told her not to stand so close to him because she made him nervous and he would get in trouble if he told her why).

Only when combined with more egregious or objectionable conduct – such as more extreme physical contact, conduct by supervisors, or conduct so frequent it interferes with job performance – will the harassment be considered hostile.  See, e.g.,  Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1248 (11th Cir. 2004) (coworker's conduct toward plaintiff involved "many direct as well as indirect propositions for sex," including "following her into the restroom, and repeated attempts to touch her breasts, place his hands down her pants, and pull off her pants," as well as "enlisting the assistance of others to hold her while he attempted to grope her"); Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 509 (11th Cir. 2000) (co-worker's conduct toward the plaintiff "included giving [her] unwanted massages, standing so close to [her] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts.");

51

Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 418 (11th Cir. 1999) (daily abuse by supervisor in the form of sexually explicit comments, and physical harassment including demands to sit on different laps, squeezing plaintiff so hard she urinated, rubbing plaintiff's buttocks with groin, grabbing or slapping her buttocks or leg); Smith v. Penfanis, 652 F. Supp. 2d 1308, 1328 (N.D. Ga. 2009) (constant, explicit sexual propositioning, grabbing plaintiff from behind, forcing his crotch into plaintiff's buttocks to simulate sex).  Moreover, even considering Plaintiff's conclusory allegations and Hendrix's conduct outside the workplace – the attempted kiss and hug, flirtation, and watching Plaintiff[37] – the Eleventh Circuit has rejected as insufficiently severe and pervasive conduct more egregious.  See Mitchell v. Pope, 189 F. App'x 911, 913 (11th Cir. 2006) (conduct not severe and pervasive when harassing co-worker tried to kiss plaintiff; called her a "frigid bitch"; made multiple sexual comments such as "you must be working out," "you sure do look fine," "your ass sure does look fine," and that she could "just walk into the room and [he gets] an erection"; arrived at her home on numerous occasions, once drunk, telling her that he loved her; attempted to look down her shirt; rubbed up against her; chased her around the office; once picked her up; asked her in telephone conversations if she was dressed or naked; opened the women's

_____

[37] Plaintiff does not explain how his inability to communicate with other employees was harassment based on sex, nor does Plaintiff suggest it was retaliatory. Accordingly, this Court will not consider it as part of a sexually hostile work environment claim.  Jones v. UPS Ground Freight, 683 F.3d 1283, 1297 (11th Cir. 2012) ("[O]nly conduct that is 'based on' a protected category may be considered in a hostile work environment analysis.").

bathroom door and turned the lights off when he knew plaintiff was inside; simulated "humping" another female employee; made other sexual comments and gestures about another woman; referred to another employee in a derogatory manner; and asked plaintiff to go to a hotel hot tub with him when they were at a conference). As a result, Plaintiff cannot make out the severe and pervasive element of his hostile work environment claim. Accordingly, Plaintiff's claim fails on this basis, and summary judgment should be **GRANTED**.[38]

Even if Plaintiff could have made out the severe and pervasive element, Defendants have demonstrated an affirmative defense. As noted above, to make out a case of hostile work environment sexual harassment, there must be a basis for holding the employer liable. In order to establish a basis for holding AA or TPS liable for a hostile work environment for Hendrix's harassment, Plaintiff must show that AA and/or TPS had notice of the alleged harassment and failed to take immediate and appropriate corrective action. Miller, 277 F.3d at 1278-80; Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000); see also Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1303-04 (11th Cir. 2007); Fleming v. Boeing Co., 120 F.3d 242, 246 n.4 (11th Cir.

---

[38] Because the Court finds the conduct not sufficiently severe or pervasive as an objective matter, it need not address Plaintiff's subjective perception, but notes that summary judgment may be granted if a plaintiff's interactions with the alleged harasser are demonstrably inconsistent with a subjective perception of harassment. MackMuhammad v. Cagle's Inc., 379 F. App'x 801, 805-06 (11th Cir. 2010); Lockett, 315 F. App'x at 865-66. Here, Plaintiff was involved socially with Hendrix before, during, and after his employment with AA, testified that his job performance was not impacted, and never complained to supervisors at work about Hendrix's alleged sexual harassment.

1997); <u>Cramer v. Bojangles Rests., Inc.</u>, No. 2:10-CV-0159-RWS-SSC, 2012 WL 716176, at *10 (N.D. Ga. Feb. 8, 2012), <u>R&R adopted</u>, No. 2:10-CV-0159-RWS, 2012 WL 716028 (N.D. Ga. Mar. 6, 2012), <u>aff'd</u>, 498 F. App'x 885 (11th Cir. 2012).  A plaintiff must therefore show, at a minimum, either that the employer knew or should have known of the co-worker harassment, <u>Miller</u>, 277 F.3d at 1278; <u>Breda</u>, 222 F.3d at 889, in particular, actual or constructive knowledge by a supervisor or senior management. <u>Nurse "Be" v. Columbia Palms W. Hosp. L.P.</u>, 490 F.3d 1302, 1307 n.8 (11th Cir. 2007).  Plaintiff testified that he did not tell any supervisor or manager at AA or TPS about his concerns regarding Hendrix's alleged sexual harassment, and no AA supervisor or manager had any knowledge regarding such allegations. (Pl.'s Dep. 94-96, 144-49, 188-193, 258; Areu Decl. ¶ 20; Sheedy Decl. ¶ 15).  Likewise, Plaintiff has presented no argument or evidence that any supervisor or manager should have known of Hendrix's alleged harassment.  Moreover, Plaintiff did not utilize AA's (and/or TPS) sexual harassment reporting policies – of which he was aware – which precludes an inference of constructive knowledge.  <u>Farley v. Am. Cast Iron Pipe Co.</u>, 115 F.3d 1548, 1554 (11th Cir. 1997).  For this separate reason, Plaintiff does not have a basis for holding AA and/or TPS liable, and summary judgment should be **GRANTED** as to his hostile work environment claim.

2.    <u>Plaintiff's Title VII Retaliation Claim</u>

Title VII makes it unlawful for an employer to retaliate against an employee because he has (1) opposed any employment practice made an unlawful by Title VII (the

54

opposition clause) or (2) "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the participation clause).  42 U.S.C. § 2000e-(3)(a); Mulkey v. Bd. of Comm'rs of Gordon Cnty., 488 F. App'x 384, 389 (11th Cir. 2012); Howard v. Walgreen Co., 605 F.3d 1239, 1244 (11th Cir. 2010); Anduze v. Fla. Atl. Univ., 151 F. App'x 875, 878 (11th Cir. 2005); McShane v. United States Att'y. Gen., 144 F. App'x 779, 787 (11th Cir. 2005). Under the participation clause, expansive protection is available to an employee who participates in adjudicative kinds of proceedings conducted by the federal government and its agencies.  EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000). Plaintiff does not contend that he filed a charge of discrimination until after he was terminated; thus, Plaintiff is not proceeding under the participation clause.  Instead, Plaintiff seeks to prove that he engaged in protected opposition to discrimination.  Total Sys. Servs., 221 F.3d at 1174.

In the absence of direct evidence, as in the instant case, claims of retaliation pursuant to Title VII follow the McDonnell Douglas burden-shifting framework.  Jackson v. Geo Grp., Inc., 312 F. App'x 229, 233 (11th Cir. 2009); Goldsmith v. City of Atmore, 996 F.2d 1155, 1162-63 (11th Cir. 1993).  To make out a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action by the employer simultaneously with or subsequent to such protected activity; and (3) a causal connection exists between the protected activity and the adverse employment action.  Crawford v. Carroll, 529 F.3d

961, 970 (11th Cir. 2008).

Defendants argue Plaintiff cannot demonstrate that he either engaged in protected activity or that there was a causal connection between any protected activity and his termination. An employee is protected by the opposition clause under Title VII if he has engaged in "protected expression" – reporting an employment practice based on a good faith, reasonable belief that the employment practice violated Title VII. Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311-12 (11th Cir. 2002); Bryant v. United States Steel Corp., 428 F. App'x 895, 897-98 (11th Cir. 2011); Anduze, 151 F. App'x at 878; Little v. United Techs., 103 F.3d 956, 960 (11th Cir. 1997). Plaintiff's complaints about Hendrix to Peterson, Segars, and Diaz about Hendrix's possible interference with the union application process do not constitute protected expression under Title VII. Hamilton v. Sheridan Healthcorp Inc., 602 F. App'x 485, 489 (11th Cir. 2015) (explaining that a complaint about an employment practice only constitutes protected opposition if the individual explicitly or implicitly communicates a reasonable belief that the practice constitutes unlawful employment discrimination under Title VII); Murphy v. City of Aventura, 383 F. App'x 915, 918 (11th Cir. 2010) (concluding that employee who complained that city manager was bullying her did not engage in protected activity because there was no communication that employee perceived the conduct to be sexually harassing); Birdyshaw v. Dillards, Inc., 308 F. App'x 431, 436-37 (11th Cir. 2009) (where written complaint did not reference gender discrimination or any other discrimination prohibited by Title VII and where verbal complaint only suggested

discrimination on the basis of age, employee did not engage in protected activity under Title VII).[39]

Additionally, Plaintiff cannot establish a causal connection between his protected activity and his termination. To establish the requisite causal connection, Plaintiff must, at a minimum, show that the decisionmaker was aware of his protected conduct, and the protected activity and the adverse action were not wholly unrelated. McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008), cert. den'd McCann v. Cochran, 555 U.S. 944 (2008). Here, it is undisputed that the decisionmaker with regard to Plaintiff's termination, Areu, was unaware of any problems Plaintiff might have had with Hendrix. (Areu Decl. at ¶ 20; Plaintiff Dep. 147-49). Accordingly, the relevant decisionmaker was

---

[39] Plaintiff attempts to create a genuine issue of material fact to survive summary judgment by submitting a self-serving declaration which appear to be a sham and will thus be disregarded by the Court. See Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1237 (11th Cir. 2010) ("A court may determine that an affidavit is a sham when it contradicts previous deposition testimony and the party submitting the affidavit does not give any valid explanation for the contradiction"); Van T. Junkins and Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). During his deposition, Plaintiff clearly testified that he complained to Peterson, Segars, or Diaz about Hendrix's involvement in a union-related application (at best, he could not say what he complained about). Plaintiff's Declaration which generally states that he complained about "Hendrix's harassing behavior" to Peterson, Segars, and Diaz contradicts his testimony without any explanation, and will not be considered. (Doc. 71-3). Similarly, Plaintiff's claims in his brief – that he had been personally informed by Tyler Perry "that he should come to him if he ever needed anything" and that he was trying to find Tyler Perry on the day of his arrest to attempt to report Hendrix's behavior – has no citation, and the Court is not aware of any record evidence substantiating it. Accordingly, his argument that his conduct on the day of his arrest and discharge constituted protected activity also fails. (Doc. 71-2, at 14-18).

not aware of any protected activity and, therefore, no causation exists.    McCann, 526 F.3d at 1376; see also Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002).  Because Plaintiff has not demonstrated that he engaged in protected conduct or that there was any causal connection between protected conduct and his termination, Plaintiff's cannot establish a claim for retaliation under Title VII.

Furthermore, even assuming Plaintiff could establish a prima facie case, his retaliatory termination claim still fails because Plaintiff cannot raise a genuine issue of material fact regarding whether the reason given for his termination was pretextual.  Once a plaintiff makes out a prima facie case, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action."  Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999). "If the defendant offers legitimate reasons, the presumption of retaliation disappears," and "[t]he plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct."  Id.  A plaintiff raises a genuine issue of material fact concerning pretext if the plaintiff casts sufficient doubt on the defendant's proffered non-retaliatory reasons to permit a reasonable factfinder to conclude that the proffered reasons were not actually what motivated its conduct.  McCann, 526 F.3d at 1375-76.  A plaintiff must meet each of the employer's legitimate reasons "head on" and not simply quarrel with the wisdom of the reasons. Chapman, 229 F.3d at 1030.

Here, AA presents undisputed evidence that it discharged Plaintiff due to his

erratic and potentially unlawful conduct on October 30, 2014.  (See Areu Decl. ¶ 37).

Plaintiff's only response is effectively "but they made me do it"; he argues briefly that

"AA fails to acknowledge that Plaintiff's behavior was a reaction to him being refused

access to report Hendrix's behavior to some authority that would actually help."  (Doc.

71-2, at 14-15).  This does not meet AA's reason head on; Plaintiff admits that he never

approached his supervisors or managers at AA, and that no one would have any reason

to know why Plaintiff barricaded himself within a TPS office.  (Pl.'s Dep. 258-59 ("Q:

At the time you went up there, there's not a soul on the property who knew what you

might have been wanting to talk to Mr. Perry about, correct?  A:  Correct.").  Thus,

Plaintiff has not satisfied his burden of showing the proffered reason for his termination

was pretextual, and his retaliation claim cannot survive summary judgment for this

additional reason.  Accordingly, for each of the reasons discussed above, summary

judgment should be **GRANTED** as to Plaintiff's Title VII retaliation claim.

### E.    Plaintiff's State Law Claims

Because the Court has recommended that summary judgment be granted on

Plaintiff's federal law claims, the undersigned is now recommending that Plaintiff's state

law claims be dismissed without prejudice.  According to 28 U.S.C. § 1367, "[t]he district

courts may decline to exercise supplemental jurisdiction over a claim under subsection

(a) if the district court has dismissed all claims over which it has original jurisdiction."

28 U.S.C. § 1367(c)(3).  The Supreme Court explained that exercising supplemental

jurisdiction requires a federal court to consider judicial economy, convenience, fairness,

AO 72A
(Rev.8/82)

and comity.  The Court held that:

> When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of a lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) (footnote omitted); see also Novak v. Cobb Cty.-Kennestone Hosp. Auth., 849 F. Supp. 1559 (N.D. Ga. 1994) (dismissing state law claims without prejudice upon granting summary judgment on all pending federal claims), aff'd, 74 F.3d 1173 (11th Cir. 1996).  Because the Court is recommending that Plaintiff's federal claims be dismissed, Plaintiffs' only remaining claims rely on applicable state law.  The undersigned therefore **RECOMMENDS** that Plaintiff's remaining state law claims of negligent hiring, supervision, and retention/failure to provide a safe working environment; intentional infliction of emotional distress; battery; and invasion or privacy claims against the moving Defendants be **DISMISSED WITHOUT PREJUDICE**.[40]

## CONCLUSION

Based on the foregoing, Defendants' initial Motion to Extend Discovery and For Sanctions is **DENIED AS MOOT**.  (Doc. 48).  Because the undersigned is recommending granting the moving Defendants' motions for summary judgment, this Court is also **RECOMMENDING** that the moving Defendants' renewed Motion for

---

[40] As noted above, this Court does not have jurisdiction over the claims asserted against Defendant Tyler Perry, accordingly the libel claim against him is subject to dismissal as well.

Sanctions be **GRANTED IN PART AND DENIED IN PART** should the Court elect to retain jurisdiction. (Doc. 66). Additionally, this Court **RECOMMENDS** that the moving Defendants' motions for summary judgment be **GRANTED** with regard to Plaintiff's federal claims, and that Plaintiff's state law claims be **DISMISSED**. (Docs. 61, 62, 63).

**SO ORDERED AND REPORTED AND RECOMMENDED**, this __3__ day of February, 2017.

/s/LINDA T. WALKER_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

61